**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MEI PANG, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>       v.<br><br>MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING,<br><br>       Defendants. | Case No. 1:22-CV-1191-DAE<br><br>CLASS ACTION |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................ 3

    A.  Core's Hosting Operations Were a Major Part of Its Business ............................ 3

    B.  Core Attempted to Pass Through Its Increased Power Costs to Its Hosting Customers in Contravention of Their Fixed Rate Contracts.................................. 4

    C.  Customers Rejected the New Fees, Leading to Core's Bankruptcy ..................... 5

III.  ARGUMENT ..................................................................................................... 7

    A.  The Court Must Disregard Defendants' Voluminous Submissions of Materials Extrinsic to the Complaint .................................................................. 7

    B.  The Complaint Adequately Alleges Violations of the Securities Act .................. 9

        1.  Rule 8(a) Pleading Standards Apply to Plaintiffs' § 11 Claims ................ 9

        2.  The Complaint Adequately Alleges Misleading Omissions.................... 11

        3.  Defendants' Arguments Regarding Falsity Are Without Merit............... 14

    C.  The Complaint Adequately Alleges Violations of Section 14(a) ........................ 19

    D.  The Complaint Adequately Alleges Securities Fraud.......................................... 20

        1.  Defendants Falsely Assert that No Plaintiff Purchased Shares of Core Stock after July 2022 ................................................................. 20

        2.  The Complaint Alleges Actionable Misrepresentations and Omissions During the Class Period ........................................................ 20

        3.  The Complaint Alleges a Strong Inference of Scienter ......................... 24

            a.  Defendants Knew or Recklessly Disregarded That Their Statements Were False or Misleading When Made .......................... 25

            b.  Defendants' Motive to Commit Fraud Further Supports a Strong Inference of Scienter ....................................................... 29

        4.  The Complaint Adequately Alleges Loss Causation ............................. 31

    E.  The Complaint Adequately Alleges Control Person Claims ............................... 34

IV.  CONCLUSION.................................................................................................. 35

i

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ....................................................................... 24

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ....................................................................... 26

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ....................................................................... 31

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ......................................................................... 25

*Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*,
   115 F. App'x 662 (5th Cir. 2004) ................................................................ 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................... 10

*Aubrey v. Barlin*,
   No. A-10-CA-076-SS, 2010 WL 3909332 (W.D. Tex. Sept. 29, 2010) ................ 33

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................... 10

*Borderplex Inv. Partners v. Borderplex Realty Tr.*,
   No. EP-16-CV-00193-KC, 2017 WL 1738080 (W.D. Tex. Apr. 5, 2017) .............. 16

*Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*,
   748 F.3d 631 (5th Cir. 2014) ............................................................... 8, 9, 18

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) ......................................................... 19

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016) ..................................................... 27, 28

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) .......................................................... 26

*Dawes v. Imperial Sugar Co.*,
   975 F. Supp. 2d 666 (S.D. Tex. 2013) ..................................................... 33, 35

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ..................................................... 28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..................................................... 31

*G.A. Thompson & Co. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ..................................................... 34

*Genesee Cnty. Employees' Ret. Sys. v. FirstCash Holdings Inc.*,
    No. 4:22-CV-0033-P, 2023 WL 2752846 (N.D. Tex. Mar. 31, 2023) ..................................................... 32

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021) ..................................................... 15

*Greenthal v. Joyce*,
    No. 4:16-CV-41, 2016 WL 362312 (S.D. Tex. Jan. 29, 2016) ..................................................... 19

*Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017) ..................................................... 30

*Heck v. Triche*,
    775 F.3d 265 (5th Cir. 2014) ..................................................... 35

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ..................................................... 9, 10

*In re Cassava Scis., Inc. Sec. Litig.*,
    No. 1:21-CV-751-DAE, 2023 WL 3442087 (W.D. Tex. May 11, 2023) ..................................................... 17, 32

*In re Cobalt Int'l Energy, Inc.*,
    No. CV H-14-3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ..................................................... 35

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008) ..................................................... 26, 31, 33

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16CIV3495ATBCM, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..................................................... 29

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    439 F. Supp. 2d 692 (S.D. Tex. 2006) ..................................................... 33, 34

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................... 10

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ..................................................... 10

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
    No. C 01-2661 MMC, 2005 WL 1869289 (N.D. Cal. Aug. 5, 2005).......................................35

*In re Express Scripts Holding Co. Sec. Litig.*,
    No. 16 CIV. 3338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ....................................24

*In re Fleming Companies Inc. Sec. & Derivative Litig.*,
    No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004)....................10, 26

*In re Greenlane Holdings, Inc. Sec. Litig.*,
    511 F. Supp. 3d 1283 (S.D. Fla. 2021) ....................................................................................24

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)......................................................................................16

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) .....................................................................................32

*In re Lehman Bros. Sec. & Erisa Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).....................................................................................34

*In re Maxwell Techs., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023 (S.D. Cal. 2014).....................................................................................30

*In re Mylan N.V. Sec. Litig.*,
    No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)..................................29

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)......................................................................................24

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    No. 08 CIV. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ................................14

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)......................................................................................15

*In re XP Inc. Sec. Litig.*,
    524 F. Supp. 3d 23 (E.D.N.Y. 2021) .......................................................................................18

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ...........................................................................................13, 30

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ...................................................................................................14

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...............................................................................................7, 8

iv

*Krim v. BancTexas Grp., Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ................................................................ 9, 10

*Kurtzman v. Compaq Computer Corp.*,
    No. CIV.A.H-99-1011, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)................................. 11

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................ 30

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ................................................................ 27

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ................................................................ 10

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................ passim

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ................................................................ 8, 26

*Magruder v. Halliburton Co.*,
    359 F. Supp. 3d 452 (N.D. Tex. 2018) ................................................................ 17

*Marcus v. J.C. Penney Co., Inc.*,
    No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ..................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................ 20

*McNulty v. Kanode*,
    No. A-13-CV-026-LY, 2013 WL 12077503 (W.D. Tex. Nov. 6, 2013) ................................. 9

*Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)................................................................ 33

*Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ................................................................ 13, 14

*Nasyrova v. Immunomedics, Inc.*,
    No. CIV.A. 14-1269 SRC, 2015 WL 382846 (D.N.J. Jan. 28, 2015) ................................. 18

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................ 25, 28

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017) ................................................................ 27

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ................................................................................................. 7

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................................ 30

*Nolte v. Cap. One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) ................................................................................ 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .............................................................................................. 17

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ................................................................................ 29

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   No. 18 CIV. 9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .............. 14

*Plagens v. Deckard*,
   No. 1:20-CV-2744, 2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ........................ 34

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ................................................................................ 28

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .............. 34

*PR Diamonds, Inc. v. Chandler*,
   91 F. App'x 418 (6th Cir. 2004) .......................................................................... 30

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ........................................................................ 31, 33

*Robbins v. Koger Properties, Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ............................................................................ 34

*Sec. Exch. Comm'n v. Sethi Petroleum, LLC*,
   No. 4:15-CV-00338, 2017 WL 3386047 (E.D. Tex. Aug. 7, 2017) ........................ 26

*Sorkin, LLC v. Fischer Imaging Corp.*,
   No. CIV.A. 03-CV-00631-R, 2005 WL 1459735 (D. Colo. June 21, 2005) .......... 26

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ................................................................................ 29

*Stone v. Life Partners Holdings, Inc.*,
   26 F. Supp. 3d 575 (W.D. Tex. 2014) .................................................................. 25

*Stratte-McClure v. Morgan Stanley,*
  776 F.3d 94 (2d Cir. 2015) ............................................................................. 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ........................................................................................ 25

*Veal v. LendingClub Corp.,*
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................................................ 26

*Walker v. Beaumont Indep. Sch. Dist.,*
  938 F.3d 724 (5th Cir. 2019) ............................................................................ 7

*Walker v. Rent-A-Ctr.,*
  No. 5:02-CV-3-DF, 2005 WL 8161388 (E.D. Tex. July 25, 2005) ................. 13

**Statutes**

15 U.S.C. § 78u-4(b)(2) .................................................................................... 24

**Rules**

Fed. R. Civ. P. 12(d) ........................................................................................... 8

Fed. R. Civ. P. 15(a) ......................................................................................... 35

**Regulations**

17 C.F.R. § 229.303 .................................................................................... 13, 19

Lead Plaintiff Morgan Hoffman and named plaintiffs Evan Achee and William J. Emanuel ("Plaintiffs") submit this memorandum in opposition to Defendants' motion (ECF No. 65, "Motion") to dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 62, "Complaint").

