# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CORE SCIENTIFIC, INC., *et al.*,[1] | ) Case No. 22-90341 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## CELSIUS MINING LLC'S PRELIMINARY OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS WITH CELSIUS MINING LLC

Celsius Mining LLC and its debtor affiliates (collectively, "Celsius") hereby file this preliminary objection (this "Objection")[2] in response to the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts With Celsius Mining LLC* [Docket No. 189] (the "Rejection Motion"). In support of this Objection, Celsius states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] A redacted version of this Objection was filed at Docket No. 211 and an unredacted version of this Objection was filed under seal at Docket No. 213. Following discussion with counsel to Core and the hearing on the Motion that took place on January 3, 2023, Celsius is filing this unredacted version of the Objection on the docket. Other than the addition of this footnote, this Objection is otherwise identical to the Objection filed at Docket No. 213.

## Objection[3]

### I. The Rejection Motion Should Not Go Forward on January 3rd

1.    Celsius does not oppose the relief sought in the Rejection Motion—indeed, Celsius believes the Celsius Contracts are even worse for Core economically than what Core believes. Further, Celsius will agree that Core can power down all of the Celsius rigs on January 3rd to stop the losses that Core alleges it suffers from continuing to perform under the Celsius Contracts. That said, Celsius does not believe it is appropriate for the Rejection Motion to proceed at the requested "emergency" hearing on January 3rd. In absence of an agreement between Celsius and Core before the January 3rd hearing, Celsius requests that the motion be adjourned to Core's "second day hearing" on January 23rd.

2.    *First*, this purported "emergency" is entirely of Core's own making and does not warrant a hearing on just two business days' notice. On the Petition Date, Core was aware of all the facts underlying the Rejection Motion, but Core waited until two days before a holiday weekend before filing the Rejection Motion on an "emergency" basis. This shortened notice is particularly problematic for Celsius, which is a debtor in possession in its own chapter 11 case pending in the Bankruptcy Court for the Southern District of New York[4] (the "Celsius Chapter 11 Case"). Celsius has its own key stakeholders, including its own unsecured creditors' committee, that must be consulted before Celsius can proceed with fully responding to the Rejection Motion, and two business days' notice is not sufficient time for those discussions to occur.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rejection Motion or the First Day Declaration, as applicable.

[4]    Hereinafter referred to as the "SDNY Bankruptcy Court."

3.      **Second**, Celsius believes that Core's act of filing the Rejection Motion is a technical violation of the automatic stay in Celsius' own chapter 11 case.[5] Celsius understands that Core will be able to demonstrate that rejection of the Celsius Contracts is appropriate, but Celsius believes that, because the Celsius Contracts are property of the Celsius estate, its own automatic stay must be lifted pursuant to an order from the SDNY Bankruptcy Court before the Rejection Motion can be granted.[6] Furthermore, the over 37,000 rigs related to the Celsius Contracts are plainly property of Celsius' bankruptcy estate, with respect to which the SDNY Bankruptcy Court has exclusive jurisdiction. Celsius brought its own motion against Core in the Celsius Chapter 11 Case, seeking to compel Core to comply with the parties' executory contract.[7] As noted above,

---

[5]  In a similar situation in this District, in *Sherwin Alumina*, the first debtor (Sherwin) filed a motion to assume an executory contract, and the counterparty (Noranda Bauxite Limited) filed for chapter 11 in the Eastern District of Missouri, and Noranda filed a lift-stay motion in Sherwin's chapter 11 case in order to obtain authority for Noranda to reject the contract. *See Emergency Motion of Sherwin Alumina Company, LLC, et al., for Entry of an Order Authorizing the Debtors (I) to Assume the Noranda Agreement and (II) to Satisfy Obligations Under the Noranda Agreement and Enforce the Automatic Stay, In re Sherwin Alumina Co. LLC*, Case No. 16-20012, (Bankr. S.D. Tex. Jan. 11, 2016) (the "Sherwin Docket") [Sherwin Docket No. 21]; *Debtors' Motion for an Order Pursuant to Sections 105(A) and 365 of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing the Rejection of Certain Executory Contracts* Nunc Pro Tunc *to the Petition Date, In re Noranda Aluminum Inc*., Case No. 16-10083, (Bankr. E.D. Mo. February 8, 2016) (the "NBL Docket") [NBL Docket No. 52]; *Noranda Bauxite Limited's Expedited Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. §§ 105(A) and 362(D)* [Sherwin Docket No. 234].

[6]  *See*, *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("[E]xecutory contracts and leases are considered a form of property of the estate.") (citation omitted). In the Rejection Motion, Core cites *In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. June 19, 2009) for the proposition that a debtor seeking to reject a contract of another debtor need not first obtain relief from the automatic stay. First, that court's ruling did not appear to consider the argument that the contractual rights were property of the second debtor's estate that could be enforced and are protected by the automatic stay. The court also noted that termination of a contract by one debtor *would* violate the automatic stay, but reasoned that rejection is breach, not termination, and therefore does not violate the automatic stay. While it is of course true that rejection is breach, not termination, a court-sanctioned breach would undoubtedly affect the second debtor's rights under the executory contract just as termination would; accordingly, Celsius respectfully submits that rejection of the Celsius Contracts would be a violation of the stay. Moreover, this situation is distinguishable from *Old Carco*, given Celsius' pending motion to enforce the same contracts that Core now seeks to reject, and that the rejection of the Celsius Contracts would create significant logistical issues relating to Celsius' recovery of its over 37,000 rigs in Core's possession, all as explained more fully below. Additionally, in *Old Carco*, a motion to enforce the automatic stay with respect to the attempted rejection had already been brought and denied, which further distinguishes *Old Carco* from the instant case.

