UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Mei Pang, Individually and on Behalf of All Others Similarly Situated | § § § § | No. 1:22-cv-01191-DAE |
| *Plaintiffs,* | § § | |
| vs. | § § | |
| Michael Levitt, Michael Trzupek, and Denise Sterling, et al. | § § § | |
| *Defendants.* | § § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
<u>MOTION TO DISMISS</u>

Before the Court is (1) a Motion to Dismiss filed on June 20, 2023, by

Defendants Michael Levitt, Michael Trzupek, Denise Sterling, Darin Feinstein,

Brian Neville, Jarvis Hollingsworth, Matt Minnis, Stacie Olivares, Kneeland

Youngblood, Patrick C. Eilers, Theodore J. Brombach, Paul Gaynor, Paul Dabbar,

Colleen Sullivan, and Scott Widham ("Defendants"), pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure. (Dkt. # 65); and (2) a Motion to Strike

portions of Defendants' Reply memorandum. (Dkt. # 70).   On August 11, 2023,

Plaintiffs filed a response to Defendants' Motion to Dismiss (Dkt. # 67).   On

September 18, 2023, Defendants replied. (Dkt. # 69).  On September 28, 2023,

Defendants responded to the Motion to Strike. (Dkt. # 71)  The Court finds these matters suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and against the motions, the Court (1) **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 65); and (2) **DENIES** Plaintiffs' Motion to Strike (Dkt. # 70) for the following reasons.

## BACKGROUND

Core Scientific, Inc. ("Core") is a prominent player in the digital asset mining sector, specializing in Bitcoin.  (Dkt. # 62 at ¶ 5.)  The company leverages a vast fleet of specialized computing machines, known as miners, to tackle intricate cryptographic algorithms. This results in the generation of cryptocurrencies, with Bitcoin as the primary focus.  (Id.)  Core offers critical infrastructure for cryptocurrency mining. The infrastructure encompasses both self-mining where it mines digital assets for its own account, and hosts services tailored for third-party miners.  (Id. at ¶ 6.)

Core's operations are intrinsically tied to the volatile cryptocurrency market. Fluctuations in cryptocurrency prices, particularly Bitcoin, significantly impact its operations and financial performance.  (Id. at ¶ 59.)

Central to Core's operations is the management of electricity costs. Because cryptocurrency miners consume large amounts of electricity, power is a

principal cost for Core's mining fleet.  (Id. at ¶ 7.)  Core's bottom-line is dependent on power prices set by the public power markets where Core's facilities are located. (Dkt. # 65-1 at 43.)   Power prices are influenced by several variables, including the price of natural gas, weather, and location, among others.  (Id.)  The company strategically seeks long-term power contracts to mitigate power expenses, a practice highly valued by its hosting customers.  (Dkt. # 62 at ¶ 7.)

The company relies heavily on its hosting customers. These customers pay a set rate per kilowatt-hour based on their actual monthly energy consumption, providing them with predictability in their energy costs while shielding them from fluctuations in power rates.  (Id. at ¶ 8.)

In July 2021, Core entered into an Agreement and Plan of Merger and Reorganization with Power & Digital Infrastructure Acquisition Corp. ("XPDI") to go public via a "de-SPAC." (Id. ¶ 87.)   XPDI stockholders approved the merger pursuant to a Proxy Statement and unredeemed shares of XDPI were converted to shares of Core pursuant to a Registration Statement filed on December 30, 2021. (Id. at ¶¶ 88-91)

The summer and fall of 2022 brought widespread increases in power costs, plummeting bitcoin prices, and an influx of cryptocurrency miners that strained the states' power grids.  (Id.  at ¶ 115.)

Due to the power cost increases, Core allegedly initiated an attempt to pass through increased power costs onto its hosting customers, ultimately deviating from its existing fixed-rate contracts.  (Id. at ¶ 10.)

Celsius Network LLC ("Celsius"), one of Core's largest hosting customers, disputed these charges and subsequently filed for bankruptcy on July 13, 2022.  (Id. at ¶¶ 115-16.)  Given Celsius' outstanding balance and Core's impending liquidity issues, Core sought to collect on the charges incurred by Celsius prior to its bankruptcy.  (Dkt. # 65-1 at 6.)   On September 28, 2022, Celsius filed a motion for civil contempt in bankruptcy publicly alleging that Core breached its agreement with Celsius by attempting to "pass through" power costs to Celsius under its contract.  (Dkt. # 62 at  ¶¶ 116-17.)  That litigation is ongoing. On September 29, 2022, Core's stock price closed at $1.30. (Id. at ¶ 118.)

On October 27, 2022, Core filed a Form 8-K informing investors that, "[a]s previously disclosed, the Company's operating performance and liquidity have been severely impacted by the prolonged decrease in the price of bitcoin, the increase in electricity costs, . . . and the litigation with Celsius." The 8-K stated Core was "exploring a number of potential strategic alternatives" and "potentially could seek relief under the applicable bankruptcy or insolvency laws."  See October 2022 Form 8-K.  That day, Core's stock price closed at $.0221 per share.

(Dkt. # 62 at ¶ 134.)  On December 21, 2022, Core filed for bankruptcy.  (Id. at ¶ 135.)  That day, Core's stock price closed at $.051 per share.  (Id. at ¶ 136.)

This dispute revolves around disclosures or lack thereof to investors both prior to and after Core allegedly decided to impose power cost pass-through charges onto its customers.  On May 5, 2023, Plaintiffs filed its Amended Complaint and brought claims for violations of the federal securities laws against the current and former officers and directors of Core Scientific, Inc.  Plaintiffs allege that Defendants made false and misleading statements and omissions in Core's SEC filings and in public statements, including in the Registration Statement and Proxy Statement issued by Core in connection with its "de-SPAC" merger.  Plaintiffs bring negligence claims under Section 11 of the Securities Act of 1933 ("Securities Act") and Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), securities fraud claims under Section 10(b) of the Exchange Act, and control person claims under each statute.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he [C]ourt accepts

'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. at 555–56.  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP

Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissal with prejudice, "unless it is clear that the defects are incurable[.]" Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002)

## DISCUSSION

I.   Plaintiffs Pled with Particularity a Section 11 Securities Act Claim

To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the Registration Statement contained (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1445 (5th Cir. 1993). "A 'material fact' is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." Id. at 1445.

A.   A Heightened Pleading Standard Applies

Claims under the Securities Act are evaluated under the normal pleading standard.  However, if the claim is based on the same underlying facts and allegations as a fraud claim under the Exchange Act, then a heightened pleading is required under Rule 9(b).  Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir. 2001).  Merely disclaiming allegations of fraud is insufficient to exempt a claim from Rule 9(b)'s requirements "when the wording and imputations of the complaint are classically associated with fraud." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (applying Rule 9(b) despite fraud disclaimer in complaint when factual allegations were "indisputably immersed" in fraud).  In other words, plaintiffs cannot do an end-run around the requirements of Rule 9(b) by giving their fraud claim a different label.

"Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." Lone Star Ladies Inv. Club, 238 F.3d at 368.  In this case, the Section 11 claim essentially alleges Defendants concealed a known business strategy of passing energy costs onto fixed rate customers.  The allegations under the Securities Act and the Exchange Act contain overlapping facts and are rooted in concealing from investors pass through costs. These are fraud allegations, which are subject to Rule 9(b)'s pleading standard.

Rule 9(b) requires that the Complaint "(1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where

the statement was made; (4) plead with particularity the contents of the false

representation; (5) plead with particularity what the person making the

misrepresentation obtained thereby; and (6) explain the reason or reasons why the

statement is misleading." In re Plains All Am. Pipeline, L.P. Sec. Litig., 307 F.