## I.    INTRODUCTION

Plaintiffs bring claims for violations of the federal securities laws against the current and former officers and directors of Core Scientific, Inc. ("Core" or the "Company"), a cryptocurrency mining company that went public through a "de-SPAC" merger at the beginning of 2022. Plaintiffs allege that Defendants made false and misleading statements and omissions in Core's SEC filings and in public statements by Core's CEO, Defendant Levitt, including in the Registration Statement and Proxy Statement issued by Core in connection with its "de-SPAC" merger. Plaintiffs bring negligence claims under Section 11 of the Securities Act of 1933 ("Securities Act") and Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), securities fraud claims under Section 10(b) of the Exchange Act, and control person claims under each statute.

As the Complaint alleges, Core had just two lines of business: (1) operating cryptocurrency mining rigs for its own benefit ("self-mining"), and (2) operating cryptocurrency mining rigs that it hosted at its facilities on behalf of third-party customers ("hosting"). Electricity costs are the primary costs associated with the mining business, which involves running thousands of specialized computers to solve algorithms and generate cryptocurrency. To attract hosting customers, Core offered fixed-rate contracts where customers agreed to a fixed price for electricity costs that would be charged based on the power consumption attributed to that customer's rigs. However, by late 2021, shortly before Core went public, the viability of its hosting business was threatened, as Core was squeezed between its own increasing power costs and its customers' fixed rate contracts. At that time, unbeknownst to investors, Levitt decided to attempt to pass Core's

1

increased power costs through to its hosting customers, despite the fact that the customers' fixed-rate contracts clearly did not permit Core to do so.

Defendants' statements during the Class Period misleadingly omitted the fact that Core was attempting to impose these "power cost pass-through" surcharges to its hosting customers in violation of their fixed rate contracts, concealing the material risk that the ill-conceived ploy would jeopardize Core's customer relationships and hosting business. When Levitt finally addressed these tactics in August 2022, after multiple customers and Core's own auditor had disputed the legality of the surcharges, he once again misled investors about the failing initiative that he had spearheaded, stating only that Core had "restructured [its] pricing to improve margins" and falsely claiming that "customer acceptance…validate[d] our new strategy."

Indeed, Core's hosting customers did dispute these charges and terminated their relationships with Core, decimating Core's hosting business. As a result of Core's tactics, one of its two largest customers, Celsius Network LLC ("Celsius"), engaged Core in extensive litigation. Celsius cited internal Core documents and deposition testimony that revealed the truth behind Core's improper actions. When the truth was finally revealed and the concealed risks materialized, the price of Core's securities plummeted, harming investors. In September 2022, upon Celsius' first public filing concerning the dispute, Core's share price fell over 10%. In October 2022, Core issued a "going concern" warning and revealed that it was considering bankruptcy, due in part to "the increase in electricity costs" and "the litigation with Celsius." On this news, Core's share price fell over 78%. In December 2022, Core filed for bankruptcy relief under Chapter 11, causing Core's stock to fall another 75% before being delisted by NASDAQ.

The Complaint adequately alleges each of the elements of its claims under Sections 11, 14(a), and 10(b), as well as the control person claims. The Court should deny Defendants' Motion.

## II.    STATEMENT OF FACTS

### A.    Core's Hosting Operations Were a Major Part of Its Business

Prior to January 2022, Core was a private company. Rather than going public through a traditional (and more strictly regulated) initial public offering ("IPO"), Core merged with a public special purpose acquisition company, or "SPAC," called Power & Digital Infrastructure Acquisition Corp. ("XPDI"). ¶¶87-91.[1] A SPAC, or "blank check" company, is a public shell corporation whose lone stated purpose is to acquire a private company. ¶83. Core and XPDI entered into an agreement in July 2021 to complete a "de-SPAC" transaction (the "Merger"). ¶87.

On January 3, 2022, Defendants issued a Proxy Statement soliciting the approval of the proposed Merger from XPDI shareholders, along with a substantively identical Prospectus issued in connection with (and forming part of) a Registration Statement registering the post-Merger Company's securities. ¶¶93-94. The Merger was approved, pursuant to the Proxy Statement, and consummated, with the surviving public company renamed "Core Scientific, Inc." and its securities redesignated as Core securities pursuant to the Registration Statement. ¶91.

Core operates blockchain computing data centers and engages in cryptocurrency mining, primarily for Bitcoin. ¶72. Bitcoin mining on a commercial scale involves operating thousands of specialized computing machines ("miners") working to solve complex cryptographic algorithms to generate Bitcoins. ¶¶6, 62. Commercial Bitcoin mining requires specialized facilities and support services capable of housing, maintaining, and most importantly, powering, these fleets of machines. ¶¶6, 77. Core provides these facilities and services at large scale, with some of their capacity devoted to their own machines ("self-mining") and some to third parties who contract

---

[1] References to "¶__" are to the paragraphs of the Complaint. References to "Def. Br." are to Defendants' memorandum of law in support of their Motion (ECF No. 65-1). References to "Baker Decl." are to the Declaration of Joshua Baker filed concurrently herewith.

with Core to host and operate machines for the third party's benefit ("hosting"). ¶¶77-79. Hosting revenues accounted for roughly 15% of Core's total revenues in 2021, and 25% in 2022. ¶233.

Electricity is the principal operating cost for any cryptocurrency mining fleet, as the miners consume large amounts of electricity. ¶¶7, 235. Leveraging its scale and buying power, Core sought to obtain favorable long-term power contracts from utility providers to streamline power costs. ¶¶7, 78. Core's ability to obtain favorable power rates appealed to Core's hosting customers, who entered fixed-rate contracts with Core. ¶8. Under these fixed-rate contracts, customers principally paid a fixed rate per kilowatt-hour based on the actual monthly energy consumption attributed to the customer's hosted miners. *Id.* This arrangement insulated customers from fluctuations in power rates. *Id.* The fixed rates for energy costs were the primary appeal for Core's customers, as it gave them predictable and stable input costs in running their mining operations. ¶9. In exchange, customers made substantial advance payments to Core, who could negotiate power agreements with utility companies with knowledge of its fixed hosting rates. *Id.*

**B.      Core Attempted to Pass Through Its Increased Power Costs to Its Hosting Customers in Contravention of Their Fixed Rate Contracts**

In late 2021, Core began to experience rising power costs, continuing into 2022. ¶¶10, 123. Core's hosting business had razor-thin profit margins, which vanished when Core was squeezed between persistent increases in power costs and its fixed rate contracts with its hosting customers. *Id.* In response, Core's then-CEO, Defendant Michael Levitt, decided that Core would attempt to pass through its increased power costs to its hosting customers. ¶¶10, 121-23.

In late 2021, Levitt told Core employees to "come up with a suggested plan" including a "Power Surcharge Fee" that would be charged to hosting customers for power cost increases. ¶¶11, 123. Core began rolling out a new version of its hosting contracts which, unlike the existing fixed-rate contracts, expressly permitted Core to pass through increases in Core's power costs to hosting

customers. *Id.* Core sought to switch all of its hosting customers to these new contracts. *Id.* However, in late 2021, Core also took the position that its existing fixed-rate hosting agreements also allowed Core to pass through its increased power costs. ¶¶12, 123. The existing contracts permitted Core to pass through to its customers "any new taxes, levies, tariffs or governmental fees and charges," and Core unilaterally decided that "tariffs" now meant utility costs. *Id.* Core then began adding "power cost pass-through" surcharges to its hosting customers' invoices. *Id.*

Core's opportunistic contract interpretation was met with strenuous resistance. Core's auditor, Ernst & Young ("EY"), specifically evaluated and pushed back on the practice, questioning the legal validity of Core's position. ¶¶13, 123. In fact, EY told Core that it should include an offsetting allowance in its financial statements to account for the likelihood that customers would dispute the surprising new surcharges. *Id.* Core's customers also rejected the new surcharges. Most notably, Celsius, one of Core's two largest customers, ardently disputed the new fees. ¶¶14, 112-14, 116. Several other hosting customers also challenged Core's new fees under their fixed rate contracts. ¶¶14, 123, 132. By July 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes. ¶245.