[7]  *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 917].

3

Celsius will agree that Core can power down the Celsius rigs immediately and is not looking to profit from any procedural delay. That said, Celsius respectfully submits that respect for the Celsius Chapter 11 Case requires a fair process by which Celsius' creditor constituents receive notice, and Judge Glenn can review and approve a stipulation that will have a significant effect on the Celsius Chapter 11 Case.

4. To be clear, Celsius does not dispute that Core could likely demonstrate "cause" for lifting the automatic stay, but Celsius cannot unilaterally waive or lift the automatic stay absent an order from Judge Glenn.[8] Celsius is willing to negotiate with Core regarding the terms of an agreed stipulation that could be filed in both this Court and in the Celsius Chapter 11 Case providing for (a) lifting the automatic stay, (b) consenting to rejection of the Celsius Contracts, and (c) the terms of rejection, including the logistics for the return of Celsius' rigs in an orderly, reasonable manner, as discussed further below. But, respectfully, Celsius believes that the Rejection Motion cannot be granted at this time, particularly given the pending litigation before the SDNY Bankruptcy Court, and that Celsius' own stakeholders should have an opportunity to

---

[8] *See*, *In re Gullett*, 230 B.R. 321, 330–31 (Bankr. S.D. Tex.), *rev'd on other grounds sub nom. Cont'l Cas. Co. v. Gullett*, 253 B.R. 796 (S.D. Tex. 1999), *aff'd sub nom. In re Gullett*, 220 F.3d 585 (5th Cir. 2000) ("[T]he automatic stay serves the interests of both debtors and creditors. Consequently, the debtor may not waive the automatic stay or limit its scope. 'Only the bankruptcy court with jurisdiction over a debtor's case has the authority to grant relief from the stay of judicial proceedings against the debtor.'") (quoting *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204–1205 (3d Cir. 1991)); *In Re House2Home, Inc.*, No. 02-3322, 2002 WL 32129974, at *3 (Bankr. N.D. Tex. Sept. 9, 2002) ("Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case.") (quoting *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995)). It is well-established in the Second Circuit, where the Celsius Chapter 11 Case is pending, that a debtor may not waive the automatic stay. *See*, *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 790 F.2d 206, 207 (2d Cir. 1986) ("Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay. . . Relief from the effect of the automatic stay provisions of section 362(a)(1) must be sought from the bankruptcy court pursuant to section 362(d).")); *In re Fugazy Exp., Inc.*, 982 F.2d 769, 776 (2d Cir. 1992) ("Only the court may lift the stay."); *In re Enron Corp.*, 300 B.R. 201, 213 (Bankr. S.D.N.Y. 2003) ("The automatic stay cannot be waived. Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case.") (quoting *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir.1995)); *In re Cabrini Med. Ctr.*, 489 B.R. 7, 23 (S.D.N.Y. 2012) ("[T]he debtor may neither unilaterally waive, nor limit, the scope of the automatic stay.").

review and comment on any order granting rejection and setting the terms of the orderly return of Celsius' rigs.

## II.    Celsius Does Not Object to Rejection of Its Contracts at the Appropriate Time

5.      Putting the procedural defects of the Rejection Motion to the side, Celsius does not object to the rejection of its contracts with Core at the appropriate time.  Celsius has no desire to continue doing business with Core's existing management team, which has repeatedly proven to be uncommercial and even duplicitous.  In late September, Celsius filed a motion in its own chapter 11 case[9] (the "Motion to Compel") to enforce the plain meaning of the Celsius Contracts and to compel Core to, among other things, (a) deploy Celsius' rigs in accordance with the agreed-upon contractual schedule, and (b) honor the fixed—not variable—hosting services rate provided for in the Celsius Contracts.  The parties engaged in significant discovery in connection with Celsius' Motion to Compel.  Core's internal documents confirmed that Core knew it had no legal basis for unilaterally imposing these so-called "pass-through" charges on Celsius, and that Core always has understood the Celsius Contracts to impose a "fixed" rate or "pass-through cap."  Indeed, it was on the promise of a "flat" rate that Core induced Celsius to enter into hosting agreements with Core.  Core devised a plan of passing through its increased power costs when its hosting business became unsustainable as energy costs rose and Core's equipment resale market deteriorated.  Additionally, Core routinely and systematically breached its contractual obligations to timely deploy new Celsius rigs when it perceived an opportunity to deploy its own rigs or rigs of other customers on more favorable terms. Discovery revealed that   Core's excuses for the delays in deploying Celsius' rigs are just that. Core's internal documents reveal it intentionally delayed

---

[9]     *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 917].