Supp. 3d 583, 614 (S.D. Tex. 2018).  Of course, the scienter requirement of Rule

9(b) does not apply to Section 11 claims, as such claims may be based on negligent

or innocent misstatements or omissions.  See Herman & MacLean v. Huddleston,

459 U.S. 375, 382 (1983) (discussing that Section 11 and Section 10(b) involve

distinct causes of action and were intended to address different types of

wrongdoing.).  Because the claim is grounded in fraud, the Court will apply a

heightened pleading standard to the Section 11 claim.

     B.       Misleading Omissions

That said, the Court now turns to a discussion of liability under the

1933 Securities Act.  Plaintiffs who purchased a security issued pursuant to a

Registration Statement must show a material misstatement or omission to establish

their prima facie case.  Krim, at 989 F.2d at 1445.  The Complaint alleges five

statements in the Registration Statement that contain omissions of material fact.

     i.      Statement 1 and Statement 2 Are Not Misleading

**Statement 1:** "Our financial performance and continued growth
depend in large part on our ability … to attract customers for our

hosting services. *Increases in power costs, ... will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.*" (Dkt. # 62 at ¶97.5.)

**Statement 2:** Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. *We may not be able to attract customers to our hosting capabilities for a number of reasons, including if: ... we fail to provide competitive pricing terms or effectively market them to potential customers;* … If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations." (Id. at ¶101.)

Plaintiffs claim Statement 1 and Statement 2 are misleading because rising costs had already materialized and were not a hypothetical future occurrence.  See Lormand v. US Unwired, Inc., 565 F.3d 228, 249 (5th Cir. 2009) (cautionary language was inadequate when defendants "recognized signs that those risks had already materialized").

Defendants argue that courts have repeatedly recognized that risk disclosures like Core's are not guarantees that a company is not presently facing a specific risk. See In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ. 9303, 2010 WL 1372709, at *7-8 (S.D.N.Y. Mar. 31, 2010) ("increases in the cost of raw materials 'could'" impact business "cannot reasonably be read to imply that [] cost of raw materials had not increased, to some extent, in the current quarter"). Defendants argue it is conclusory to allege the risks materialized at the time of the

Registration Statement. Additionally, Defendants argue the Complaint is contradictory because Core's "acute increase in power costs" did not occur until "the start of Russia's invasion of Ukraine," nearly two months after Core's Registration Statement was filed.

Whether energy prices had already begun to rise at the time of the Registration Statement is irrelevant. The purpose of a risk disclosure statement is to warn investors of potential future risks.  In a market as volatile as Crypto, it is especially important to disclose risks that might impact the price of a currency such as Bitcoin.

In this case, Core's disclosure adequately warned investors of future spikes in energy prices that could stem from unforeseen events such as Russia's invasion of Ukraine.

However, Plaintiffs are not solely contesting that the risk disclosure was inadequate because it failed to inform investors of current high energy prices. Those prices, as Defendants note, are publicly available.  Rather, Plaintiffs argue the problem with the risk disclosure is that it was allegedly misleading in omitting relevant information about the company's future pricing strategy before going public through de-SPAC.  Core was allegedly attempting to foist additional power charges upon its fixed rate customers.

Still, the Court does not find this misleading because there is "too attenuated a relationship between the allegedly misleading statements and the omissions, and the [Complaint] makes no attempt to bridge this analytical gap." Magruder v. Halliburton Co., 359 F. Supp. 3d 452, 465 (N.D. Tex. 2018).  Neither of these statements refer to fixed rates or to Core's business model for hosting contracts.  Plaintiffs fail to connect the risk disclosure to the omitted information. Therefore, Statements 1 and 2 fail to meet 9(b)'s pleading standard.

ii.     Statement 3 and Statement 4 Are Not Misleading

**Statement 3***: Any failure to meet our end-users' expectations, including, but not limited to, any inability     to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships. … If these customers reduced spending on our services, … it could have a material adverse effect on our  business, financial condition and results of operations. …. (Dkt. # 62 at ¶103.)

**Statement 4:** If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which  could have a material adverse effect on our business, financial condition and results of operations. … (Id. at ¶105.)

Plaintiffs reiterate that Statement 3 and Statement 4 create the impression of a hypothetical, rather than actual representation of facts that had already materialized.

As the Court previously explained, it is not concerned about Core's disclosure as it relates to rising power costs.  Whether those price increases occurred before the Registration Statement or in 2022 does not impact whether Core adequately disclosed its strategic response to future price fluctuations in a volatile market depended on energy pricing.  The Courts' rationale as to Statement 3 and Statement 4 is consistent with its rationale as to Statement 1 and Statement 2.

There is too attenuated of a relationship between these statements and what Plaintiff believes should have been stated.  The Complaint fails to bridge an analytical gap between the stated disclosure and what should have been said. Magruder, 359 F. Supp. at 459-60.  An investor, according to Core, would not think these statements are misleading because disclosing its business strategy within these statements would have been out of place.

Plaintiffs must plead facts showing that the statements "created an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed."  Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  The Court acknowledges that in late 2021, Levitt instructed Core employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases. (Dkt. # 62 at ¶ 11.)  However, Plaintiffs do not allege any facts that any customer even received a pass-through charge before June 2022.  The Complaint is devoid of

13

any facts from any time period suggesting that Core struggled to "attract customers," "effectively market" its "competitive pricing terms," or "fail[ed] to meet [its] end-users' expectations" at the time these statements were made.  (Dkt. # 62 at ¶¶ 101, 103, 105) See In re Capstead Mortg. Corp. Sec. Litig., 258 F. Supp. 2d 533, 550 (N.D. Tex. 2003).   Therefore, the Court does not find Statement 3 or Statement 4 to be misleading because neither statement omits any information that at the time of the registration should have been included.

### iii.   Statement 5 Survives Rule 9(b) Pleading

Statement 5:  "Hosting revenue from customers and related parties is based on consumption-based contracts with our  customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a  fixed and recurring basis each month for the duration of their contract***, which vary from one to three years in length." (Dkt. # 62 at ¶ 99.)

Plaintiffs claim Statement 5 is misleading because it omitted that Core was billing its customers for its own increased power costs, which violated the fixed-rate terms of those contracts.  (Id. at ¶ 100). Plaintiffs further allege Statement 5 misleads because Core sought to migrate "all" of its new and renewing customers to new contracts that permitted Core to pass through power cost increases, and thus did not have fixed rates. (Id. at ¶ 123.)  Plaintiffs' theory is Core omitted that it was experiencing rising energy prices and was "foisting" these

14

costs onto customers.  The imposition of pass-through charges, according to Plaintiffs, foreseeably jeopardized Core's business.

Defendants argue there is nothing misleading about Statement 5.  Core disclosed that its customers are "generally billed on a fixed" basis, not that they are always billed on a fixed basis.  (Dkt. # 62 at ¶ 100.)  The word "generally" naturally suggests that there are cases where the rule does not apply.  See Drzala v. Horizon Blue Cross Blue Shield, No. 15-8392, 2016 WL 2932545, at *4 (D.N.J. May 18, 2016) ("The plain meaning of this term is clear: 'generally' means most of the time (but not always) and necessarily implies exceptions.").

Plaintiffs pled with particularly Statement 5 is misleading because "generally" is not sufficient when, behind closed doors, the company had plans to divert from fixed rates.  Plaintiffs pled with particularity that Core should have been clearer and more direct in how it intended to operate as a company.  Plaintiffs pled that at the time of the Registration Statement, Core sought to migrate "all" of its new and renewing customers to new contracts that permitted Core to pass through power cost increases, and thus did not have fixed rates.  (Dkt. # 62 at ¶123.) This change of strategy could have been highly relevant information for an investor seeking to buy or sell shares of the company.  It goes to the heart of the company's business model.  To say that Core generally billed at a fixed rate might have been literally truthful.  However, it failed to disclose to investors that the

literal truth was subject to change in the near future. See In re Cassava Scis., Inc.