### C.     Customers Rejected the New Fees, Leading to Core's Bankruptcy

In September 2022, Celsius filed a motion for civil contempt in Celsius' bankruptcy proceedings, alleging that Core had imposed improper power cost pass-through surcharges. ¶¶16, 116. In its motion, Celsius explained how these surcharges violated the parties' hosting contract. *Id.* On this news, the Company's stock price fell over 10%. ¶¶116-18.

In October 2022, Core revealed that due to, among other things, "the increase in electricity costs, … and the litigation with Celsius," the Company would not make outstanding debt payments and was exploring strategic alternatives to its capital structure. ¶¶17, 133. Core also disclosed that "substantial doubt exists about the Company's ability to continue as a going concern." *Id.* On this

news, Core's stock price fell 78.1%. ¶134. In December 2022, Core filed for bankruptcy and its securities were delisted, rendering Core's securities virtually worthless. ¶¶18, 115, 136, 138.

In Core's bankruptcy proceedings, Celsius filed an objection "to set the record straight with respect to the terms of the Celsius Contracts," *i.e.,* its hosting agreements with Core. ¶¶19, 120. Celsius and Core had "engaged in significant discovery" in connection with Celsius' September 2022 motion and Celsius's objection cited the results of that discovery, noting that "Core's internal documents confirmed that Core knew it had no legal basis for unilaterally imposing these so-called 'pass-through' charges on Celsius, and that Core always has understood the Celsius Contracts to impose a 'fixed' rate.'" ¶121. Celsius explained how Core's attempts to pass through its own increased power costs to customers contravened the customers' fixed rate contracts and caused Core to lose most of its hosting business, including detailed citations to Core's internal documents and deposition testimony from Core's employees and executives. ¶123.

Indeed, as a direct result of Core's attempts to impose these new surcharges, Core lost at least 5-10 hosting customers. ¶¶15, 123-24. In fact, a total of 24 of Core's hosting contracts were terminated in the fourth quarter of 2022, leaving Core with only 14 remaining hosting customers by mid-December. ¶¶15, 124-25. Those customers accounted for as much as 88.7% of Core's hosting revenues, and as much as 22.1% of its total revenues for 2022. ¶126.

The mass departure of Core's hosting customers and extensive litigation with Celsius were material contributing factors to the deterioration of Core's financial condition, resulting in the October 2022 "going concern" warning and eventual bankruptcy. ¶¶22, 139-40. Those adverse events caused Plaintiffs and the Class to suffer significant losses. ¶¶22, 139-41. In less than a year, Core shareholders' investments were wiped out. By the time Core filed for bankruptcy, its stock price had completely collapsed before being delisted. ¶¶23, 136, 138.

### III.    ARGUMENT

The Court should deny Defendant's Motion because the Complaint adequately alleges each of the claims asserted therein. In assessing a motion to dismiss a complaint under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (noting that "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations").[2]

#### A.    The Court Must Disregard Defendants' Voluminous Submissions of Materials Extrinsic to the Complaint

In connection with their Motion, Defendants foist upon the Court 23 extraneous documents comprising over 2,000 pages. Defendants have not expressly requested that the Court take judicial notice of any of these documents, and it should not do so. Half of these documents bear no connection to the Complaint and Defendants submit them for the improper purpose of asking the Court to accept the truth of the matters asserted therein. Defendants are attempting to present their own alternate version of the facts, while their motion purports to challenge the sufficiency of the allegations of the Complaint under Rule 12(b)(6).

Fed up with defendants' persistent practice of submitting hundreds of meaningless pages in support of motions to dismiss, the Ninth Circuit cautioned that courts must resist "a concerning pattern in securities cases like this one: exploiting [incorporation by reference and judicial notice] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Ninth Circuit warned that this "unscrupulous use of extrinsic documents to resolve competing theories against

---

[2] Internal quotations and citations are omitted unless otherwise indicated.

the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery," cautioning that "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Id.* at 998–99.

In deciding a motion to dismiss under Rule 12(b)(6), "a district court generally must limit itself to the contents of the pleadings, including attachments thereto. The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings ***and are central to a plaintiff's claims***." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (emphasis added). "When deciding a motion to dismiss a claim for securities fraud on the pleadings," even when considering documents of which a court may take judicial notice, the Fifth Circuit has long held that "[s]uch documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). If the Court considers this extraneous material for the truth of the matters asserted therein, it must convert this Motion to one for summary judgment and permit the parties to conduct discovery. Fed. R. Civ. P. 12(d).

Defendants' Exhibits A, C, D, J, K, and L are cited or quoted in the Complaint to varying extents, but Defendants do not assert that the Complaint misquotes or takes out of context any section of any of these documents. Rather, Defendants cite these documents merely to provide additional background or other facts not referenced in the Complaint. None of these documents are cited for the purpose of "determining what statements the documents contain," *Lovelace*, 78 F.3d at 1018," but are instead offered only "to prove the truth of the documents' contents." *Id.*

*None* of the other 17 documents submitted by Defendants are quoted, cited, or even referenced in the Complaint. In no way are these other documents—Defendants' Exhibits B, E, F, G, H, I, M, N, O, P, Q, R, S, T, U, V, or W—incorporated by reference into the Complaint, nor are they "central to" Plaintiffs' claims. *Brand Coupon*, 748 F.3d at 635. While some of these documents may be subject to judicial notice as SEC filings (Exhibits B, and M-V), none are offered for a legitimate purpose and thus the Court must not consider them.[3]

The Complaint makes no reference to the documents Defendants submit as Exhibits E, F, G, or W. In no sense are these documents, comprising various news articles, "central to" Plaintiffs' claims. *Brand Coupon*, 748 F.3d at 635. Rather, these articles merely provide extraneous background information. That these articles exist or that the statements therein were made offers no substantive assistance to the Court's evaluation of Defendants' Motion. These materials serve no purpose other than Defendants' improper attempt to dispute the factual allegations of the Complaint at the pleading stage. The Court should refuse to consider these documents.

### B.      The Complaint Adequately Alleges Violations of the Securities Act

#### 1.      Rule 8(a) Pleading Standards Apply to Plaintiffs' § 11 Claims

Section 11 of the Securities Act was designed to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). The elements of a claim under Section 11 are: (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). "A 'material' fact is one which a reasonable investor would consider significant in the

---

[3] With respect to earnings call transcripts, *McNulty v. Kanode*, No. A-13-CV-026-LY, 2013 WL 12077503, at *5 (W.D. Tex. Nov. 6, 2013) concerned only "transcripts that were explicitly referenced in the complaint," which is not the case for Defendants' Exhibits H or I here.

decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Id.* Scienter is not an element of a Section 11 claim. *See Huddleston*, 459 U.S. at 382; *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001).

Notice pleading under Rule 8 is all that is required for Plaintiffs' Securities Act claims. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 596 (S.D. Tex. 2002). Under Rule 8, the complaint need only state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The heightened pleading requirements of Rule 9(b) do not apply to Securities Act claims where the plaintiffs disavow allegations of fraud. *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at *44 (E.D. Tex. June 16, 2004) (citing *Schlotzsky's*, 238 F.3d 363); *see also Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 669, n.30 (5th Cir. 2004) (negligent misrepresentation claims do not become subject to Rule 9(b) simply because they are based on the same operative facts as fraud claims); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003) (where the complaint "expressly states that the claims against [defendants] are not grounded in fraud, and because the claims can be viewed as grounded in strict liability or negligence, heightened pleading standards and scienter are not applicable").

The Complaint expressly disavows any fraud allegations in its Section 11 and Section 14(a) negligence claims. ¶¶154-55, 168-69. The Section 11 and Section 14(a) claims incorporate by reference only the preceding allegations in the Complaint, as opposed to the securities fraud allegations separately alleged after those claims, which allege unique sets of statements and

defendants. *Id.* Thus, there is no basis to support Defendants' assertion that Plaintiffs' Section 11 or Section 14(a) claims are "grounded in fraud." Def. Br. at 8. Plaintiffs need not allege "actual knowledge" or scienter for these claims.[4] In any event, Defendants do not identify a single instance in which Plaintiffs' negligence claims fail to satisfy the Rule 9(b) standard, were it to apply.

### 2. The Complaint Adequately Alleges Misleading Omissions

The Complaint alleges several actionable omissions of material fact in the Registration Statement which rendered certain statements contained therein misleading:

Statement 1: "Our financial performance and continued growth depend in large part on our ability … to attract customers for our hosting services. ***Increases in power costs, … will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.***" ¶97.[5]

Statement 2: "Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis each month for the duration of their contract***, which vary from one to three years in length." ¶99.