Celsius' deployment to prioritize the expansion of its own mining fleet. Core deployed approximately 4,200 of Celsius' rigs the day after Celsius filed its Motion to Compel—quite the coincidence.

6.     Even aside from the substance of the pending contempt motion between Celsius and Core, Core's existing management team has continued to mislead Celsius.  In November, when Celsius learned of Core's precarious financial position, Celsius agreed to pause litigation of its contempt motion—on the very day its opposition and reply brief was due to be filed—out of recognition that Celsius could not enforce the terms of the contracts if Core were to file for bankruptcy and reject the contracts, and based on Core's assurances that it would negotiate in good faith regarding revised contract terms and include Celsius in Core's restructuring negotiations. Following the commencement of that temporary détente, Celsius repeatedly tried to engage with Core in the hopes of having a constructive dialogue and reaching agreement on a revised hosting agreement that would benefit both sides.  Celsius also repeatedly asked to participate in Core's restructuring discussions as Core's largest secured noteholder and largest customer.  But Core avoided Celsius' repeated attempts to engage in discussions regarding revised contractual terms, and even blocked Celsius from joining the Ad Hoc Noteholder Group, citing the paused litigation between Celsius and Core.

7.     On the Petition Date, counsel to Core told this Court and all other parties that Core "look[ed] forward to engaging with [Celsius] as we move forward" and wanted to "see if we can find a path forward that obviously minimizes expense."[10]  Counsel to Celsius reciprocated in kind, explaining that "Celsius is focused on the long term future of Core. We remain ready to engage with Core, and now that they've filed for bankruptcy, see if there's a mutually agreeable path

---

[10]    First Day Hr'g Tr. 17:3–8, December 22, 2022.

forward."[11]  But between the Petition Date and the date the Rejection Motion was filed, Core did not engage in constructive discussions.  Instead, just six days after its first day hearing, Core filed the Rejection Motion on a purportedly "emergency" basis, seeking a hearing on just five days' notice.  This timing might be understandable if there were truly an emergency for which Core needed relief.  But to be clear, this is an "emergency" entirely of Core's making: Core knew all the relevant facts on the Petition Date and discussed them in some detail in the First Day Declaration.[12]

8.      Despite Celsius' frustrations with Core's existing management team, Celsius remains one of Core's largest secured noteholders and remains open to maximizing value of Core's estates and, if appropriate, doing business with a reorganized Core on terms that are mutually acceptable.  Celsius wants to have constructive restructuring conversations with anyone who shares that goal.  In the meantime, given that Celsius has agreed its rigs can be powered down now—mooting the alleged basis for emergency relief, Celsius respectfully submit that the parties should negotiate in good faith on the terms of rejection and the return of Celsius' rigs.

## III.    Any Order Granting the Rejection Motion Should Provide for Adequate Provisions Regarding the Return of Celsius' Rigs in Core's Possession

9.      Celsius recognizes that Core is likely to meet its burden to reject the Celsius Contracts, especially because Celsius believes that the contracts are much more favorable to Celsius than Core believes.  But critically, if the Court approves the rejection of the Celsius Contracts, there are significant logistics that must be arranged to return Celsius' property currently in Core's possession, including over 37,000 mining rigs.  Celsius estimates that transporting these

---

[11]    *Id.* at 41:18–21.

[12]    *See*, *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "First Day Declaration") [Docket No. 5], ¶¶ 74-75.

rigs would take at least 70 semi-trucks upwards of 30 days just to make the deliveries alone, never mind the time to unplug the rigs, prepare them for pickup, and locate trucks and moving staff across the five states where the rigs are currently located. Celsius did not arrange the logistics necessary to recover its property because Celsius reasonably expected to have good faith discussions with Core given the comments made at Core's first day hearing. Celsius has a duty to maximize the value of its own estate and accordingly, did not spend time or money unnecessarily incurring significant transition costs that may not have been necessary.

10.     Since Core filed the Rejection Motion, Celsius has had preliminary conversations with Core regarding the logistics and timing needed for Celsius to recover its property following rejection. Celsius remains hopeful that an agreement can be reached with Core for the orderly pickup of its property, but Celsius submits that any order granting the Rejection Motion must include reasonable protections and procedures for the return of Celsius' rigs. Celsius has made a proposal to Core that includes the following provisions: (a) Core will provide a reasonable transition period of at least seventy-five days; (b) all Celsius rigs will be powered down immediately and will not be restarted during the transition period; (c) Core will unrack and package the Celsius rigs using commercially reasonable industry standards, consistent with the Celsius Contracts, and will keep Celsius apprised as to expected availability for pickup at each location; (d) Core will allow a Celsius observer to monitor the unracking and packaging process; (e) Celsius will to pick up its rigs as soon as practicable and will consult with Core on the schedule for pickups, and, in any event, all Celsius rigs will be picked up within 75 days of January 3, 2023; (f) Core and Celsius are to negotiate an agreed stipulation to be filed for expedited consideration in the Celsius Chapter 11 Case providing for relief from the automatic stay to permit rejection on substantially the terms set forth in an agreed form of order to be filed in this Court providing for