Sec. Litig., No. 1:21-CV-751-DAE, 2023 WL 3442087, at *12 (W.D. Tex. May 11,

2023); Lormand, 565 F.3d at 248; Omnicare, Inc. v. Laborers Dist. Council Const.

Indus. Pension Fund, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough:

An issuer must as well desist from misleading investors by saying one thing and

holding back another.").

It is true that "generally" necessarily implies exceptions.  However,

Plaintiffs particularly pled that Core was not just planning on making exceptions to

a few customers.  Nor did Plaintiffs plead that the change in business strategy was

some future hypothetical that might occur.  Plaintiffs pled that Core was going to

overhaul its pricing terms for many of their contracts.  Plaintiffs pled with

particularity that "generally" was misleading because Core no longer sought

protection as to a few outliers that were billed for actual costs.  Moreover, that

Core stated elsewhere in the Registration statement that contracts were subject to

"adjust[ments] for actual costs," does not counter Plaintiffs allegation that Core

was planning on changing its pricing.

The Plaintiffs pled that the risk disclosure was misleading because it

did not disclose a business strategy central to its future viability as a company.

The registration statement was first filed on August 11, 2021. (Dkt. # 62 at ¶ 94).

However, it was not effective until December 30, 2021, after it was amended

several times. (Id.)   By the time the Registration Statement became effective, Plaintiffs plead that Core's CEO instructed employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would charge hosting customers in the event of power cost increases. In late 2021, Plaintiffs allege Core's legal team was instructed to get "comfortable" with the idea that the existing fixed rate agreements allowed Core to pass through its increased power costs. (Id. at ¶ 238.)

Plaintiffs pled with particularity that Core's management had serious discussions about changing its business model before the Registration Statement was implemented. As the Senior Vice President said, it was becoming clear that Core's entire hosting business "might not be viable" unless Core could come up with some way to "improve [its] performance." (Id. at ¶ 123.)

In late 2021, Plaintiffs allege that they were revising the Master Services Agreement ("MSA"), the main form of the agreement with Core's hosting customers, to add new language expressly permitting Core to pass through increased power costs. (Id. at ¶ 238.)  This adequately pleads that prior to the Registration Statement, Core sought to change its business strategy.

Defendants argue that Statement 5 cannot be misleading because Plaintiffs fail to allege facts that any hosting customers were charged pass through costs prior to the summer of 2022.  Defendants claim it is backwards pleading

because it attempts to allege liability for something that was unknowable at the time.  See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.")  It is true that securities law does not hold the company out to be a perfect fortune teller.  However, as stated in Novak, "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  Id. (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)). In this case, the Court does not subject Defendants to predict the future.  However, Plaintiffs have claimed that there were facts available to the company about the nature of its business going forward that should have been disclosed to protect investors from future risks that may occur.  This is especially the case when fixed pricing was central to Core's success as a company.

How Core chose to react to high energy prices was highly relevant to a reasonable investor.  In a business dependent on energy prices, it is imperative that risk disclosures provide relevant information on how the company intends to withstand price fluctuations.  In this case, Plaintiffs adequately pled that Statement 5 failed to explain to investors how Core planned to remain profitable in times of distress.  In this case, Plaintiffs pled that Core's internal management was planning on altering the MSA for the near future.  Core then did not disclose to investors

that the changes were going to be made. Rather, as Plaintiffs allege in accordance with Rule 9(b), it hid behind vague and misleading language about the nature of its business.  Therefore, the Court finds Plaintiffs pled with particularity that Statement 5 is misleading.

The Court finds Statement 5 meets the heightened standard of 9(b).  In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers.  See Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987).  Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and, where possible, the roles of the individual defendants in the misrepresentations. Id.  Accordingly, the Complaint meets the 9(b) heightened pleading standard because it (1) specifies the statement that is misleading, (2) identifies Defendants as the speaker, (3) identifies where and when the statement was made  (in the Registration Statement), (4) it pleads with particularity the content of the misleading statement, (5) pleads with particularity what Core obtained thereby, and (6) pleads with particularity how the statement may be misleading.

II.     Plaintiff Did Not Sufficiently Allege an Item 303 Violation

Section 11 of the 1933 Securities Act may also have been violated if Defendants violated Item 303(a)(3)(ii) of SEC Regulation S–K,[1] which requires a public offering prospectus to disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(a)(3)(ii). Item 303(a)(3)(ii) essentially says to a registrant: "If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus." Kapps v. Torch Offshore, Inc., 379 F.3d 207, 218 (5th Cir. 2004) (quoting Oxford Asset Management, Ltd. v. Jaharis, 297 F.3d 1182, 1191-92 (11th Cir. 2002).

Plaintiffs allege that Defendants should have disclosed the rising energy costs that were occurring. The Court does not find this persuasive under the Fifth Circuits holding in Kapps. 379 F.3d at 221 (no Item 303 claim because "the price of natural gas was not a trend required to be disclosed by Item 303.") Power

---

[1] The Court reads the Complaint to state a violation of Item 303 under Section 11 of the Securities Act. As Defendants note, the Fifth Circuit has "never held that Item 303 creates a duty to disclose under the Securities Exchange Act." Mun. Emps.' Ret. Sys. Of Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 436–37 (5th Cir. 2019). A Item 303 claim under Section 10(b) would be dismissed by this Court for this reason. Courts within the Fifth Circuit have extended Item 303 disclosures to encompass Section 11 claims. See McCloskey v. Match Grp., Inc., No. 3:16-CV-549-S, 2018 WL 4053362, at *5 (N.D. Tex. Aug. 24, 2018); Kapps v. Torch Offshore, Inc., 379 F.3d 207, 217 (5th Cir. 2004).

costs are public, and Defendants repeatedly disclosed that increased costs could impact Core's business.

The more relevant contest is the undisclosed "trend" that Core campaigned to impose improper pass-through surcharges on its hosting customers. This trend, according to Plaintiffs, was "known" for the purposes of Item 303 because Core's CEO created and implemented the plan to pass-through Core's power costs to its hosting customers.

While Section 11 claims generally do not require proof of scienter, "[s]ome of the duties of disclosures, the breaches of which Section 11 makes actionable, do require knowledge." J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 392 (6th Cir. 2008). Item 303 mandates the disclosure of "known" trends or events and "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend." Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07–10528, 2010 WL 148617, at *9–10 (S.D.N.Y. Jan. 14, 2010) (holding on motion to dismiss that news articles and price indices published after defendant's IPO were insufficient evidence of defendant's knowledge of a rising foreclosure trend) (collecting cases); J & R Mktg., SEP, 549 F.3d at 392. Item 303 does not require Plaintiffs to plead that Defendants acted with fraudulent intent. It "requires the registrant's actual

knowledge of the relevant trend or uncertainty." <u>Indiana Pub. Ret. Sys. v. SAIC,</u>
<u>Inc.,</u> 818 F.3d 85, 95 (2d Cir. 2016).

   The Complaint fails to allege "trends" were "known" as of the date
the Registration Statement became effective.  Plaintiff impermissibly lumps all
defendants—both officers and outside directors alike—together.  Such group
pleading cannot establish that there was a known trend at the time of the
Registration Statement.  Plaintiffs failed to plead that any individual within Core
knew of the trend.  <u>Slater v. A.G. Edwards & Sons, Inc.,</u> 719 F.3d 1190 (10th Cir.
2013) (observing that plaintiffs' allegations that the defendants failed to disclose
known trends as required by Item 303 "fail to differentiate between the
Defendants, robbing their assertion of plausibility.").

   The Court must only look to whether there was a known trend at the
time the Registration Statement was made effective.  As time went on, Defendants
allegedly learned more about Core's changing business model and potential
liability.  However, at the time of the Registration Statement, Plaintiffs have not
pled, nor can the Court infer, that Defendants knew of a trend that had to be
disclosed under Item 303.  Only with hindsight could the allegation potentially be a
trend.  This does not, however, limit the Court in how it previously analyzed
Statement 5 as a misleading disclosure.  There, without the need to state a trend,

Plaintiffs particularly pled facts that investors should have been informed about how the company intended on orchestrating its energy pricing.