Statement 3: "Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. ***We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:***

… • ***we fail to provide competitive pricing terms or effectively market them to potential customers;*** …

If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations." ¶101.

---

[4] *Kurtzman v. Compaq Computer Corp.*, No. CIV.A.H-99-1011, 2000 WL 34292632, at *62 (S.D. Tex. Dec. 12, 2000) states only that "actual knowledge" must be alleged to defeat a "safe harbor" defense for forward-looking statements, which is not at issue here.

[5] Defendants incorrectly describe Statement 1 as a "risk disclosure," Def. Br. at 8. Statement 1 appears under a section titled, "Key Factors Affecting Our Performance." ¶97.

Statement 4:   We have generated a significant portion of our historical revenue from a small number of hosting customers. … ***Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships.*** … If these customers reduced spending on our services, … it could have a material adverse effect on our business, financial condition and results of operations. …. ¶103.

Statement 5:   ***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.*** … ¶105.

These statements were misleading because they omitted that Core was imposing power cost pass-through charges on its hosting customers in contravention of their fixed rate contracts, foreseeably jeopardizing Core's hosting business. ¶¶98, 100, 102, 104, 106.

Statement 1 misleadingly portrayed "increases in power costs" as impacting Core's ability to attract hosting customers and having a potential adverse effect on Core's business, while in truth it was Core's improper course of conduct *in response to its increased power costs* that was jeopardizing the Company's hosting business. ¶98.

Statement 2 was misleading because it omitted that while Core's hosting contracts entailed fixed rates for energy usage, Core was billing its customers for its own increased power costs, which violated the fixed-rate terms of those contracts. ¶100.

Statement 3 misleadingly portrayed the risk of Core being unable to attract hosting customers due to pricing terms as a future, hypothetical scenario, when in fact the risk had materialized already as Core was imposing power cost pass-through fees on its hosting customers in violation of the fixed-rate terms of their contracts. ¶102.

Statement 4 misleadingly portrayed the risk of Core being unable to attract hosting customers due to "failure to meet our end-users' expectations" including by an "inability to [provide] attractive rates" as a future, hypothetical scenario, when in fact the risk had materialized

12

already as Core was imposing power cost pass-through fees on its hosting customers in violation of the fixed-rate terms of their contracts. ¶104.

Statement 5 misleadingly portrayed the risk of Core's failure to accurately estimate its power costs as a future, hypothetical scenario, when in fact the risk had materialized already as Core's failure to accurately estimate its power costs had already led to Core's decision to impose improper surcharges on its customers in violation of their hosting contracts. ¶106.

"Once the defendants engaged in public discussions concerning the benefits of [certain developments], they had a duty to disclose a 'mix of information' that is not misleading." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248–49 (5th Cir. 2009). "We have long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Id.* A statement or omission is misleading where it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008).

Alternatively, Defendants' omissions violated Defendants' duty to disclose under Item 303 of Regulation S-K ("Item 303"). ¶¶107-11. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that … are reasonably likely to have a material … unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. *See Walker v. Rent-A-Ctr.*, No. 5:02-CV-3-DF, 2005 WL 8161388, at *13–14 (E.D. Tex. July 25, 2005) (finding plaintiffs had adequately alleged a violation of duty to disclose under Item 303).[6]

---

[6] The Fifth Circuit has not expressly opined on whether Item 303 creates a duty to disclose under the Exchange Act. In *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 436 (5th Cir. 2019), the court declined to address the issue because the case was resolved on other

Here, the undisclosed trend was Core's campaign to impose improper pass-through surcharges on its hosting customers, which was reasonably likely to have a materially adverse impact on Core's hosting business and financial condition. ¶109. This trend was "known" for the purposes of Item 303 because Levitt, Core's CEO, was the one who created and implemented the plan to pass through Core's power costs to its hosting customers. ¶¶10-12, 123. To be clear, "plaintiffs need not plead defendants' knowledge, as there is no scienter requirement in Section 11." *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 CIV. 9848 (PGG), 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) ("[t]he issue is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent").

### 3.   Defendants' Arguments Regarding Falsity Are Without Merit

Defendants' assertion that the Registration Statement disclosed the risk of increasing power costs, Def. Br. at 9, is a straw man argument that fundamentally mischaracterizes the allegations of the Complaint. Similarly, Defendants' argument that they had no duty to disclose a trend of increasing power costs under Item 303, Def. Br. at 17, misidentifies the undisclosed trend. The Complaint alleges that Defendants misleadingly omitted Core's course of conduct—imposing improper surcharges—*in response to* increasing power costs. ¶¶98, 100, 102, 104, 106, 109.

Defendants concede that risk disclosures may be misleading when they "warn of a risk that has already materialized." Def. Br. at 10.[7] Here, the Registration Statement did not warn of the

_____

grounds, but it noted that other circuits had held that Item 303 can support an actionable duty to disclose. *Id.* (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015)). The Fifth Circuit has substantively analyzed the sufficiency of disclosures under Item 303 in the context of Section 11 claims, suggesting the theory is viable. *C.f. Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) ("We must address whether the [omitted fact] was indeed a trend disclosure of which was required by Item 303," but finding no trend that had to be disclosed).

[7] This flatly contradicts Defendants' argument that warnings of hypothetical risks do not imply that the company is not currently facing those risks. In *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 CIV. 9203 (RJS), 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010), an outlier on this

risks that Core's attempts to impose improper surcharges on its customers would imperil Core's hosting business, and to the extent it did, the disclosures were inadequate and misleading because those risks had already begun to materialize. *See Lormand*, 565 F.3d at 249 (cautionary language was inadequate when defendants "recognized signs that those risks had already materialized"). "When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021) (quoting *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015)).

The Complaint also alleges that the undisclosed conduct creating the concealed risks had materialized by the time of the Registration Statement. For instance, the Complaint alleges that Core "began to face significant headwinds in its hosting business, including rising power costs" by late 2021. ¶¶10, 123. "In late 2021," in response to Core's increasing power costs, Levitt instructed Core employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases. ¶¶11, 123. "Core decided, beginning in late 2021," to begin adding power cost pass-through charges to its hosting customers' invoices. ¶¶12, 123.

The Complaint clearly does *not* allege that Core's first acute increase in power costs did not occur until February 2022, Def. Br. at 10 and 18, but only that one former employee "reported that Core experienced a particularly acute increase in power costs" around that time and again in the summer of 2022. ¶130. That Core continued experiencing increases in power costs throughout 2022 in no way undermines the Complaint's allegations that the increases in power costs and the

---

issue, the court acknowledged that other courts had found "that cautionary statements may constitute misleading statements where warned of contingency has already occurred," citing *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399–400 (S.D.N.Y. 2005).

implementation of Core's pass-through scheme had begun to materialize by the beginning of the year. Likewise, the fact that one former employee "first learned about Core passing through its increased power costs to its hosting customers during … meetings in the summer of 2022," ¶131, does not "undermine" Plaintiffs' allegations that the same conduct was occurring at the time of the Registration Statement. Def. Br. at 12. Plaintiffs' allegation that Core received "questions and concerns from customers" regarding the pass-through costs "prior to July 18, 2022," ¶123, does not negate Plaintiffs' allegations that the conduct began at the end of 2021. *See* ¶¶10-12, 123.

Defendants are also wrong that "Plaintiffs do not allege…what provisions of those contracts were allegedly breached." Def. Br. at 12. *See* ¶¶12 and 123 (citing specific contract language).[8] Defendants' broad contention that "power rates are public," Def. Br. at 11 and 17, is entirely beside the point as Plaintiffs do not challenge the disclosure of Core's power rates.

Defendants' argument that Statements 1 and 5 "do not suggest that the undisclosed improper activity alleged by Plaintiffs was not occurring," Def. Br. at 11-12, misses the point. Plaintiffs do not allege these statements were literally false, but that they were misleading by omitting the key link between the disclosed contingency—increased power costs or the Company's inability to accurately estimate its hosting contract pricing—and the risk to the Company's hosting business. ¶¶98, 106. Disclosing that those *contingencies* could harm Core's business was misleading by omitting that Core's *actions*, taken in response to those contingencies, had already materialized and were the true source of the risk.[9] "[I]t is well-settled that 'the ability of a statement

---

[8] Unlike here, *Borderplex Inv. Partners v. Borderplex Realty Tr.*, No. EP-16-CV-00193-KC, 2017 WL 1738080, at *9 (W.D. Tex. Apr. 5, 2017) involved Section 10(b) claims subject to the Rule 9(b) pleading standard, where the plaintiff failed to identify the allegedly misleading statements.