the rejection of the Celsius Contracts retroactive to January 3, 2023. These protections are reasonable given the lack of notice, particularly as Celsius is protected by the automatic stay in its own chapter 11 case which, technically, Core is violating. Celsius agrees that form should not be elevated over substance in this regard, but, absent reasonable protections from this Court, there could be significant costs to Celsius for not moving to enforce its automatic stay. Specifically, had Core filed a motion in the Celsius Chapter 11 Case seeking relief from the automatic stay, Celsius would have had ample time before rejection to (literally) put the wheels in motion necessary to recover its property. That is exactly what the automatic stay is intended to do—give a debtor a breathing spell and time to respond. Celsius is willing to cooperate with an orderly rejection and transition process, including presenting a joint stipulation to both Judge Glenn and this Court for approval. Again, Celsius will agree now that its rigs can be powered down so that Core shuts off the alleged ongoing losses under the Celsius Contracts, and Celsius would agree to participate in any further status conferences or hearings on the joint stipulation—including on shortened notice. Alternatively, absent cooperation and agreement, Celsius could file a turnover motion pursuant to section 542 of the Bankruptcy Code in the Celsius Chapter 11 Case to have an orderly process approved for the return of Celsius' property, as the SDNY Bankruptcy Court has exclusive jurisdiction over the property of the Celsius debtors. However, for efficiency's sake, and out of respect for both parties' chapter 11 cases, Celsius would like to resolve the transition process consensually and present it for approval in both cases. Given that Celsius was not provided advance notice of the filing of the Rejection Motion, nor was relief sought in the Celsius Chapter 11 Case, Celsius asks for this Court's assistance in helping to protect the Celsius debtors' property during the transition.

## IV. Core Has No Basis For Charging Celsius Any "Power Costs Pass-through"

11. Finally, Celsius needs to set the record straight with respect to the terms of the Celsius Contracts. Although the Celsius Contracts will likely soon be rejected, rendering the terms of the contracts moot on a go-forward basis, Core has asserted that Celsius owes Core for almost $8 million in pass-through energy costs that Core asserts are due under the terms of the Celsius Contracts—and filed a motion in the Celsius Chapter 11 Case seeking payment of such costs.[13] For the benefit of Core's and Celsius' stakeholders, Celsius sets forth below its position based on the Celsius Contracts and the discovery taken in conjunction with Celsius' Motion to Compel: Core does not have any valid claim to such amounts; instead, Celsius has a significant claim against Core for Core's violations of the Celsius Contracts.[14]

### 1. Order #10 Unambiguously Provides for A Fixed Hosting-Services Rate

12. Core's primary basis for rejecting its hosting agreements with Celsius is the notion that "Celsius improperly refuses to pay" power cost pass through charges assessed "[w]hen power costs spiked dramatically around the second quarter of 2022." Rejection Motion ¶¶ 7, 11. But that contention is flatly contradicted by the terms of the hosting agreements upon which Core relies. Order #10, together with the Master Services Agreement ("MSA"), between Celsius and

---

[13] Rejection Motion ¶ 13; *Motion of Core Scientific, Inc. (I) to Compel Immediate Payment of Administrative Expenses and (II)(A) for Relief from Automatic Stay to Exercise Rights Under Master Services Agreement and Related Orders or (B) in the Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 1144] (the "Core Administrative Claim Motion").

[14] For the avoidance of doubt, Celsius reserves the right to file any claims against Core as the circumstances warrant, including secured (including resulting from setoff rights under Section 506(a) of the Bankruptcy Code), unsecured, and administrative claims.

10

Core is clear and unambiguous: Core is obligated to provide Celsius with hosting services at a fixed—not variable—hosting-services rate.  *See* Ex. 1, MSA; Ex. 2, Order #10.[15]

13.     Order #10 sets out fixed rates per deployment month for hosting services.  This means that Celsius pays a fixed rate based upon its actual power usage, not variable rates based upon the spot price of power charged to Core.  *See Cox Commc's., Inc. v. T-Mobile US, Inc.*, 27 A.3d 752, 760 (Del. 2022) ("[A] contract's construction should be that which would be understood by an objective, reasonable third party." (citation omitted)); *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018).

14.     Core concedes that there is no express term in Order #10 that contemplates variability in the hosting-services rate.  Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 32:20–33:6 ("Q.  Where do you see the word 'estimate' in that section of Order No. 10, Mr. Pratt?  A.  It's not stated explicitly in this."); *see also id.* at 33:9–13; Ex. 4, 11/8/22 M. Levitt Dep. Tr. at 99:20–25 ("Q.  And there's no row here that shows that the hosting rate is subject to adjustment, correct?  A.  There is no verbiage on this page that says that, but of course, it's not necessary.").