III.   Section 14(a) of the Exchange Act

To plead a Section 14(a) claim, Plaintiffs must allege (1) a false or misleading statement or omission of material fact; (2) made with at least negligence; (3) in a proxy statement that was an essential link in the corporate action that caused the plaintiff's injury.  Braun v. Eagle Rock Energy Partners, L.P., 223 F. Supp. 3d 644, 649 (S.D. Tex. 2016).

Section 14(a) does not require plaintiffs to prove "fraud, deceit, manipulation, or contrivance" in order to state a claim.  Section 14(a) merely requires a plaintiff to prove that the defendant acted "at least negligently."  In re Browning-Ferris Industries, Inc. Shareholder Derivative Litigation, 830 F. Supp. 361, 365 (S.D. Tex. 1993).  In the present case, Plaintiffs pled a Section 14(a) claim based on mere negligence not fraud.  In re Alta Mesa Res., Inc. Sec. Litig., No. 4:19-CV-957, 2023 WL 3873307, at *5 (S.D. Tex. June 7, 2023)

Plaintiffs' claims under Section 14(a) are based on allegations of misleading omissions in the Proxy Statement, which are identical to the omissions in the Registration Statement, as discussed above. This Proxy Statement applies to to "all persons and entities who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the

Merger at the special meeting of XPDI stockholders on January 19, 2022." (Dkt. # 62 at ¶ 2.)

For the reasons above, the Court denies Defendant's Motion to Dismiss as to the 14(a) of the Exchange Act. The Court found that Plaintiff stated with particularity how Statement 5 was misleading at the time of the Proxy Statement.

IV.    Plaintiffs Failed to Plead a Section 10(B) Exchange Act Claim

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege (1) a material misrepresentation or omission, (2) reliance on such misrepresentation or omission; (3) scienter, and (4) loss causation. Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 686 (S.D. Tex. 2013).

Section 10(b) claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b). In re Plains All Am. Pipeline, L.P. Sec. Litig., 307 F. Supp. 3d 583, 614 (S.D. Tex. 2018). To adequately plead a material omission, Plaintiffs must "plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." Magruder, 359 F. Supp. at 459-60. The PSLRA further requires Plaintiffs establish scienter by "stat[ing] with particularity facts giving rise to a strong inference that each defendant acted with intent to deceive, manipulate, or defraud or [with] severe recklessness." Id. at 460.

A. <u>Some of Core's Statements Were Misleading</u>

Plaintiffs' Section 10(b) claim is premised in large part on statements made in the Company's 2021 annual report ("2021 10-K"), the Company's quarterly reports for the first and second quarters of 2022 ("22Q1 10-Q" and "22Q2 10-Q"), and in the Company's second quarter earnings call ("22Q2 Earnings Call").

Specifically, Plaintiffs claim Statement 6 and Statement 7 from 22Q2 10-Q are misleading as well as Statement 8 from Core's 22Q2 Earnings Call. The Court will evaluate each statement in turn.

i.   <u>Statement 6 Is Not Misleading</u>

**Statement 6:** Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us and/or seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be subject to factors outside of our control. (Dkt. # 62 at ¶211.)

Plaintiffs claim Statement 6 is misleading because it downplayed the risk of Celsius bringing claims against Core.  In truth, Plaintiffs allege there was a significant undisclosed risk that Celsius would bring expensive and extensive claims against Core.

The Court does not find this statement misleading.  Plaintiffs did not plead with particularity that Core attempted to hide from investors the impact Celsius' bankruptcy might have on the company.  Moreover, it is not incumbent

upon Core to predict what might occur during Celsius' bankruptcy proceeding.  As

Core said, much of it is "outside of [Core's] control." Securities law does not

require Core to predict the future.  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.

2000) ("[A]llegations that defendants should have anticipated future events and

made certain disclosures earlier than they actually did do not suffice to make out a

claim of securities fraud.").

Defendants' disclosures were consistent with federal securities laws,

which do not "require issuers to predict the precise manner in which disclosed risks

will manifest themselves."  Gomez v. Credit Suisse AG, 2023 WL 2744415, at *9

(S.D.N.Y. Mar. 31, 2023).

ii.    Statement 7 Survives Rule 9(b) Pleading

**Statement 7:**  Continued increases in power costs and unfavorable
prices for digital assets will impact our ability to attract customers for
our services, harm our growth prospects and could have a continuing
material adverse effect on our business, financial condition and results
of operations. … If we are unable to obtain hosting customers at
favorable pricing terms or at all, it could have a material adverse
effect on our business, financial condition and results of operations.
(Dkt. # 62 at ¶ 215; 22Q1 10-Q).

Hosting revenue from customers and related parties is based on
consumption-based contracts with our customers and related parties.
Most contracts are renewable, and ***our customers are generally billed
on a fixed and recurring basis*** each month for the duration of their
contracts, which vary from one to three years in length." (Dkt. #62 at
¶ 200; 22Q1 10-Q.)

Plaintiffs claim Statement 7 is misleading because it was not the power costs themselves that were a risk to the business.  Rather, it was Core's response to its increased power costs that was jeopardizing the Company's hosting business. Plaintiffs argue Core should have disclosed the receipt of customer complaints.

Defendants argue that just because Core received complaints from some of its hosting customers does not render Core's risk disclosures materially misleading.  See In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) ("[C]ourts generally do not impose a duty to disclose . . . internal problems merely because those problems were potentially significant").

For reasons explained above, the Court finds Plaintiffs pled particular facts that it was not enough to discuss the fixed pricing without letting investors know of their attempt to foist pass through costs onto their customers.   In this 10-Q filing, Core reiterated that it "generally billed a fixed rate."  But by this time, the pass-through strategy was allegedly not just a hypothetical future plan.  Rather, it was concrete and just a couple months away from when customers began to dispute the pass-through costs.  Plaintiffs therefore pled with particular facts this was misleading.

   iii. <u>Statement 8 Survives Rule 9(b) Pleading</u>

**Statement 8:** During the 22Q2 Earnings Call, Levitt stated that:  "We took a long hard look at our hosting business. Historically, the

business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day one. ***We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms. … … Initial customer acceptance, … validate[s] our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our offering.*** (Dkt. # 62 at ¶223.)

Plaintiffs claim Statement 8 was misleading because several hosting customers had disputed Core's improper surcharges and challenged their legality, which did not "validate" Core's strategy and showed that customers were not "eager" to engage in Core's hosting business.

By the time Levitt made Statement 8, Plaintiffs allege following events had occurred:

In June of 2022, Ernst & Young ("EY") evaluated Core's effort at passing through rising powers costs and questioned "the legal validity of passing through [power] cost."  EY suggested that Core include in its financials "an offsetting allowance . . . as opposed to merely recording of revenue" in case customers disputed the pass through of increased utility costs.  (Dkt. # 62 at ¶ 239.)

Just as EY predicted, questions about the pass-through costs began to circulate.  On June 19, 2022, Poolin Technology Pte. wrote, "I remembered the hosting fee is 6.5 cents in the hosting contract, could you explain why the hosting price was changed?"  (Id. at ¶ 244.)  On June 23, 2022, Core had received an email

from Atlas stating, "Atlas hereby disputes Core's June 2022 invoice because Core has inappropriately and without any contractual basis increased the price of KWh. (Id. at ¶ 242)  On June 25, 2022, Alloy Ventures Management wrote to Core, "This is a bit unexpected as conversations in the past had led me to believe our rate would be guaranteed through end of term in March 2023."  (Id. at ¶ 244)  On July 15, 2022, Celsius received its first post-petition invoice from Core Scientific, which totaled approximately $4.6 million.  (Ex. E at 26.)  The July 15 invoice contained a new line item that had never before appeared on any previous (i.e., prepetition) invoice, called "Power Costs Pass-through."  One former employee of Core said that in a summer meeting, management discussed that Celsius had pushed back on Core's new pass-through surcharges. (Id.)  On July 16, 2022, Core had received a letter from the general counsel of its client CoreWeave, stating, "[Y]ou are hereby notified that CoreWeave disputes charges 1 and 2 namely, the two charges for May and June 2022 'Power Costs Pass-through.'"  (Id. at ¶ 123.)