[9] This case is unlike *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012), where the court found that "there is no direct connection between Defendants' statements regarding the sources of its revenue and enrollment growth and the omitted information regarding ESI's predatory recruitment practices or quota system." This case likewise

to provide accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud cases.'" *In re Cassava Scis., Inc. Sec. Litig.*, No. 1:21-CV-751-DAE, 2023 WL 3442087, at *12 (W.D. Tex. May 11, 2023) (Ezra, J.); *Lormand*, 565 F.3d at 248; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

Likewise, Defendants' argument, that because Statements 2-4 make no representation about power or pass-through costs they cannot be rendered misleading, also falls flat. Statements 3 and 4 discussed the risks that Core's inability to provide "competitive pricing" or "attractive rates" to its customers may jeopardize its hosting business, while misleadingly omitting that Core was subverting the pricing and rates set out in their customers' contracts. ¶¶102, 104. Statement 2 misleadingly omitted that Core's power cost pass-through fees violated the fixed rate terms of its hosting contracts. ¶100. Defendants' argument that the statement that customers are "generally billed on a fixed" basis may be literally true also fails. Core sought to migrate "all" of its new and renewing customers to new contracts that permitted Core to pass through power cost increases, and thus did not have fixed rates. ¶123. For existing customers with fixed-rate contracts Core imposed the improper surcharges anyway, turning them into variable-rate contracts. *Id.*

Plaintiffs do not contend that Defendants had to disclose that Core was breaching its hosting contracts simply by virtue of committing the wrongdoing. Def. Br. at 16. Defendants had a duty to disclose that Core was engaged in conduct that entailed a material undisclosed risk of

---

bears no resemblance to *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 465 (N.D. Tex. 2018), where "the [complaint] simply asserts that the statements were misleading and asserts what the omitted information was, without drawing any kind of connection between the two." In contrast, the Complaint here alleges precisely the direct connection missing in those cases. ¶¶98, 106.

jeopardizing Core's hosting business, because Defendants undertook to speak about the sources of that risk in an incomplete and misleading manner. *Lormand*, 565 F.3d at 248–49.[10]

The fact that Core disclosed that it adjusted its contract pricing for "actual costs" has *nothing* to do with Core's improper surcharges. In the context of Core's hosting contracts, adjusting for "actual costs" simply refers to the fact that Core billed its customers in advance based on estimated power usage—at the agreed-upon fixed rate—subject to a subsequent "true up" adjustment after a customer's actual power usage was determined. Baker Decl., Ex. 1 (Celsius objection) at 14 ("Each month, Celsius pre-pays for hosting services an estimate of its anticipated hosting costs, which is calculated by Celsius' estimated power consumption per rig multiplied by the hosting-services rate. [citing Celsius contract]. Subsequent invoices are subject to a 'true up'").[11] The fixed rate did not change; the adjustment was merely to account for minor differences between the preliminary estimate and the final usage calculation. As Celsius' objection states, Core's own internal accounting memo "explained that [the Celsius contract] and Core's other hosting contracts were 'variable consumption not variable price.'" *Id.*

Finally, Defendants' argument that the Complaint fails to allege that the adverse *effect* of Core's undisclosed conduct had materialized at the time of the Registration Statement also fails. Defendants conflate falsity with loss causation—which is not an element of a Section 11 or Section 14(a) claim. Defendants failed to disclose Core's conduct which risked imperiling Core's hosting

---

[10] This case is unlike *Nasyrova v. Immunomedics, Inc.*, No. CIV.A. 14-1269 SRC, 2015 WL 382846, at *8 (D.N.J. Jan. 28, 2015), where the court found that a statement that a company's main customer "decided to concentrate development of [a pharmaceutical] for a different indication than originally planned," was not rendered misleading by the failure to disclose the customer had issued a notice of breach to the company unrelated to that decision. Similarly inapposite is *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37 (E.D.N.Y. 2021), which involved allegations of a failure to disclose government investigations of anticompetitive conduct.

[11] Plaintiffs request that the Court take judicial notice of this court filing, which the Complaint quotes extensively, ¶¶120-23, and is central to Plaintiffs' claims. *Brand Coupon*, 748 F.3d at 635.

business. That conduct materialized when Core began implanting its pass-through scheme in late 2021, and the Registration Statement concealed the risks by omitting that conduct. ¶¶10-12, 123. The *consequences* of those risks materialized later, causing Plaintiffs' losses. *See infra*, § III(D)(5) (addressing Plaintiffs' Section 10(b) loss causation allegations).[12] For Plaintiffs' claims under Item 303, the Complaint need not allege that the material adverse impact (losing hosting customers) of the undisclosed trend (Core's attempts to impose improper power cost surcharges) had already materialized, only that it was "reasonably likely" to do so. 17 C.F.R. § 229.303.

### C.   The Complaint Adequately Alleges Violations of Section 14(a)

The elements of a claim under Section 14(a) of the Exchange Act are: (1) a false or misleading statement or omission of material fact; (2) made with at least negligence; (3) in a proxy statement that was an essential link in the corporate action that caused the plaintiff's injury. *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 649 (S.D. Tex. 2016). The "[o]mission of information from a proxy statement will violate Section 14(a) and Rule 14a–9 if … the omission makes other statements in the proxy statement materially false or misleading." *Greenthal v. Joyce*, No. 4:16-CV-41, 2016 WL 362312, at *2 (S.D. Tex. Jan. 29, 2016).

As Defendants recognize, Def. Br. at 18, Plaintiffs' claims under Section 14(a) are based on allegations of misleading omissions in the Proxy Statement which are identical to the omissions in the Registration Statement, as discussed above in § III(B). Defendants challenge no other aspect of Plaintiffs' Section 14(a) claims. Thus, for the same reasons that the Complaint adequately alleges claims under Section 11, the Complaint also adequately alleges claims under Section 14(a).

---

[12] Defendants are also wrong that "Plaintiffs have no support for the allegation that any terminations were the result of pass through disputes." Def. Br. at 13. Core's own Revenue Accounting Manager testified that Core lost 5-10 clients as a result of its new decision to pass through rising power costs. ¶123. Plaintiffs also allege that a total of 24 hosting contracts were terminated as a result of Core's attempts to pass through its increased power costs." ¶¶125-27.

### D.      The Complaint Adequately Alleges Securities Fraud

The elements of a claim under Section 10(b) of the Exchange Act are: (i) a false statement or omission of material fact in connection with the sale or purchase of a security; (ii) made with scienter; (iii) upon which the plaintiff relied; and (iv) that caused plaintiff's losses. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). The Court assesses these claims under "the usual contours of a Rule 12(b)(6)" analysis, except that the inference of scienter must be strong and the misleading statements must be pleaded with particularity, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Lormand*, 565 F.3d at 239.

### 1.      Defendants Falsely Assert that No Plaintiff Purchased Shares of Core Stock after July 2022

Defendants falsely represent to the Court that "no Plaintiff purchased Core shares or warrants after July 2022." Def. Br. at 19. This is not true. The Lead Plaintiff, Mr. Hoffman, purchased 10,000 shares of Core common stock on October 19, 2022. ¶29 ("incorporat[ing] by reference" Mr. Hoffman's PSLRA certification, ECF No. 17-2 at 8). Defendants' arguments based on their false premise necessarily fail. Def. Br. at 19. Defendants either made a glaring oversight or purposefully attempted to mislead the Court, in either event failing their duty of candor.

### 2.      The Complaint Alleges Actionable Misrepresentations and Omissions During the Class Period

The Complaint alleges several actionable false and misleading statements and omissions of material fact during the Class Period, including and in addition to those contained in the Registration Statement and Proxy Statement. All of those statements and omissions serve as the basis for Plaintiffs' claims under Section 10(b).[13] *See* ¶¶185, 229.

---

[13] Contrary to Defendants' assertions, Defendants Eilers and Brombach are liable for the statements and omissions contained in the Registration Statement, which they signed. ¶¶94, 251.