15.     Instead, Core points to Section 4(f) of the MSA, which allows Core to impose on Celsius "any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services."  MSA § 4(f).  Core contends it is "implicitly" permitted to pass-through its increased power costs as a "tariff" within the meaning of Section 4(f), thus increasing the hosting rate above the fixed rate set forth in Order #10.  *Id.*

16.     The term "tariff" in Section 4(f), however, does not refer to power costs, explicitly or implicitly.  The primary, common sense usage of tariff is a "schedule or system of duties

---

[15]     All references to exhibits refer to exhibits to the *Affidavit of Judson Brown, P.C. in Support of Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* filed contemporaneously herewith.

imposed by a government on imported or exported goods." TARIFF, Black's Law Dictionary (11th ed. 2019); *Tariff*, Oxford English Dictionary (Online Ed.) ("[D]uties to be imposed on imports and exports"); *Tariff*, Collins Dictionary (Online Ed.) ("A tariff is a tax that a government collects on goods coming into a country."). That is precisely how the term is used in Section 4(f) of the MSA.

17. Section 4(f) permits Core to pass through a limited class of governmentally-assessed duties—namely, "taxes," "levies," "tariffs," and other "governmental fees and charges." Ex. 1, MSA, § 4(f). Both the plain meaning of the word "tariff," and the context in which it is used, make clear that Section 4(f)'s "tariff" refers to import or export duties. The "tariff" pass through does not permit Core to unilaterally change the Hosting-Services Rate set forth in Order #10 by passing through increases in the variable aspects of Core's own costs to purchase power. *Rhone-Poulenc Basic Chems., Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."); *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *11 (Del. Ch. Nov. 4, 2011) ("Though the Plaintiff jumps through many hoops and artfully twists seemingly reasonable interpretations out of various provisions of the JV Agreement, she ultimately fails to reconcile these interpretations with common sense and reason.").

18. Under Core's formulation of the contract, the hosting-services rate is a "floor" without a "ceiling," where Celsius bears all the risk of the power cost increases without benefitting from any decreases or credits. Ex. 5, 10/31/22 M. Xia Dep. Tr. at 39:3–5; Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 34:12-14; Ex. 6, 11/7/22 R. Cann Dep. Tr. at 129:11–18. This arrangement makes little economic sense. *Cf. Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 98 n.70 (Del. Ch. 2009) ("[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be

abandoned and the one adopted which would accord with reason and probability." (citation omitted; alteration in original)). If Celsius intended to bear the risk of power-price fluctuations, the economically rational way to do so would be to structure the contract as a "direct pass-through" of power costs, where Celsius would directly pay for power and Core would be entitled to a fixed margin. *See* Ex. 7, 10/26/22 KC Mares Dep. Tr. at 134:10–20. That direct pass-through would allow Celsius to capture the upside in power-price declines, rather than just bearing the downside of price increases. In fact, a direct pass-through is the "most common" way to structure pricing for hosting in this industry, as Core's own expert witness concedes. *Id.*; *see also* Ex. 6, 11/7/22 R. Cann Dep. Tr. at 37:12–38:16.

19.     Order #10 as it is actually structured makes the most economic sense for both parties. Celsius signed up for a fixed hosting-services rate, meaning it did not bear the risk of power increases or reap the benefit of power decreases. In exchange for this stability, Celsius agreed to pre-pay tens of millions of dollars to Core ahead of the deployment schedule and to pre-pay one month in advance for its hosting invoices. *See* Ex. 2 at 1–4. Core, on the other hand, received up-front cash and could negotiate power purchase agreements with knowledge of its hosting rates, while bearing the risk of power fluctuations and had resources it presumably could have used to hedge its power costs.

20.     Core's absorption of the risk of power fluctuations is a reasonable allocation of that risk: Core is the party that has the relationships with power providers—which are not shared with Core's customers—and therefore is in the best position to know when and how to hedge its power costs. Ex. 6, 11/7/22 R. Cann Dep. Tr. at 131:6–21. As one of Core's executives testified, one of the reasons that customers hire Core is for its expertise in managing power costs. *Id.* at 37:12–38:16. The fact that Core failed to use that expertise and actually manage its own power

costs is not a risk that is allocated to **Celsius** under the contract. *See* Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 26:25–27:7.

21.     The "Fees" provision of Order #10 is not to the contrary. Each month, Celsius pre-pays for hosting services an estimate of its anticipated hosting costs, which is calculated by Celsius' estimated power consumption per rig multiplied by the hosting-services rate. Ex. 2 at 4. Subsequent invoices are subject to a "true up," which is comprised of two components:

> [1] any additional charges incurred by Client and [2] adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by [Celsius] during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.

Ex. 2 at 4.

22.     The first of these components, "additional charges incurred by Celsius," refers to other charges that appear on Celsius' invoices from time-to-time, such as repair services, sales taxes, technician charges, and shipping costs, among others. *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 57:20–58:14. "[A]dditional charges incurred by [Celsius]" does not refer to additional charges incurred by Core under its power purchase agreements with utility providers. The second component—"adjustments resulting from differences … based on [Core's] determination of power utilized by [Celsius]"—merely refers to adjustments for differences based on the Celsius' estimated versus actual power consumption. Core knows this. Its own accounting memo explained that Order #10 and Core's other hosting contracts were "***variable consumption not variable price.***" Ex. 8 at CORE-00009911 (emphasis added). An adjustment for actual power usage in no way suggests that the rate for that usage is variable.