After these events occurred, Core CEO told investors that the change was validated by customers.  For this, Plaintiffs pled with particularity that they were misled.

      B.      <u>Plaintiffs Pled Particular Facts of Reliance on Misleading Statements</u>

Plaintiffs pled adequate reliance because investors bought stock after Core allegedly misled investors in its SEC filings.  On March 30, 2022, Core filed

its 2021 annual report with the SEC on Form 10-K ("2021 10-K").  On May 13, 2022, Core filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2022 ("22Q1 10-Q").  In both filings, Core did not change its position or articulate how it would price energy contracts.  Just a month later, Core started to receive push-back from clients pertaining to pass-through costs.  Plaintiffs pled with particularity that Core should have disclosed its changed business strategy before pushback started to occur a month later.  Core allegedly did not disclose how it was planning on changing its business model. Viewing the facts in light most favorable to Plaintiff, it omitted relevant information.

Plaintiffs pled particular facts to show investors relied on this omission when buying stock.  As stated, Core made a public filing with the SEC on March 30, 2022 and on May 13, 2022.  As pled, class members bought shares after these two SEC filings.  Three-hundred shares were purchased by William J. Emanuel on June 17, 2022.[2]  Evan Achee bought shares on the following dates in 2022: June 13, June 28, July 6, and July 12.[3]  Plaintiffs thus pled that both Emanuel and Achee read the quarterly reporters and bought shares based on potential misinformation.

---

[2] (Pl. Ex. 1.)

[3] (Pl. Ex. 2.)

Moreover, Plaintiffs particularity pled reliance on the second quarter earnings call and accompanying Form 10-Q filed on August 22, 2022.  Lead Plaintiff, Morgan Hoffman, purchased 10,000 shares of Core common stock on October 19, 2022. ¶ 29 ("incorporat[ing] by reference" Hoffman's PSLRA certification, Dkt. # 17-2 at 8).  Hoffman bought these shares after the August 10-Q.  Defendants argue (for the first time in their Reply) that Hoffman cannot allege reliance because his October 2022 purchase occurred after the truth emerged in a September 2022 bankruptcy court filing by Celsius.  Thus, Hoffman could no longer rely on the previously misleading statements once the truth entered the marketplace.

This Court has recognized that "'arguments raised for the first time in a reply brief are generally waived.'" <u>Wilson v. Tessmer Law Firm PLLC</u>, No. 5:18-cv-1056-DAE, 2021 WL 7448751, at *3 (W.D. Tex. Mar. 4, 2021).  However, even if the Court entertains this argument, it is unpersuasive.[4]  Defendants misread the Complaint because Plaintiffs did not plead that the September Celsius filing fully disclosed the truth.  Rather, it was a partial disclosure. (Dkt. # 62 at ¶117.)  According to Plaintiffs, more information emerged after the October purchase.  (<u>Id.</u> at ¶¶ 120-23.)  Courts have held that purchases

_____

[4] Because the Court does not rely on Defendants' first-time argument in their reply brief, it denies Plaintiff's Motion to Strike.  (Dkt. # 70.)

made after a partial disclosure does not defeat reliance on alleged misstatements.
In re Under Armour Sec. Litig., 631 F. Supp. 3d 285, 304 (D. Md. 2022) ("as
several courts have observed, a stock purchase after a partial corrective disclosure
is not per se evidence that a class representative … did not rely on the alleged
fraudulent representations.").  Lastly, Defendants fail to account for the fact that
Hoffman bought shares in June, shortly after Core made public filings with the
SEC on March 30, 2022 and on May 13, 2022. Therefore, Hoffman can also
adequately pled reliance on alleged misleading statements based on his June stock
purchases (Dkt. # 17-2 at 8).

      C.  <u>Plaintiffs Failed to Plead Scienter.</u>

      The PSLRA requires a securities fraud complaint to state with
particularity facts that give rise to a strong inference of scienter.  15 U.S.C. § 78u-
4(b)(2).  On a motion to dismiss, the relevant inquiry "is whether all of the facts
alleged, taken collectively, give rise to a strong inference of scienter, not whether
any individual allegation, scrutinized in isolation, meets that standard."  <u>Tellabs,
Inc. v. Makor Issues & Rts.</u>, Ltd., 551 U.S. 308, 322–23 (2007).

      i.  <u>Plaintiffs Engaged in Group Pleading</u>

      Group pleading occurs when a plaintiff fails to specify which
defendants made the alleged misstatements or omissions, and attributes the
wrongdoing to defendants collectively.  <u>Indiana Elec. Workers' Pension Tr. Fund</u>

IBEW v. Shaw Grp., Inc., 537 F.3d 527, 533 (5th Cir. 2008).  This type of pleading "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 365 (5th Cir. 2004)

        The Fifth Circuit has repeatedly rejected the "group pleading approach to scienter," and instead "focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the collective knowledge of all the corporation's officers and employees."  Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 957 (5th Cir. 2016) (internal quotations omitted).  As a result, "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."  Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002).  And "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded."  Southland, 365 F.3d at 365.

In their complaint, Plaintiffs engage in group pleading.  For nearly all Defendants, the Complaint alleges only that they signed the Registration Statement, Proxy Statement or SEC filings.

Further, the fact that Defendants executed a statutorily-required Sarbanes–Oxley Act ("SOX") certification does not on its own establish scienter. Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc., 497 F.3d 546, 555 (5th Cir.2007).  To infer scienter from SOX certifications, there must be facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  Shaw Group, 537 F.3d at 545

The Complaint need not establish actual knowledge.  "Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." Stone v. Life Partners Holdings, Inc., 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (citing Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir. 2001) (defining recklessness as "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.")).

As stated above, the Complaint was too vague to support a strong inference of scienter because Plaintiffs engaged in group pleading and individual defendants were not connected to the alleged fraud.

For instance, Plaintiffs pled that Ernst & Young ("EY") disputed the idea that Core's contracts permitted pass through costs.  However, Plaintiffs did not allege with specificity as to who in the company was actually aware of EY's alleged recommendations, took part in any discussions, or chose to ignore the supposed advice.  The same can be said as to the receipt of customer complaints. Plaintiffs allege that Core's receipt of complaints from hosting customers supports a finding of scienter.  However, Plaintiffs did not allege that any Defendant knew about these complaints, who received the complaints, who was responsible for adjudicating them, and when Defendants were otherwise made aware of them. Allegations that "Core executives" received such complaints are insufficient.  See Veal v. LendingClub Corp., 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019) (no scienter where complaint "fails to connect any . . . Defendant[] to the customer complaints.").

Additionally, Levitt, who was the CEO, cannot be said to have the requisite scienter. Plaintiffs pled that he instructed Core employees to "come up with a suggested plan, including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases.  However, that does not

mean that Levitt knew it was wrong or that he would mislead investors in future SEC filings. The pleading only suggests that Levitt intended to implement a new business strategy.  The Complaint thereafter fails to state with particularity Levitt's future involvement into the execution of that strategy and whether he personally received pushback.

      ii.    <u>The Special Circumstances / "Core Operations" Doctrine Does Not Apply</u>

At any rate, the Fifth Circuit's disdain for group pleading is not absolute. In <u>Diodes</u>, the Fifth Circuit held that an officer's position in a company can support scienter where "special circumstances" are alleged, including "transactions critical to the company's continued vitality [and] omitted information readily apparent to the speaker." <u>Carlton v. Cannon</u>, 184 F. Supp. 3d 428, 459 (S.D. Tex. 2016) (citing <u>Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.</u>, 810 F.3d 951, 959 (5th Cir. 2016)).  In doing so, the court considered four "special circumstances" sufficient to find scienter based on position alone: (1) whether the company is small, thus making it more likely that executives are familiar with day-to-day operations; (2) whether the transaction was critical to the company's existence; (3) whether the misrepresented or omitted information was readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent.  <u>Id.</u>  "No one 'special circumstance' is

dispositive," such that Plaintiffs need only allege "some combination of four considerations that might tip the scales in favor of an inference of scienter." Id. at 484 (quoting Diodes, 810 F.3d at 959).