After the Registration Statement, Defendants made false and misleading statements and omissions in the Company's 2021 annual report ("2021 10-K"), the Company's quarterly reports for the first and second quarters of 2022 ("22Q1 10-Q" and "22Q2 10-Q"), and in the Company's second quarter earnings call ("22Q2 Earnings Call"). Most of those statements were substantially identical to those in the Registration Statement (*supra* § III(B)(2)): Statement 1 was repeated in the 2021 10-K (¶187) and 22Q1 10-Q (¶198); Statement 2 was repeated in the 22Q1 10-Q (¶200) and 22Q2 10-Q (¶213); Statement 3 was repeated in the 2021 10-K (¶191) and 22Q1 10-Q (¶202); Statement 4 was repeated in the 2021 10-K (¶189), 22Q1 10-Q (¶204), and 22Q2 10-Q (¶217); and Statement 5 was repeated in the 2021 10-K (¶193), 22Q1 10-Q (¶206), and 22Q2 10-Q (¶219).[14] Those statements were misleading when repeated during the Class Period for the same reasons outlined above, *supra* § III(B)(2). Defendants' reiterated arguments about Statements 1-5, Def. Br. at 19-23, also fail when applied to the statements made during the Class Period. *Supra* § III(B)(3).

The Complaint also challenges as misleading additional statements in the 22Q2 10-Q:[15]

Statement 6:   Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us and/or seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be subject to factors outside of our control. ¶211.

Statement 7:   … ***Continued increases in power costs and unfavorable prices for digital assets will impact our ability to attract customers for our services, harm our growth prospects and could have a continuing material adverse effect on our business, financial condition and results of operations.***

---

[14] Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") were attached to the 2021 10-K (¶195), 22Q1 10-Q (¶208), and 22Q2 10-Q (¶221), which were false or misleading because the signors knew or recklessly disregarded that the subject reports contained misleading statements and omissions and did not fairly present Core's financial condition. ¶¶196, 209, 222.

[15] Defendants' contention that "Plaintiffs allege no facts suggesting that Core passed through power costs prior to June 2022," Def. Br. at 21-22, is wrong, *supra* § III(B)(3), but even if it were true it would have no bearing on statements made after June 2022 in the 22Q2 10-Q and 22Q2 Earnings Call (Statements 2, 4, 5, 6, 7, and 8).

> *… If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.* ¶215.

Finally, during the 22Q2 Earnings Call, Levitt stated that:

Statement 8:   We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day 1. ***We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms.*** …

> *… Initial customer acceptance, … validate[s] our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our offering.* ¶223.

Statement 6 was misleading because it downplayed the risk of Celsius bringing claims against Core as a hypothetical risk that Core might not recover all of its claims for payments from Celsius simply because of Celsius' bankruptcy. ¶212. In truth, there was a significant, undisclosed risk that Celsius would bring expensive and extensive claims against Core due to Core's own actions contravening its fixed-rate contract with Celsius. ¶212. Far from requiring Defendants' "clairvoyance," Def. Br. at 23, the Complaint simply alleges that the generic warning that "Celsius may take actions" related to its own bankruptcy falls woefully short of adequately informing investors of the material risk that Celsius would bring expensive litigation against Core due to Core's misconduct. By August 2022, Core had already billed Celsius for the improper surcharges, ¶116, and received "multiple direct challenges to the legality of its pass-through practices." ¶123.

Statement 7 misleadingly portrayed "continued increases in power costs" as impacting Core's ability to attract hosting customers and having a potential adverse effect on Core's business, while in truth it was Core's improper course of conduct with respect to its hosting customers *in response to its increased power costs* that was jeopardizing the Company's hosting business. ¶216. The second highlighted statement misleadingly portrayed the Company's failure to provide its

22

hosting customers with favorable pricing terms as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its customers' contracts. *Id.*

Statement 8 was false and misleading because Core's attempts to "restructure[] our pricing" for its hosting business actually entailed imposing improper surcharges in violation of its customers' fixed-rate contracts. ¶224. The second highlighted statement was false and misleading because by July 2022, several hosting customers had disputed Core's improper surcharges and challenged their legality, which did not "validate" Core's strategy and showed that customers were not "eager" to engage in Core's hosting business. *Id.*

Defendants' assertion that "restructured our pricing" refers to something other than the pass-through costs is nonsensical. Def. Br. at 24. The context of the statement plainly supports the reasonable inference that "restructured our pricing to improve margins over time" refers to the power cost pass-through surcharges, a scheme which Levitt himself directed Core to implement for the express purpose of trying to address Core's razor-thin hosting margins. ¶¶10, 123. Defendants fail to proffer any competing meaning—much less a compelling one—pointing only to Levitt's statement that "restructured our pricing" includes "refinements to price per kilowatt hour," which means the exact same thing. Price per kilowatt hour is simply the standard unit of measure for electricity rates, including the fixed rates in Core's hosting contracts. ¶8.

Defendants also ignore that not only did multiple hosting customers directly challenge the legality of Core's new surcharges prior to August 2022, but the Complaint also alleges that (1) "Core received many other questions and concerns from customers prior to July 18, 2022"; (2) "[b]y July 12, 2022, Core had nearly $800,000 in overdue accounts receivable related to pass-through disputes"; and (3) "Core received more disputes after July 18, 2022, too." ¶123. These

allegations are more than enough to support Plaintiffs' allegations that Statement 8 was false and misleading when Levitt made it.

The Complaint alleges that Defendants' statements and omissions are misleading not because "Core received complaints from some of its hosting customers," Def. Br. at 22, but because they concealed the risk that Core's conduct in controverting its customers' fixed-rate hosting contracts was jeopardizing Core's hosting business. When Core's customers disputed those improper surcharges, that was the foreseeable *consequence* of Core's conduct: a materialization of the concealed risks that, when disclosed, caused Plaintiffs losses. *See infra*, § III(D)(5) (addressing Plaintiffs' Section 10(b) loss causation allegations). Thus, this case is entirely unlike *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017) or *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000), where the customer dispute or complaints themselves were the allegedly omitted facts, not the company's conduct that entailed a significant risk of losing customers.[16]

### 3.   The Complaint Alleges a Strong Inference of Scienter

The PSLRA requires a securities fraud complaint to state with particularity facts that give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). However, the PSLRA "was not enacted to raise the pleading burdens ... to such a level that facially valid claims … must be routinely dismissed." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). On a motion to dismiss, the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

---

[16] This case does not remotely resemble the facts in *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1288 (S.D. Fla. 2021), where the company "cautioned that many cities and states were 'likely' to propose or enact new laws restricting the use or sale of e-cigarettes," and the plaintiffs challenged the omission of the fact that "San Francisco had introduced … two ordinances that proposed a ban on e-cigarettes," which the court found was and immaterial as a matter of law.

isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). "At the pleading stage, … a plaintiff … must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" *Lormand*, 565 F.3d at 250 (citing *Tellabs*, 551 U.S. at 328). In other words, "[a] tie favors the plaintiff." *Id.* at 266 n.33. The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 251 (quoting *Tellabs*, 551 U.S. at 324).

The Complaint need not establish actual knowledge. "Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (defining recklessness as "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.")).

### a. Defendants Knew or Recklessly Disregarded That Their Statements Were False or Misleading When Made

The Complaint adequately alleges scienter because Defendants and the Company knew, or recklessly disregarded, facts suggesting that their statements were false and misleading when made. "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Here, Plaintiffs allege that Defendants Eilers, Brombach, Levitt, Trzupek, Feinstein, and Sterling each knew of the concealed risks entailed with Core's scheme to impose improper surcharges on its hosting customers, yet they signed documents containing the misleading statements. "Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs 'have specifically alleged defendants' knowledge of

25

facts or access to information contradicting their public statements.'" *Fleming Cos.*, 2004 WL 5278716, at *10 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432–33 (5th Cir. 2002)).