23.     In short, Core's interpretation of the word "tariff" is not reasonable. *Rhone-Poulenc Basic Chems., Co.*, 616 A.2d at 1196. But even if "tariff" could be read to include

Core's rising power costs, Order #10's fixed hosting-services rate would still control the contract pricing.  Order #10 provides: "If any terms of this Order conflict with the terms of the [MSA], the terms of this Order shall govern with respect to this Order."  Ex. 2 at 1.  If Core could pass through increases in power costs to Celsius, then this would transform the fixed hosting-services rate in Order #10 into a variable rate, which directly contradicts the fixed price term in Order #10.  Thus, under the express terms of Order #10, the fixed price of the hosting-services rate controls.

### 2. Even If Order #10 Were Ambiguous, Extrinsic Evidence Supports Celsius' Interpretation

24.     Because the contract is unambiguous, extrinsic evidence is not necessary to determine the parties' contractual relationship.  But the extrinsic evidence here is damning.  Core's internal documents confirm it has no legal basis for charging Celsius a "power costs pass-through," and that Core always has understood the hosting-services rate in Order #10 to impose a "fixed" rate or "pass-through cap."  It was on the promise of a "flat" rate that Core induced Celsius to enter its hosting agreements.

25.     Core conceived the idea of routinely passing through its increased power costs only *after* its hosting business became unsustainable as energy costs rose and Core had apparently not adequately hedged against power price increases, and Core's equipment resale market deteriorated. Even if the Court were to determine the hosting-services rate in Order #10 is ambiguous, there is "compelling record evidence to divine [its] meaning," all of which supports Celsius' view.  *Cox Commc'ns, Inc.*, 273 A.3d at 762 n.71.

26.     *First*, from the outset, Core marketed Order #10 to Celsius as a "fixed" or "flat" rate contract, in meetings, emails, and presentations to Celsius.  Ex. 9 at -CORE-00007612, -00007615; Ex. 10; Ex. 11 at CORE-00007670; Ex. 12; *see, e.g.*, *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *21-22 (Del. Ch. Mar. 15, 2017) (defining the

meaning of a term in part based on "other contemporaneous communications between [the parties] . . . during their negotiations," including "presentations and regulatory materials"), *aff'd*, 177 A.3d 610 (Del. 2017). Early on in negotiations for Order #10, Core offered Celsius a hosting package of up to 36 months with a "***fixed price for hosting***" at 6.5 cents per kWh. *See* Ex. 10 at CORE-00000072 (emphasis added). As discussions progressed, Core sent Celsius several proposals, each one featuring a "***Flat*** Hosting Rate" for a period of up to 36 months. Ex. 9 at CORE-00007612, -00007615; Ex. 11 at CORE-00007670. A "fixed-price contract" is "[a] contract in which the buyer agrees to pay the seller a definite and predetermined price ***regardless of increases in the seller's cost*** or the buyer's ability to acquire the same goods in the market at a lower price." CONTRACT, Black's Law Dictionary (11th ed. 2019) (emphasis added). Similarly, a "flat rate" is "a charge that is the same in all cases, not varying in proportion with something." Oxford English Dictionary (Online Ed.); Black's Law Dictionary (11th ed. 2019).

27. ***Second***, the parties' conduct shows that Core did not understand "tariff" to permit it to pass through increased power costs. *ATT Corp. v. Lillis*, 970 A.2d 166, 172 (Del. 2009) ("It is hornbook law that the contracting parties' course of conduct may be considered as evidence of their intended meaning of an ambiguous term."). After Order #10 was signed, Core initially honored its commitments. When energy costs would increase, Core would "bear the costs" of that power variability, Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 125:20–126:7, consistent with the fixed hosting-services rate it had sold to Celsius. Core's internal accounting documents likewise referred to the hosting-services rate in all of Core's contracts as "***fixed*** per kWh of power consumption," and explained that the contracts as a whole are "variable consumption[,] ***not*** variable price." Ex. 8 at CORE-0009903, -00009911 (emphasis added).[16]

---

[16] Core elsewhere has pointed to Celsius' decision to voluntarily pay certain pre-petition utility cost increases at one specific site, Marble 2, as evidence that Core was contractually allowed to pass through increased power costs.

28.     In late 2021 and early 2022, however, Core began to face significant headwinds in its hosting business, including rising power costs.  *See* Ex. 4, 11/8/22 M. Levitt Dep. Tr. at 34:8–35:3.  Core's already-thin hosting margins evaporated when it faced increasing power costs to utilities on one side and a fixed hosting rate with customers on the other.  *Id.* at 176:22–177:2 ("Q. And so what you're saying here effectively is over the last couple of years, the hosting business was break-even or losing money from a profit perspective, correct?  A. Correct."); Ex. 6, 11/7/22 R. Cann Dep. Tr. at 112:21– 113:4 ("I mean, the margins on hosting are *de minimis*."); Ex. 15 at CEL_CS-00006978 ("Historically, the [hosting] business delivered low profitability."). As Core's Senior Vice President of Partnerships (and Rule 30(b)(6) witness) Jeff Pratt testified, it was becoming clear that Core's entire hosting business "might not be viable" unless Core could come up with some way to "improve [its] performance."  Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 177:10–178:13.