The Fifth Circuit and other courts have been reluctant to apply the limited exception recognized in Diodes.  See e.g., Rosenzweig, 332 F.3d at 867–68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business— water-privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success.")

Plaintiffs have not sufficiently alleged that the purported fraud warrants application of the narrow exception.  With 118 employees, Core is larger than other companies in which the Fifth Circuit has found a "special circumstance."  Ex. A at 267; E.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 425 (5th Cir. 2001) (32 to 35 employees); Neiman v. Bulmahn, 854 F.3d 741, 750 (5th Cir. 2017) (no "special circumstances" where company had "over 60 employees").

Most important, the pleadings fail to allege whether the alleged omitted information would have been apparent to the speaker.  Collmer v. U.S. Liquids, Inc., 268 F.Supp.2d 718, 754 (S.D. Tex. 2003) ("[T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how

37

plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (citations omitted) (quotation marks omitted)).  In this case, Plaintiffs failed to plead what information Defendants might have had access to.  Moreover, Plaintiffs failed to plead that Defendants would know that pass-through costs were improper.

Plaintiffs have pled that pass-through costs were "critical to the company's continued vitality."  Power costs were the primary expense associated with Core's business and the hosting segment comprised approximately 25% of Core's revenues in 2022.  (Dkt. # 62 at ¶ 233.)  In fact, by mid-July 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes. (Id. at 245.)  As a result of these disputes, Core lost customers accounting for as much as 88.7% of its hosting revenues and 22.1% of its total revenues.  (Id. at ¶¶126-27.)

However, the importance of the overdue accounts receivables is just one factor in whether to impute knowledge onto Defendants.  The Complaint does not state how and why Defendants may have learned of such account receivables.  Plaintiffs have not pled that Defendants would have been exposed to internal corporate documents, who received them, or how plaintiffs learned of them.  The complaint is bereft of details of specific conversations or board meetings dealing

with such problems.  Ultimately, it is not enough that Plaintiffs would have known by virtue of their positions.  Something must link the Defendants to show scienter for the special circumstance exception to apply.

In a fraud claim, such specificity is imperative because the scienter requirement must at least allege that Defendants were reckless in knowing, approving, and misleading investors of pass-through costs.  Magruder, 359 F. Supp 3d at 460.  In this case, the omission of when and how Defendants might have learned about foisting pass through costs onto Defendants is critical.  As to many of the Defendants named in the Complaint, it is not clear if they ever knew that such pass-through costs were possibly improper.  It also is not clear whether and how some of the Defendants might have heard about the rising accounts receivables.  If Defendants were put on notice of the rising accounts receivable in July, there is no scienter for the quarterly statements made earlier in the year.

When Plaintiffs did specify scienter, it negated any wrongdoing.  For instance, Defendant Sterling allegedly attended Core's monthly budget review meetings in the summer of 2022 where Core discussed Celsius' pushed back on surcharges.  The exact date of these meetings was not specified. On August 22, 2022, Sterling signed the 22Q2 10-Q stating "Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us. …" (Dkt. # 62 at ¶ 210).  In disclosing Celsius attempt to terminate its agreement with Core,

Sterling signed off on what he learned during the 2022 summer meetings.  (Id.)
Plaintiffs fail to allege any facts prior to the summer meetings specific to Sterling
where he would have recklessly or knowingly misled investors in earlier 10-Q
forms.

   It is also possible to infer nonfraudulent intent by way of Defendants
seeking input from their audit team and legal team.  That Core's legal team signed
off on these pass-through charges supports a non-culpable inference.  See, e.g.,
S.E.C. v. Snyder, 292 F. App'x 391, 406 (5th Cir. 2008) (relying on counsel's
advice is "a means of demonstrating good faith and represents possible evidence of
an absence of any intent to defraud").

   Motive can be properly considered alongside other allegations of
scienter.  Owens v. Jastrow, 789 F.3d 529, 540 (5th Cir. 2015).  Even if allegations
of Defendants' motives do not suffice by themselves to show scienter, they
contribute to the holistic analysis of the allegations.  See also Spitzberg v. Houston
Am. Energy Corp., 758 F.3d 676, 684-85 (5th Cir. 2014) (motive allegations
"might meaningfully enhance the strength of scienter," but are not necessary).
Plaintiffs pled that Defendants Levitt and Feinstein each beneficially owned tens of
millions of shares of Core common stock.  Feinstein capitalized on this new
avenue for monetization, selling 6 million shares during the Class Period in a one-
week span for over $18 million.  However, the Court notes that not a single other

Defendant sold stock, negating an inference of scienter among all Defendants.  See

Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017)

("Courts typically find that the fact that the other defendants did not sell their

shares during the relevant class period undermines plaintiffs' claim of scienter.")

(quotations omitted).  To the contrary, Defendants acquired Core stock, including

over 23 million shares during the Class Period.  See In re Biogen Inc. Sec. Litig.,

193 F. Supp. 3d 5, 50 n.21 (D. Mass. 2016), aff'd, 857 F.3d 34 (1st Cir. 2017) (that

defendants increased holdings during class period and suffered significant losses

undermined inference of scienter).

Because Plaintiff failed to plead scienter, the Court dismisses without

prejudice Plaintiffs' 10(b) claim.

D. Plaintiff Did Not Adequately Plead Loss Causation

The PSLRA requires a plaintiff to prove that the alleged

misrepresentation "caused the loss for which the plaintiff seeks to recover" 15

U.S.C. § 78u–4(b)(4).  Loss causation under a Section 10(b)(5) claim requires a

plaintiff to "adequately allege and prove the traditional elements of causation and

loss."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005).  This requires a

plaintiff to allege "a plausible causal relationship between the fraudulent

statements or omissions ... followed by the leaking out of relevant or related truth

41

about the fraud that caused a significant part of the depreciation of the stock."
Lormand v. US Unwired, Inc., 565 F.3d 228, 258 (5th Cir. 2009).

A corrective disclosure is a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud.  It must be a "relevant or related truth about the fraud." Lormand, 565 F.3d at 258.  This is because price changes "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events." Dura, 544 U.S. at 343.

Plaintiffs failed to adequately plead a corrective disclosure because it cannot rely on Celsius' motion for civil contempt in its bankruptcy proceedings. On September 28, 2022, during bankruptcy proceedings, Celsius alleged that Core breached its agreements.  (Dkt. #62 at ¶ 116.)  This allegedly revealed to investors that Core was passing through its own increased energy costs onto its hosting customers.  (Dkt. #62 at ¶ 116.)

The Court cannot rely on the Celsius disclosure because "a corrective disclosure that is entirely based on another party's allegation in a separate suit does not pass muster." Genesee Cnty. Emps' Ret. Sys. v. FirstCash Holdings Inc., No. 4:22-CV-0033, 2023 WL 2752846 at *20 (Mar. 31, 2023).  In Genesee Cnty, the court discussed the presumption of innocence and peril of using a complaint in one

42

matter as a basis of liability in another.  Id.  While there has been discovery in Core's contract dispute with Celsius, the Court agrees with the rationale behind Genesee Cnty and is wary to transform an unadjudicated breach of contract dispute between Celsius and Core into a corrective disclosure.