Levitt himself was the one who decided that Core would attempt to pass its increased power costs on to its hosting customers. ¶237. Levitt asked Core employees to "come up with a suggested plan" that included a "Power Surcharge Fee" charged to hosting customers to offset Core's increased power rates. *Id.* At the end of 2021, Core's legal team had to get "comfortable" with the tactic of passing through Core's increased power costs to its hosting customers despite their fixed rate contracts, implying that they had previously expressed doubts. ¶238.[17]

This was not simply a matter of debatable contract language. Core's own auditor expressly disagreed with Core's position and questioned its legal validity. ¶239. In fact, the auditor told Core that it should include an offsetting allowance instead of merely recording revenue, to account for the likelihood that customers would dispute the charges. *Id.*[18] Indeed, Core did receive vigorous pushback from its hosting customers by at least June 2022, including challenges to the legality of the surcharges. ¶¶241-44.[19] In fact, by mid-July 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes, ¶245: measurable evidence of the

---

[17] That Core's legal team had to *get* "comfortable" with the pass-through scheme pushed by Levitt supports an inference of scienter. *See Sec. & Exch. Comm'n v. Sethi Petroleum, LLC*, No. 4:15-CV-00338, 2017 WL 3386047, at *5 (E.D. Tex. Aug. 7, 2017) ("arguments for reliance on counsel support, rather than negate, scienter" where the counsel "acted at the behest of a fraud.").

[18] Unlike in *Lovelace*, 78 F.3d at 1021, or *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 474–75 (S.D.N.Y. 2008), Plaintiffs do not allege a mere disagreement over the application of accounting rules or the "quiet" departure of an auditor. In *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008), at issue was the defendants' knowledge of accounting violations, not an auditor's express disagreement with the legality of defendants' conduct.

[19] These direct challenges to the legality of Core's actions are not equivalent to the receipt of ordinary customer complaints alleged in *Sorkin, LLC v. Fischer Imaging Corp.*, No. CIV.A. 03-CV-00631-R, 2005 WL 1459735, at *10 (D. Colo. June 21, 2005), or *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019).

concealed risk of Core's pass-through tactics, which Core's then-CEO (Levitt) and CFO (Sterling) had direct access to. As a result of these disputes, Core lost customers accounting for as much as 88.7% of its hosting revenues and 22.1% of its total revenues. ¶¶126-27.

An officer's position in a company can support scienter where "special circumstances" are alleged, including "transactions critical to the company's continued vitality [and] omitted information readily apparent to the speaker." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 459 (S.D. Tex. 2016) (citing *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016)). "No one 'special circumstance' is dispositive," such that Plaintiffs need only allege "*some combination* of four considerations that might tip the scales in favor of an inference of scienter." *Id.* at 484 (quoting *Diodes*, 810 F.3d at 959). Here, the Complaint alleges sufficient "special circumstances" to support a compelling inference of scienter as to the Company's highest ranking executive officers: its CEOs, CFOs, and the Co-Chairs of its board.

Unlike in *Neiman v. Bulmahn*, 854 F.3d 741, 744 (5th Cir. 2017), which concerned the production of one oil well out of 104 in which the company had an interest, here Core had only two closely-related business segments, self-mining and hosting, which "comprise[d] all or substantially all of [Core's] business activities." ¶232. The hosting segment comprised approximately 25% of Core's revenues in 2022. ¶233. Power costs were the primary expense associated with Core's business. ¶235. As several Core executives admitted during their depositions in the Celsius litigation, ¶123, Core's hosting business "might not [have been] viable" unless Core took action in light of increased power costs and fixed-rate hosting contracts. ¶236. Thus, Core's hosting business, and its actions to impose improper surcharges that risked imperiling that business, were "critical to the company's continued vitality." *Carlton*, 184 F. Supp. 3d at 459.

The Company's executives also "omitted information readily apparent to the speaker." *Carlton*, 184 F. Supp. 3d at 459. Levitt himself devised and put in motion the plan to pass through Core's increased power costs, ¶237; it is reasonable to infer that he kept abreast of how his plan was progressing. Sterling participated in monthly meetings during the summer of 2022 in which Core's pass-through tactics and hosting customers' pushback and disputes were discussed. ¶131. Levitt spoke directly on the issue of Core's attempts to "restructure our pricing" and "[i]nitial customer acceptance," demonstrating his knowledge or reckless disregard (and misrepresentation) of the pass-through tactics and customers' reactions. ¶223. *Carlton*, 184 F. Supp. 3d at 484 (allegations that "[the CEO's] own statements on earnings calls" misleadingly discussed the exact relevant issues supported an inference that he acted with scienter).

Considered collectively, the allegations here are similar to other cases in which the Fifth Circuit has applied the "core-business" exception to support a strong inference of scienter. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342–43 (5th Cir. 2008) (company was "a one-trick pony" without an "extensive operating [history]" whose success was "dependent" on the facts underlying the basis of the alleged false or misleading statement); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (finding it was "reasonable to assume, given the importance of the[] deals to the company," that company "would have familiarized itself" with the information allegedly withheld); *Nathenson*, 267 F.3d at 424–25 (one-product company dependent on the product about which the defendants had made statements alleged to be false or misleading).[20]

---

[20] In *Carlton*, the court noted that "although KiOR had 183 employees"—over 50% more employees than Core—"making it substantially larger than the companies to which the Fifth Circuit has applied the 'core-business' exception in other cases, there is no bright-line rule based on the company's size." 184 F. Supp. 3d at 484 (finding CEO's scienter adequately alleged).

To the extent Defendants assert that this is merely an unadjudicated "contract dispute," Def. Br. at 27, courts have held a defendant's knowledge of the underlying facts is sufficient to state a claim under the Exchange Act even where the complaint does not plead the ultimate legal violation.[21] In *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at \*17 (S.D.N.Y. Mar. 28, 2018), the court held that plaintiffs had adequately alleged a Section 10(b) violation with respect to allegations of anticompetitive behavior. While the complaint did not contain direct evidence of a collusive agreement, the court found that the existence of facts tending to show collusive behavior, together with evidence that top executives controlled pricing decisions, was sufficient to allege that the defendants knew, or were reckless in not knowing, that their actions constituted illegal price fixing. *Id.* Similarly, the allegations here that Core's pass-through tactics violated its customers' contracts, and that the plan came directly from Levitt, supports a strong inference of scienter as to the 10(b) Defendants.

### b. Defendants' Motive to Commit Fraud Further Supports a Strong Inference of Scienter

Motive allegations are properly considered alongside other allegations of scienter. *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015). Even if allegations of Defendants' motives do not suffice by themselves to show scienter, they contribute to the holistic analysis of the allegations. *See also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684-85 (5th Cir. 2014) (motive allegations "might meaningfully enhance the strength of scienter," but are not necessary).

Prior to the Merger, Defendants Levitt and Feinstein each beneficially owned tens of millions of shares of Core common stock, which was not publicly traded. ¶248. Those shares stood

---

[21] Moreover, unlike in *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) and *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16CIV3495ATBCM, 2017 WL 4049253, at \*8 (S.D.N.Y. June 28, 2017), here the complaint alleges facts drawn from Core's internal documents and deposition testimony, not merely unsubstantiated third-party allegations or investigations.

to be converted into publicly traded shares upon the approval and consummation of the Merger, monetizing their substantial holdings. *Id.* Thus, Levitt and Feinstein had substantial personal motives—roughly $230 million and $403 million, respectively—to conceal the risks of Core's plan to impose improper surcharges until well after the Merger was approved. *Id.* Thus, these are not the "generalized motives" of increasing the value of a defendant's holdings. Def. Br. at 32.

Moreover, Feinstein capitalized on this new avenue for monetization, selling 6 million shares during the Class Period in a one-week span for over $18 million. ¶249. As the Complaint alleges, Feinstein's stock sales were unusual because they represented over 16% of his holdings, and he had not sold any shares of the Company's stock prior to that point. *Id.* "Suspicion may be generated if the sales are out of line with prior trading practices." *Shaw*, 537 F.3d at 543.

"Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see also PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 436 (6th Cir. 2004). Moreover, "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *E.g., Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014) (finding that a lack of stock sales is "consistent with the inference that the individual defendants mistakenly believed that the fraud would remain hidden and they ultimately would be able to reap the benefits of the inflated stock value."). That other Defendants purchased shares during the Class Period does not negate the individual analysis of Feinstein's scienter.[22]

---

[22] Unlike here, the plaintiffs in *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) "d[id] not allege specifically why [the defendants'] stock sales were suspicious or support an inference of scienter."

### 4.       The Complaint Adequately Alleges Loss Causation

The Rule 8(a) notice pleading standard applies to allegations of loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). To sufficiently allege loss causation, a plaintiff need only allege "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citing *Dura*, 544 U.S. at 342). At the pleading stage, the Court should not weigh a plaintiff's plausible inference of loss causation against competing inferences. *Dell*, 591 F. Supp. 2d at 906.