29.     Instead of accepting that it had made a bad business bet on power costs, Core's recently-appointed Chief Executive Officer, Mike Levitt, decided that Core simply would no longer bear the cost of power fluctuations; instead, Core would pass those costs on to its customers. *See* Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 177:10–178:13 (explaining that Levitt "didn't like the

---

Not so.  At that one site, in October 2021, Core expressly **asked** for and received Celsius' permission to pass through certain increased power costs at the Marble 2 site.  *See* Ex. 13, 11/1/22 Q. Lawlor Dep. Tr. at 95:21-96:14; Ex. 14 (Celsius email stating, "I authorize Core to turn our rigs back on in light of the unexpected economic power curtailment in Marble.").  Celsius granted such permission, despite understanding that it was contractually entitled to a fixed hosting services rate, on a pure cost-benefit basis to prevent Core from turning off Celsius' machines.  *See* Ex. 13, 11/1/22 Q. Lawlor Dep. Tr. at 88:5–21, 316:6–317:12; Ex. 6, 11/7/22 R. Cann Dep. Tr. 111:19–112:2 (describing the curtailment option as a "cost-benefit" analysis for customers).  From October 2021 through April 2022, Core continued passing through increased power costs just for the Marble 2 site, just for certain days each month, and just due to the unexpected curtailment.  Ex. 5, 10/31/22 M. Xia Dep. Tr. at 75:22–76:11.  Even today, Core's own executives acknowledge there is a difference between the limited pass-through for Marble 2 and Core's widespread pass-through practices implemented in June 2022.  *See* Ex. 6, 11/7/22 R. Cann Dep. Tr. 119:16-24 ("Q. Would you agree with me that there's a difference between this Marble 2, 2021 specific event and the power cost that you passed through starting in June of 2022? . . . A. Yes, I will agree with that.").

concept or the practice of [Core Scientific] bearing the cost of short-term fluctuations" in power costs); Ex. 5, 10/31/22 M. Xia Dep. Tr. at 102:18–103:16 ("Q. Core wanted to avoid losing money on its hosting contracts by passing through these power costs, right? A. Yes.").

30. To that end, towards the end of 2021, Mr. Levitt asked Core's team to "come up with a suggested plan" for reworking the fee structure of the hosting business. Ex. 16 at CORE-00000006. This included a "Power Surcharge Fee" that would be charged "in the event power costs to a specific facility at Core encounters material seasonal or economic increases." *Id.* at -00000005.

31. Around the same time, Core decided to roll out a "new" version of the MSA, with a revised Section 4(f) that "include[d] new language around energy price increase pass throughs." *Id.*; *see* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 30:25–31:11. The "new" MSAs retained the prior language allowing Core to pass through increases in tariffs, but added a clause enabling Core to pass through to customers "increases or changes in **utility costs** for one or more company facilities." Ex. 17 at CORE-00017187 (emphasis added); *see also* Ex. 18 at CORE-00000720 ("***New MSA that explicitly allows pass through of power costs for all new contracts as of 4/18***.") (emphasis added).

32. Core planned "to migrate all customers to the new MSA as soon as possible." Ex. 18 at CORE-00000720; Ex. 19 at CORE-0008415 ("[W]e should use this as an opportunity to migrate the client to a new MSA that allows for escalating power costs pass through."). Core successfully convinced some hosting customers to sign the new MSA, all of which were either newly signed customers or customers whose contracts were up for renewals. *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 26:19–27:8.

33.     Of course, for customers like Celsius who did not sign the "new" MSA, Core nevertheless has contended that "'tariff' equals utility costs," Ex. 3, 11/1/2022 Pratt Tr. 12:18-19 ("Q. And so in your view tariff equals utility costs, correct?  A. Absolutely, yeah, without a doubt."), allowing it to pass through increased power costs.  But if the term "tariff" already allowed for a pass through of utility costs, the supplemental phrase in Core's new MSAs is entirely "unnecessary," Ex. 5, 10/31/22 M. Xia Dep Tr. at 197:12–24.  This would, of course, "violate a fundamental principle of contract interpretation" that parties do not include superfluous language unnecessarily.  *See* Core Obj. ¶ 74 (citing *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008)).  Core's conduct and efforts to "migrate" customers to a "new" MSA with updated "utility cost" language contradict its contentions that "tariff" already covers the pass through of utility costs.

34.     ***Third***, the evidence makes clear that Core did not believe the term "tariff" referred to power costs until the end of 2021—after entering Order #10 with Celsius—when its legal team got "comfortable" with the idea.  *See* Ex. 20 at CORE-00015187.  But to this day, Core does not have internal (or external) consensus on what power costs are included in "tariff."  Monica Xia, Core's corporate representative for discussing the meaning of Section 4(f), testified that "tariff" does not include the base rate of power that Core pays to utility companies.  Ex. 5, 10/31/22 M. Xia Dep. Tr. at 14:20–22.  Jeff Pratt, Core's corporate representative on other topics including Core's pass throughs "to customers other than Celsius," believes tariff encompasses "every component of the bill or invoice received from a utility" without exclusion, including "the base rate of power." Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 12:7–9, 51:25-52:2.  Russell Cann, another Core

executive, testified that "tariff" would not allow Core to pass through increased power costs on a "fleetwide" basis because "tariff" only narrowly describes utility costs at a particular site. Ex. 6, 11/7/22 R. Cann Dep. Tr. at 169:24–171:20. In all this time, Core still cannot get straight what sorts of utility costs the term "tariff" actually covers.