Plaintiffs argue that the Court can read the Celsius disclosure with the totality of the other alleged partial disclosures.  Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 324 (5th Cir. 2014).  Even if the Court chooses to do so, the other partial disclosures do not satisfy the loss causation prong.

On October 27, 2022, Core filed a Form 8-K report with the SEC, revealing that due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius," the Company would not make outstanding payments for financing and was exploring strategic alternatives to its capital structure.  (Dkt. # 62 at ¶ 133.)  Plaintiffs fail to plead how this statement "revealed" to the market that Defendants' prior statements were false.  The 8-K reiterates many of the risks disclosed in prior public statements to the SEC.  Therefore, there is a disconnect between the facts allegedly concealed and the purported corrective disclosures. See Magruder v. Halliburton, No. 3:05–CV–1156–M, 2009 WL854656, at *15 (N.D. Tex. 2009) (no loss causation because "Plaintiffs simply fail to connect the

alleged misrepresentations with correlative corrective disclosures during the Class Period.")

Plaintiffs also failed to plead how Core's own Bankruptcy filing on December 21, 2022, was a corrective disclosure.  During Core's bankruptcy proceedings, Celsius filed an objection to a motion filed by Core "to set the record straight with respect to the terms of the Celsius Contracts." (Dkt. #62 at ¶ 120.)  As stated in Genesee Cnty, the Court will refrain from using the unadjudicated dispute as a means for a corrective disclosure.  Moreover, the bankruptcy did not reveal that any past statements were misleading.  Core's bankruptcy confirmed what was disclosed in its October 22 Form 8-K.

Plaintiffs argue that the Court should adopt a materialization of the risk theory towards loss causation.  Under this this approach, the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss.  In re Enron Corp. Securities, Derivative & "Erisa" Litig., 2005 WL 3504860, *18 (S.D. Tex. Dec. 22, 2005) (quoting In re Initial Public Offering Sec. Litig. v. Credit Suisse First Boston Corp., No. MDL 1554(SAS), 21 MC 92(SAS), 2005 WL 1529659, *6 (S.D.N.Y. June 28, 2005).  This contrasts with a "corrective disclosure" whereby an alleged misstatement is an intentionally false opinion, and the market does not respond to the truth until the falsity is revealed. In re Initial Public Offering Securities Litig., 399 F.Supp.2d 298, 307

(S.D.N.Y.2005); In re Enron Corp. Securities, Derivative & "Erisa" Litig., 2005 WL 3504860, *18 (S.D. Tex. Dec. 22, 2005).  Plaintiffs argue that they prevail under a materialization of the risk theory because investors did not disclose pass-through pricing and disputed charges.  Thereafter, the concealed risks materialized.

The Court notes that the Fifth Circuit has yet to comment on the validity of "materialization of the risk" as a method of showing loss causation. Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 709 (S.D. Tex. 2013).  At least two district courts in this circuit have permitted securities-suit plaintiffs to rely on the materialization-of-the-risk theory of loss causation.  See Aubrey v. Barlin, No. A-10-CA-76-SS,  2010 WL 3909332, at *12 (W.D. Tex. 2010) (permitting the plaintiffs to rely on the materialization-of-the-risk theory);  In re Enron Corp. Sec., Derivative & "ERISA" Litig., 439 F.Supp.2d 692, 706 (S.D. Tex. 2006) (permitting the plaintiffs to plead the materialization-of-the-risk theory of loss causation but noting that, when that case was decided, the Fifth Circuit had "not addressed loss causation since Dura Pharmaceuticals was issued").  Another court, however, noted that Fifth Circuit case law appears to require a corrective disclosure to show loss causation.  In re Dell Inc., Securities Litig., 591 F.Supp.2d 877 (W.D. Tex. 2008).

The Court declines to adopt the materialization of the risk theory given the uncertainty of its application in the Fifth Circuit and for policy reasons. Specifically, the Court is sensitive to endorse the theory when it is tied to Plaintiffs

reliance on Core's dispute with Celsius.  The September 28 Celsius disclosure is potential evidence of a materialized risk because Celsius' bankruptcy is a possible byproduct of the pass-through costs that Plaintiffs argue should have been disclosed.  The Court will refrain from using the unadjudicated contract dispute to satisfy loss causation.  Therefore, the Court must analyze whether the corrective disclosures revealed concealed truths to the marketplace.  As stated above, Plaintiffs failed to plausibly plead that either the 8-K or Core's bankruptcy filing brought any new truths to the marketplace.

        If the Court adopted a materialization of the risk theory, it fears that it would eviscerate Dura's loss causation requirement, as any negative news following a misrepresentation could, arguably, "materialize" the risk of a prior misrepresentation.  See In re Williams Sec. Litig., 496 F.Supp.2d at 1265; see also Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir.2007) (if the "risk could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement.").  The Court thus finds Plaintiffs have failed to allege the loss causation element of Section 10(B).

        In sum, the Court finds that Plaintiffs' pleadings did not satisfy all the elements of Section 10(B) of the Exchange Act.  While the Court found Plaintiffs

sufficiently pled some statements to be misleading, Plaintiffs failed to plead

scienter and loss causation among the Defendants.  Therefore, the Court **GRANTS**

Defendants' Motion to Dismiss Plaintiffs' claim under Section 10(B) of the

Exchange Act. The claim will be dismissed without prejudice.

V.     Plaintiffs Failed to Plead a Control Person Claims, Except as to CEO
       Levitt under Section 15 of the Securities Act.

Plaintiffs alleged that the Defendants are liable as "control persons" of

Core under Section 20(a) of the Exchange Act. (Dkt. # 62 at ¶ 146). Section 20(a)

imposes joint and several liability on "[e]very person who, directly or indirectly,

controls any person liable under any provision of this chapter or of any rule or

regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a).  "Control person

liability is secondary only and cannot exist in the absence of a primary violation."

Southland Securities Corp., 365 F.3d at 383.

To state a control person claim, Plaintiffs must allege: (1) an

underlying primary violation; and (2) that the defendant directly or indirectly

possessed "the power to direct or cause the direction of the management and

policies of a person, whether through the ownership of voting securities, by

contract, or otherwise." G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 957

(5th Cir. 1981).

Although the Fifth Circuit has not directly addressed the issue, other courts have held that the primary violator can be a corporation and need not be named in the same action against the defendant allegedly subject to control-person liability. In re Supreme Specialties, Inc., Sec. Litig., 438 F.3d 256, 285 (3d Cir. 2006), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D., 551 U.S. 308 (2007) ("[T]here is no requirement in the language of [§ 20(a) ] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants."); Kemmerer v. Weaver, 445 F.2d 76, 78 (7th Cir. 1971) (control-person liability adequately alleged based on a primary violation by a nondefendant, since-dissolved association); In re Hayes Lemmerz Int'l, Inc., 271 F. Supp. 2d 1007, 1021 n.11 (E.D. Mich. 2003) ("[I]f the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons.").

Courts have also held that the Bankruptcy Code's automatic-stay provision, 11 U.S.C. § 362(a)(1), does not prevent a plaintiff from asserting a control-person claim when the primary violator, as here, is a corporation in bankruptcy.  In re Thornburg Mortg., Inc., Sec. Litig., 824 F. Supp. 2d 1214, 1279 (D. N.M. 2011) (collecting cases).  Courts reason that the "liability of the primary violator is simply an element of proof of a section 20(a) claim, and . . . liability

need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong." In re CitiSource, Inc., Sec. Litig., 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988).  As one district court in this circuit explained, "nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability." Keys v. Wolfe, 540 F. Supp. 1054, 1062 (N.D. Tex. 1982), rev'd in part on other grounds, 709 F.2d 413 (5th Cir. 1983).