A corrective disclosure need not "precisely mirror" the alleged misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009), it merely must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id.* In addition, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures," *Lormand*, 565 F.3d at 261, which may be disclosed to the market by third parties. *Id.* at 264. Allegations of partial corrective disclosures "must be viewed together with the totality of the other alleged partial disclosures." *Amedisys*, 769 F.3d at 324.

The Complaint alleges that the truth behind Defendants' false and misleading statements leaked out through a series of partial disclosures. *First*, on September 28, 2022, Celsius filed a motion in Celsius's bankruptcy proceedings, revealing that Core had imposed improper surcharges on Celsius in violation of the parties' fixed rate agreement. ¶¶116-17. On this news, Core's stock price fell by approximately $0.15 per share, or over 10%. ¶118. *Second*, on October 27, 2022, Core filed a current report with the SEC revealing that the Company was considering bankruptcy due to, among other things, "the increase in electricity costs,… and the litigation with Celsius," and

"substantial doubt exists about the Company's ability to continue as a going concern." ¶133. On this news, Core's stock price fell by approximately $0.79 per share, or over 78%. ¶134. *Third*, on December 21, 2022, Core filed for bankruptcy relief under Chapter 11, and on this news Core's stock price fell by approximately $0.16, or over 75%. ¶¶135-36.

The September 28 Celsius filing was a partial corrective disclosure that revealed to investors for the first time that, in response to increased power costs, Core was attempting to pass through its own increased costs to its hosting customers in violation of the customers' fixed rate agreements with Core. ¶117. This partial corrective disclosure was corroborated by Celsius's later objection in Core's bankruptcy proceedings, which set out evidence further showing that Core had violated its agreements with Celsius and other hosting customers. ¶¶120-23.[23] "Viewed collectively, these partial disclosures 'gradually informed the market of the relevant truth'" regarding Core's improper surcharge scheme, "and, thus, collectively constitute a corrective disclosure that adequately pleads loss causation." *Cassava*, 2023 WL 3442087, at *12.

The September Celsius filing was unlike the allegations in the regulatory lawsuit alleged to be a corrective disclosure in *Genesee Cnty. Employees' Ret. Sys. v. FirstCash Holdings Inc.*, No. 4:22-CV-0033-P, 2023 WL 2752846, at *20 (N.D. Tex. Mar. 31, 2023), because as the court repeatedly emphasized, the regulatory lawsuit "ha[d] not advanced past the pleadings stage." Here, the September Celsius filing was corroborated by the January Celsius filing, which adduced evidence gleaned through discovery. "To require, … a conclusive [] finding of fraud merely to

---

[23] Unlike in *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 864 (S.D. Tex. 2016), where the court found a "complete disconnect" between the alleged misrepresentations and the events purportedly causing the plaintiffs' losses, here the Celsius filings revealed that Core was violating its customers' agreements and jeopardizing its hosting business with one of its two most important customers, precisely what Defendants' statements had misleadingly omitted.

plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." *Amedisys*, 769 F.3d at 324-25.[24]

The October 27, 2022 "going concern" warning and December 21, 2022 bankruptcy filing were materializations of the risks concealed by Defendants' false and misleading omissions. Defendants' omissions concealed the material risk that Core was jeopardizing its hosting business and overall financial condition. ¶139.[25] That risk materialized as Core lost most of its hosting customers and a substantial amount of its revenues, which was a material contributing factor in the implosion of Core's financial condition that resulted in the "going concern" warning and bankruptcy. ¶¶139-40. Plaintiffs have thus alleged a plausible connection between the omissions and the loss suffered upon the "going concern" warning and bankruptcy announcement.[26]

Multiple courts in this Circuit have allowed claims to proceed on a materialization-of-the-risk theory. *E.g.*, *Aubrey v. Barlin*, No. A-10-CA-076-SS, 2010 WL 3909332, at *12 (W.D. Tex. Sept. 29, 2010); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 439 F. Supp. 2d 692, 706 (S.D. Tex. 2006).[27] Under this theory, "a misstatement or omission is the proximate cause of an

---

[24] Alternatively, the September 28 filing represented a partial materialization of the risk concealed by Defendants' misrepresentations and omissions. ¶117. The concealed risk was that Core's actions had jeopardized its hosting business, and that risk partially materialized as one of Core's two largest customers brought claims against Core based on Core's course of conduct. *Id.*

[25] This was not a "known risk." Def. Br. at 34 (citing *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014)). Unlike in *YPF*, Defendants cannot claim here that the undisclosed risk—that Core's actions were jeopardizing its hosting business— was ever disclosed or known to investors during the Class Period.

[26] Defendants cite *Dell*, 591 F. Supp. 2d at 909, for the proposition that the disclosure of financial losses is not sufficient to allege loss causation, but the *Dell* court was considering those allegations under a corrective disclosure theory. Moreover, unlike in *Dell*, here the "going concern" warning expressly tied the deterioration of the Company's financial condition to "the increase in electricity costs, … and the litigation with Celsius," which pertain directly to the alleged omissions. ¶133.

[27] In *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 709–11 (S.D. Tex. 2013), the court simply noted that the Fifth Circuit had yet to expressly approve (or reject) the materialization-of-the-risk

investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *Enron*, 439 F. Supp. 2d at 703.

Other courts have found that similar allegations, where defendants concealed a material risk that contributed to the Company's spiral into bankruptcy, were adequate to plead loss causation. *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011); *Plagens v. Deckard*, No. 1:20-CV-2744, 2023 WL 2711263, at *24 (N.D. Ohio Mar. 30, 2023). Plaintiffs need only show that Defendants concealed risks which were "a significant contributing cause" of their loss. *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).[28]

**E.    The Complaint Adequately Alleges Control Person Claims**

Plaintiffs allege control person claims against all Defendants under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. To state a control person claim, Plaintiffs must allege: (i) an underlying primary violation; and (ii) that the defendant directly or indirectly possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Control person liability does not require participation in the underlying violation. *Id.* at 958. Courts in this Circuit "apply a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for

___

theory, but nonetheless analyzed the plaintiff's allegations under that theory and granted the plaintiff leave to amend to attempt to allege loss causation under that theory.

[28] Plaintiffs need only allege that they "would have been spared all *or an ascertainable portion* of the [] loss absent the fraud." *Lehman Bros.*, 799 F. Supp. 2d at 305 (emphasis in original); *Plagens*, 2023 WL 2711263, at *24 ("Plaintiff need only allege … that Defendants' false and misleading statements caused some portion of his losses").

control-person liability." *In re Cobalt Int'l Energy, Inc.*, No. CV H-14-3428, 2016 WL 215476, at *9 (S.D. Tex. Jan. 19, 2016) (collecting cases).

The Complaint alleges sufficient facts to find primary violations by the Company for the purposes of control person liability. ¶¶162, 180, 260. "[T]he complaint may allege violations by [a bankrupt company not named as a defendant], for purposes of control person liability, without seeking to hold [the company] itself liable for those violations." *In re Exodus Commc'ns, Inc. Sec. Litig.*, No. C 01-2661 MMC, 2005 WL 1869289, at *45 (N.D. Cal. Aug. 5, 2005) (collecting cases). Plaintiffs have adequately alleged the respective primary violations. *Supra* §§III(B)-(D).

As to the second element, control, Plaintiffs must allege only "that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014). Plaintiffs allege Defendants' ability to control the Company's actions, including their participation in the management and day-to-day operations of the Company, access to confidential information, and/or ratification of the challenged statements. ¶¶47-48, 50, 93-94, 163-66, 182, 186, 195, 197, 208, 210, 221, and 261-63.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. To the extent the Court grants Defendants' Motion, Plaintiffs request that the Court grant leave to amend. Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given"). *See* Dawes, 975 F. Supp. 2d at 685–86 ("the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice."). Neither Plaintiffs nor their attorneys had any involvement with the pleadings in this case until after the appointment of Lead Plaintiff and Lead Counsel, thus the Complaint is Plaintiffs' first pleading.

Dated: August 11, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Laurence Rosen (*pro hac vice*)
Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**COCHRAN LAW, PLLC**
Stuart L. Cochran
Texas Bar No.: 24027936
8140 Walnut Hill Ln., Suite 250
Dallas, Texas 75231
Telephone: (469) 333-3405
Facsimile: (469) 333-3406
stuart@scochranlaw.com

*Liaison Counsel for Lead Plaintiff*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (213) 519-5876
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of August, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/Joshua Baker*