35.     **Fourth**, despite Core's insistence that "tariff" equals utility costs or power costs, others did not share that understanding—including Core's auditor EY and many of Core's other hosting customers.

36.     Core's external auditor, Ernst & Young ("EY"), evaluated Core's effort at passing through rising powers costs in June and July 2022. EY viewed "the impact of the pass through to be material," Ex. 21 at CORE-00017174, and harbored reservations about Core's pass-through maneuver. EY questioned "the legal validity of passing through [power] cost" under the "tariff" language in the "old" MSAs, like Celsius'. Ex. 22 at CORE-00017158. As EY explained to Core in June, "[EY's] understanding is that tariffs can be defined as government imposed levies." *Id.* EY suggested that Core include in its financials "an offsetting allowance . . . as opposed to merely recording of revenue" in case customers disputed the pass through of increased utility costs. *Id.* at -00017158– -00017159.

37.     Core, however, dismissed its auditors' concerns, representing to EY that legal had determined that it was "no[t] probabl[e]" that customers would "challenge the pricing increases down the road." Ex. 22 at CORE-00017157. When EY asked for a meeting on the issue, Core's Vice President of Accounting Policy, Ed Haney, wrote back on July 18, 2022 and claimed "the potential reversal of revenue recognized from the power pass-through charges is not significant, as the contract clearly provides for the power pass-through in the monthly charge." *Id.* at -00017155– -00017156. He punctuated his assessment by representing that Core's customers

were accepting, and paying, the pass-through amounts: "***There is currently no challenge from any client on the legality of the pass-through charges.***" 10/31/22 M. Xia Dep. Tr. at 219:5-10 (emphasis added).

38.     That representation was not true.  *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 219:5-10 ("This sentence is not as accurate as it's supposed to be.").  At the time, Core had received multiple direct challenges to the legality of its pass-through practices.  On June 23, 2022, for example, Core had received an email from Atlas stating, "Atlas hereby disputes Core's June 2022 invoice because Core has inappropriately and without any contractual basis increased the price of KWh."  Ex. 23 at CORE-00007809.  On July 16, 2022, just two days before Mr. Haney's email to EY, Core had received a letter from the general counsel of its client CoreWeave, stating, "[Y]ou are hereby notified that CoreWeave disputes charges 1 and 2 of the Invoice; namely, the two charges for May and June 2022 'Power Costs Pass-through.'"  Ex. 24 at CORE-00002521.[17]

39.     Core received many other questions and concerns from customers prior to July 18, 2022, as well.  On June 19, 2022, Poolin Technology Pte. wrote, "I remembered the hosting fee is 6.5cents in the hosting contract, could you explain why the hosting price was changed?"  Ex. 26 at CORE-00004157.  On June 25, 2022, Alloy Ventures Management wrote to Core, "This is a bit unexpected as conversations in the past had led me to believe our rate would be guaranteed through end of term in March 2023."  Ex. 27 at CORE-00004165.  By July 12, 2022, Core had nearly $800,000 in overdue accounts receivable related to pass-through disputes.  Ex. 28 at CORE-00009801.  *See, also, e.g.*, Ex. 29 at CORE-00004132.

---

[17] Core has now fired EY, simultaneously disclosing that EY had found "material weaknesses" in Core's "internal control over financial reporting."  *See* Ex. 25, Core Scientific Form 8-K, dated Oct. 24, 2022.

40.     But that was not the end.  Core received more disputes after July 18, 2022, too. Altogether, Core lost between five to ten clients as a result of its new decision to pass through rising power costs.  Ex. 5, 10/31/22 M. Xia Dep. Tr. at 22:1–25.

41.     Core's baseless contentions that Celsius is the defaulting party is belied by the contractual language and by Core's own documents, testimony, and conduct.  It is Core who has improperly passed-through increased costs in an effort to rectify its own poor business decisions.

## **RESERVATION OF RIGHTS**

42.     Nothing contained in this response is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Celsius; (b) a waiver of any claim held by Celsius against Core, its directors or officers or any other party in interest on any grounds; (c) a promise or requirement to pay any particular claim; or (d) a waiver or limitation of Celsius' rights under the Bankruptcy Code or any other applicable law, including the right to seek related relief from this Court or the SDNY Bankruptcy Court in the Celsius Chapter 11 Case.

Houston, Texas
January 9, 2023

_/s/ Ross M. Kwasteniet_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:             jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig (admitted _pro hac vice_)
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:             patrick.nash@kirkland.com
                        ross.kwasteniet@kirkland.com
                        chris.koenig@kirkland.com
                        dan.latona@kirkland.com

- and -

Judson Brown, P.C. (admitted _pro hac vice_)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:      (202) 389-5000
Facsimile:       (202) 389-5200
Email:             judson.brown@kirkland.com

_Counsel to Celsius Mining LLC_

23

**Certificate of Service**

      I certify that on January 9, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                      */s/ Ross M. Kwasteniet*
                                      Ross M. Kwasteniet