     In this case, Plaintiffs allege that the primary violator was Core as a company.  For instance, the Complaint states, "Director Defendants exercised their power and authority to cause *the Company* to engage in the wrongful acts complained of herein.  The XPDI Director Defendants, therefore, were 'controlling persons' *of the Company* within the meaning of Section 20(a) of the Exchange Act." (Dkt. # 62 at ¶ 165.)  Core is not a named Defendant.  Even so, the complaint may allege violations by Core, for purposes of control person liability, without seeking to hold Core itself liable for those violations.  However, Plaintiffs therefore must provide proof and state a primary violation by the Company.  See In re Citisource, Inc. Securities Litigation, 694 F.Supp. 1069, 1077 (S.D.N.Y.1988) (holding "liability of the primary violator is simply an element of proof of a section 20(a) claim").

The Complaint seeks to hold Core accountable by virtue of actions by its management.  Therefore, proof that Core is a controlled entity and primary violator must come from the Complaint's allegations against named Defendants. As stated in Section IV, *supra*, the Plaintiffs failed to plead fraud under Section 10(b) as to all the Defendants.  Thus, when Plaintiffs fail to adequately plead a primary violation by a "controlled person," courts should dismiss the § 20(a) claim.  Southland, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.)"

However, Plaintiffs have also stated a Control Persons Claim under Section 15 of the Securities Act, which provides that "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control."  This operates much like control-person liability under the Exchange Act and the Fifth Circuit gives them the same interpretation.  Pharo v. Smith, 621 F.2d 656, 673 (5th Cir.1980); G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 958 & n. 22 (1981).

As stated in Section I, *supra*, the Court found a violation under Section 11 of the Securities Act.  This claim can be attributed to Core for the purposes of a control persons claim.

Now, the Complaint must plead that Defendants were controlling persons and had the requisite power to influence the alleged misleading statement highlighted in Section I, *supra*.

A survey of Fifth Circuit caselaw shows that a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." Heck v. Triche, 775 F.3d 265, 283 (5th Cir. 2014) (quoting Meek v. Howard, Weil, Laboisse, Friedrichs, Inc., 95 F.3d 45, at *3 (5th Cir. 1996) (per curiam) (unpublished)).  Control-person liability demands something beyond a defendant's corporate status but can be something short of culpable participation in the primary violation.  The Fifth Circuit looks to see if Defendant had "effective day-to-day control" of the corporation and "actual[ly] exercise[d]...that power." Abbot v. Equity Group, Inc., 2 F.3d 613, 620 (5th Cir. 1993).

The Fifth Circuit has found support for a control-person claim when the defendant's role gave him the power to control the fraudulent transaction or activity.  In Thompson, for example, the plaintiff sued several officers, directors, and shareholders in a mortgage-loan-marketing company.  636 F.2d at 949.  The Fifth Circuit considered whether the district court erred in failing to grant a director-defendant's motion for judgment as a matter of law dismissing the control-person claim.  Because the evidence showed that the defendant "was not only a

24% stockholder and an officer and director, but was apparently involved in the day-to-day coordination of the loan gathering,"—the conduct forming the basis for the primary violation—the Fifth Circuit held that the plaintiff had "established that [the defendant] had the requisite power to directly or indirectly control or influence corporate policy." Id. at 958.

The primary violator in Heck v. Triche was the CEO of an antique-investment firm who issued allegedly misleading prospectuses to raise money from private investors.  775 F.3d 265 (5th Cir. 2014).  The control-person defendant was a certified public accountant who helped draft the prospectuses. Id. at 268.  The Fifth Circuit found a sufficient basis to support control-person liability.  Id. at 282–84.  The court reasoned that the CEO "was dependent" on the defendant "to get him out of debt," that the defendant "contributed and approved the financial concepts detailed in the prospectus," and that the CEO "checked in with [the defendant] after every investment." Id. at 284.

When the Fifth Circuit has found insufficient support for a control-person claim, the defendant's role put the fraudulent transaction or activity outside his ability to control.  In Dennis v. Gen. Imaging, Inc., for example, the record showed that one defendant "owned a minority position" in the corporation, another was a director who "had no knowledge" of the allegedly fraudulent operations, and a third was a "nominal shareholder" who had "tried numerous times to obtain

information concerning the [allegedly fraudulent] financial conduct... but was always rebuffed."  918 F.2d  496, 509–10 (5th Cir. 1990).  The Fifth Circuit affirmed summary judgment for the defendants dismissing the control-person claims against them.  Id.

        In Zagami v. Natural Health Trends Corp., 540 F. Supp. 2d 705 (N.D. Tex. 2008), the court held that the plaintiffs had sufficiently alleged a control-person claim against a company's internal director.  This director allegedly reviewed the company's financial statements and internal accounting controls during the relevant period.  The company was the primary violator liable under § 10(b) for failing to disclose related-party transactions.  The plaintiffs alleged that the defendant was the "independent director and chair" of the audit committee "charged with reviewing and approving all related-party transactions" when the failure to disclose occurred.  Id. at 716.  The allegations pled facts showing the defendant's "ability to control the specific transaction or activity upon which the primary violation [was] based."  Heck, 775 F.3d at 283.

        In this case, Plaintiffs have failed to plead a control persons claim for all named Defendants except CEO Levitt.  The Complaint states, "[b]ecause of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace …."  (Dkt. # 62 at ¶ 263.)

The Complaint further alleges that "Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  Defendants, therefore, were 'controlling persons' of the Company within the meaning of Section 20(a) of the Exchange Act."  Id.

It is simply not enough to allege that because of one's position on the Board or within the company, that the individual was able to exercise control and make decisions pertaining to the alleged fraud.  A survey of Fifth Circuit law is clear that there must be some fact that pleads a Defendant had "the requisite power to directly or indirectly control or influence corporate policy."  Thompson, 636 F.2d at 957.  Outside of Levitt, Plaintiffs have alleged Defendants participated in the day-to-day operations of the Company, but they have pointed to no specific knowledge or facts demonstrating such control.

Plaintiffs have pled that as CEO, Levitt had control over Core's strategy to impose pass-through costs and its ultimate disclosures.  Plaintiffs pled that it was Levitt's decision to impose the surcharges.  Plaintiffs also pled that Levitt spoke about the restructuring of pricing at an earnings call.  Therefore, particular facts were pled to show that Levitt had control over this strategy before making the alleged misleading statements about them.  Therefore, the Court will **DISMISS** all claims control person claims without prejudice, except as to CEO Levitt.

Case 1:22-cv-01191-DAE   Document 73   Filed 12/20/23   Page 55 of 55

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** AND

**DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 65).  The Motion is

**GRANTED** as to: (1) Plaintiffs' claim under Section 10(b) of the Exchange Act

and said claim is **DISMISSED WITHOUT PREJUDICE**; and (2) Plaintiffs'

claim under Section 20(a) of the Exchange Act and said claim is **DISMISSED**

**WITHOUT PREJUDICE**.  The Motion is **DENIED** as to: (1) Plaintiffs' claim

under Section 11 of the Securities Act; and (2) Plaintiffs' claim under Section 14 of

the Exchange Act.  The Motion is **FURTHER GRANTED IN PART** and

**DENIED IN PART** as to Plaintiffs' claim under Section 15 of the Securities

Act.  The Section 15 claim against Michael Trzupek, Denise Sterling, Darin

Feinstein, Brian Neville, Jarvis Hollingsworth, Matt Minnis, Stacie Olivares,

Kneeland Youngblood, Patrick C. Eilers, Theodore J. Brombach, Paul Gaynor, Paul

Dabbar, Colleen Sullivan, and Scott Widham is **DISMISSED WITHOUT**

**PREJUDICE**.  The Section 15 claim against Levitt will proceed.

    Lastly, the Court **DENIES** Plaintiffs' Motion to Strike as it did not rely

on any new arguments advanced in Defendants' reply brief (Dkt. # 70).

    **IT IS SO ORDERED.**

    DATED: Austin, Texas, December 20, 2023

_____
David Alan Ezra
Senior United States District Judge

55