# EXHIBIT O

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>CORE SCIENTIFIC, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-90341 (DRJ)<br><br>(Jointly Administered)<br><br>Re: D.I. 1438<br><br>Hearing Date: December 22, 2023 at 10:00 AM CT |

**LEAD PLAINTIFF'S LIMITED OBJECTION TO CONFIRMATION OF
THE THIRD AMENDED PLAN AND DISCLOSURE STATEMENT**

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim (admitted pro hac vice)
Joshua Baker (admitted pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com


*Lead Counsel for Lead Plaintiff*

**CONDON TOBIN SLADEK
THORNTON NERENBERG PLLC**

Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile:  (214) 691-6311
scochran@condontobin.com



*Liaison Counsel for Lead Plaintiff*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Lead Plaintiff Morgan Hoffman and named plaintiffs Evan Achee and William J. Emanuel (together, "Plaintiffs"), on their own behalf and on behalf of the Class (defined below), hereby object to the Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors (D.I. 1438, the "Plan") and the Disclosure Statement for the Plan (D.I. 1439, "Disclosure Statement") as to the broad nondebtor third party releases and injunctions contained therein.

### INTRODUCTION

1.     Plaintiffs are the court-appointed Lead Plaintiff and two additional Plaintiffs named in the operative complaint in the securities class action, *Pang v. Levitt, et al.*, No. 1:22-cv-01191-DAE (W.D. Tex.) ("Securities Action"), representing a putative Class of investors in Core Scientific, Inc. ("Core") securities.

2.     Plaintiffs object to the confirmation of the Plan and the Disclosure Statement because the Plan contains broad nondebtor third party releases and injunctions ("Third Party Releases") that purport to release and enjoin all claims being litigated in the pre-petition Securities Action on behalf of Plaintiffs and the Class against fifteen nondebtor third parties: current and former directors and officers of Core and its predecessor ("Securities Action Defendants").

3.     Indeed, the Debtors are attempting to shoehorn releases of the Securities Action Defendants into the Plan, which releases purport to extinguish the substantive rights and claims of thousands of defrauded Core shareholders who lost as much as $2 billion.[2] The Third Party Releases are a blatant overreach that this Court cannot permit. Indeed, the Third-Party Releases

---

[2] Hoffman's proof of claim originally cited a lower estimated aggregate damages number based on the claims in the initial complaint in the Securities Action, but an updated estimate based on the expanded claims in the operative amended complaint in the Securities Action, including statutory damages pursuant to Section 11 of the Securities Act of 1933, exceeds $2 billion.

are invalid as to Plaintiffs and the Class – and thus the Plan and Disclosure Statement are unconfirmable – for two central reasons.

4.      *First*, this Court lacks subject matter jurisdiction over the valuable legal claims of Plaintiffs and the Class against nondebtor defendants in the Securities Action. This Court also lacks personal jurisdiction over Plaintiffs and the Class, who are strangers to this bankruptcy. Accordingly, the Court has no authority to extinguish their substantive rights by purporting to release and enjoin their claims against other nondebtors. Moreover, any purported failure by Plaintiffs or members of the Class to opt out of the Third Party Releases – for which they received inadequate notice – cannot be deemed to constitute affirmative consent to the jurisdiction of this Court over them or their claims.

5.      *Second*, the Debtors' procedure for distributing the Release Opt Out Form (*see* D.I. 1384 at 28-30) to a subset of the Class does not cure the invalid Third-Party Releases. The notice provides no meaningful details concerning the valuable Securities Action claims being released and the equity securities holders are required to engage in an onerous process to opt-out of the releases in exchange for no consideration. Debtors could just as easily have structured the Third Party Releases with an ***opt-in*** mechanism. They did not, of course, because they recognize there is no chance that a fully informed Class member would willingly agree to release their claims in the Securities Action in exchange for nothing in return.

6.      Accordingly, the Plan and Disclosure Statement are unconfirmable because the Third Party Releases are non-consensual and purport to release the Class's claims against nondebtors. *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009). There are no unusual or rare circumstances presented here which might justify these non-consensual nondebtor releases. The Plan and Disclosure Statement are also unconfirmable to the extent the Debtors characterize

the Third-Party Releases as part of a "settlement" of claims under Section 1123(b)(3)(A) of the Bankruptcy Code, because there is no meaningful consent or consideration. *In re Bigler LP*, 442 B.R. 537, 544 (Bankr. S.D. Tex. 2010).

7.      Accordingly, the Court should deny the Debtors' motion to confirm the Plan and the Disclosure Statement with respect to the Third Party Releases as currently constituted.

## BACKGROUND

### A.      The Securities Action

8.      U.S. District Judge David Ezra appointed Morgan Hoffman as Lead Plaintiff in the pre-petition Securities Action pending in the U.S. District Court for the Western District of Texas, representing the putative Class. Hoffman and the other Plaintiffs filed their amended complaint on May 5, 2023. Securities Action D.I. 62 (amended complaint).

9.      In their amended complaint, Plaintiffs allege, on behalf of themselves and the putative Class, violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rules 10b-5 and 14a-9 promulgated thereunder, against former officers and directors of Power & Digital Infrastructure Acquisition Corp. ("XPDI"), Core's predecessor, and current and former officers and directors of Core.[3] *Id.* ¶ 2. Core is not a party to the Securities Action. *Id.* ¶ 71.

10.     The Class is defined in Plaintiffs' amended complaint as: (a) all persons and entities that purchased or acquired the publicly traded common stock or warrants of Core or XPDI, or purchased call options or sold put options on XPDI or Core common stock, between January 3, 2022 and December 20, 2022, both dates inclusive ("Class Period"); and (b) all persons and entities

---

[3] Prior to combining with Core, XPDI was a public special purpose acquisition company, or "SPAC," also known as a "blank check" company.

who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the Merger (the "de-SPAC" business combination between XPDI and Core) at the special meeting of XPDI stockholders on January 19, 2022.  *Id.* ¶ 1.

11.     The Securities Action Defendants are:

- Former XPDI officers and directors: CEO and Board member Patrick C. Eilers, former Chair Theodore J. Brombach, and former directors Paul Gaynor, Paul Dabbar, Colleen Sullivan, and Scott Widham. *See id.* ¶¶ 32-46.

- Current and former Core officers and directors: former CEO and current Chairman Michael Levitt; former CFO Michael Trzupek, former Chief Accounting Officer Brian Neville, current CFO Denise Sterling, Chief Vision Officer and former Co-Chair of Core's board of directors Darin Feinstein, current director Jarvis Hollingsworth, current director and Core co-founder Matt Minnis, former director Stacie Olivares, and current director Kneeland Youngblood. *Id.*

12.     Plaintiffs allege that the Securities Action Defendants made false and misleading statements and omissions in Core's SEC filings and in public statements made by Levitt. Plaintiffs allege that when the truth was finally revealed and concealed risks materialized, the price of Core's securities plummeted, harming investors. *See id.*

13.     In the Securities Action, the Securities Action Defendants have moved to dismiss the amended complaint and Plaintiffs have opposed the motion, which is fully briefed. The parties are awaiting a decision on the motion from the District Court.

**B.     The Plan, Disclosure Statement, and Plan Approval Motion**

14.     On November 16, 2023, Debtors filed the current Plan and Disclosure Statement after filing the Plan Approval Motion on November 3, 2023. D.I. 1438 (Plan); 1439 (Disclosure Statement) D.I. 1384 (Motion). The Plan contains third party releases and injunctions that expressly purport to release and enjoin, among other things, the claims of Plaintiffs and the Class against the nondebtor Securities Action Defendants in the Securities Action.

15.    The current iteration of the Plan and Disclosure Statement follow Plaintiffs' preliminary objection to the then-current Disclosure Statement, filed on August 10, 2023. D.I. 1132 ("Preliminary Objection"), which raised these and substantially similar issues with the Third Party Releases. D.I. 1132 ¶ 11-27.

### C.    The Third Party Releases

16.    The Plan provides exceedingly broad Third Party Releases for numerous nondebtors, including the Securities Action Defendants, in Article X, Sections 10.5 and 10.6(b). D.I. 1438 at 81-87. The Third Party Releases are broadly drafted to release and enjoin a near-limitless universe of claims, expressly including the claims in the pre-petition Securities Action, including as against an expansive group of nondebtor third parties which would include the Securities Action Defendants. *Id.* For reference, the full language of the Third Party Releases and some of the applicable definitions are reproduced in the Release Opt-Out Form, a copy of which is attached hereto as Exhibit A.[4]

17.    Under Article X, Section 10.5, titled "Injunction," the Plan provides that no entity or person may commence or pursue a claim against any Released Party (including the Securities Action Defendants), including "all claims and Causes of Action asserted or assertable in the Securities Class Action…without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a claim of willful misconduct, fraud or gross negligence against a Released Party or Exculpated Party…." D.I. 1438 at 82.

18.    The claims in the Securities Action do not necessarily represent claims of willful misconduct, fraud, or gross negligence, as they may be satisfied by severely reckless conduct (as

---

[4] The Release Opt-Out Form attached as Exhibit A is from the website maintained by Stretto for "Solicitation    Materials    (Non-Voting)."    https://cases.stretto.com/CoreScientific/court-docket/court-docket-category/1912-solicitation-materials-non-voting/

to the claims for violations of Section 10(b) of the Exchange Act), negligent conduct (as to Section 14(a) of the Exchange Act), or strict liability (as to claims under Section 11 of the Securities Act). *See* Securities Action D.I. 62 at 41-45 and 65-68 (alleging counts under amended complaint).[5]

19.     Under Article X, Section 10.6(b), titled "Releases by Holders of Claims and Interests," the Plan provides that each Releasing Party (defined to include Plaintiffs and the Class) shall be deemed to have released the Released Parties (defined to include the Securities Action Defendants) from all claims, expressly including "all claims and Causes of Action asserted or assertable in the Securities Class Action." D.I. 1438 at 83.

20.     Article 1.253 of the Plan defines "Released Parties" to include all "Related Parties" of the Debtors and other parties. *Id.* at 29. Article 1.252 of the Plan defines "Related Parties" to include current and former officers and directors of a relevant company. *Id.* at 28-29. Article 1.254 defines "Releasing Parties" to include "the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out." *Id.* at 29. Article 1.225 of the Plan defined "Other Beneficial Owners" as "any current or former beneficial owner of equity securities of Core Scientific, Inc., purchased during the period from January 3, 2022 through December 20, 2022, inclusive." *Id.* at 25. Article 1.286 of the Plan defines "Securities Class Action" as "the class action pending in the United States District Court for the Western District of Texas, Austin Division, styled as *Pang v. Levitt et al.*, Case No. 1:22-cv-01191," *id.* at 32.

---

[5] "[C]onduct that is severely reckless satisfies the scienter requirement under section 10(b)." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014). Scienter is not an element of a claim under Section 11 of the Securities Act. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Claims under Section 14(a) of the Exchange Act require only that "defendants acted at least negligently." *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 649-50 (S.D. Tex. 2016).

**D.      The Plan Provides No Consideration for the Release of Securities Action Claims Against Nondebtors**

21.      Plaintiffs and the Class stand to receive no distribution under the Plan, nor any additional consideration for the release of their valuable Securities Action claims.

22.      The Class Proof of Claim filed by Hoffman, on behalf of himself and the Class, was disallowed by this Court. D.I. 1522. Therefore, there is no current proof of claim by *any* verified Class member.

23.      Further, of the individuals who *may* have claims in the Securities Action who individually filed proofs of claims, Debtors have already sought to disallow the vast majority through an omnibus objection. Debtors have continuously stated they would object to and seek to disallow *all* claims brought pursuant to the Securities Action in these cases. *See e.g.*, D.I. 1384 ¶ 55 ("the underlying beneficial owners of those equity securities [purchased by financial institutions in 'street name' as nominees] during the period from January 3, 2022 through December 20, 2022, inclusive [*i.e.*, members of the Class] … may be potential Holders of Section 510(b) Claims (although *the Debtors do not believe any such Claims are valid or will be Allowed*).") (emphasis added).

24.      To the extent that some members of the Class are still holders of "Existing Common Interests" under the Plan by virtue of their continued holding of Core common stock, and thus theoretically entitled to some vaguely defined residual distribution (if any exists) as members of "Class 12" under the Plan, that does not constitute consideration for the release of their claims in the Securities Action. Continuing to hold Core common stock through the Plan's Effective Date is completely irrelevant to membership in the Class or ability to recover in the Securities Action. Indeed, Class members may have sold all of their holdings after (or even during certain later parts of) the Class Period with no prejudice to their ability to recover fully on their claims in the

Securities Action. Indeed, given the total evaporation of the value of Core securities by the end of the Class Period and Core's current share price (trading under $1 on the OTC market), it is likely that the vast majority of the Class sold their Core securities to harvest losses for tax purposes.

25.     The Class's claims in the Securities Action are based on their purchase of Core securities (including securities other than Core common stock) at artificially inflated prices or having held XPDI common stock as of the record date for voting on the XPDI-Core merger, and the damages incurred when the value of the securities plummeted at the end of the Class Period. Thus, any distribution received on account of a Class member's *continuing* ownership of Core common stock is entirely irrespective of the value of the Class member's claims in the Securities Action that the Third Party Releases seek to extinguish. Plaintiffs and the Class will receive no independent consideration for those claims.

26.     Any intimation by Debtors that Plaintiffs or the Class purportedly benefit as Released Parties from a "mutual release," thus serving as consideration for the Third Party Releases, is nonsense. There is no reason to suggest that there exist claims of any value against non-insider public equity holders like Plaintiffs and the Class. Indeed, Plaintiffs struggle to imagine what such claims might be. Thus, any purported benefit from "mutual releases" are illusory in this context and constitute no real consideration for the purported extinguishment of the claims of Plaintiffs and the Class in the Securities Action.

**ARGUMENT**

**A.     The Bankruptcy Code Does Not Expressly Allow Third Party Releases**

27.     Under 11 U.S.C. § 1129(a), the Court must determine that the Plan complies with *all* relevant sections of the Bankruptcy Code prior to granting confirmation. Here the Plan violates Section 524(e) and Section 1123(b)(3)(A) under applicable law.

8

28.     As an initial matter, Debtors do not cite, and Plaintiffs are unaware of, any provisions of the Bankruptcy Code or other statutory authority that allow a bankruptcy court to impose or enforce third party releases between nondebtors.[6] Indeed, well-settled Fifth circuit law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pac. Lumber*, 584 F.3d at 252. In *Pac. Lumber*, the Fifth Circuit found that "[i]n a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties." *Id.* (citing *In re Coho Res., Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir. 1993); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)).

29.     In contrast, courts that have allowed third party releases have relied not on the Code itself, but on broad readings of equitable powers. *C.f. In Re Purdue Pharma L.P.*, 69 F.4th 45, 73 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23-124), 2023 WL 5116031 (U.S. Aug. 10, 2023). In *Purdue Pharma*, the Second Circuit acknowledged the lack of express authority for third party releases in the Bankruptcy Code. *Id.* While the *Purdue Pharma* court did not agree that the lack of express textual authority meant that third party releases *necessarily* fell outside of a bankruptcy court's statutory authority, it noted that its interpretation ran counter to the Fifth Circuit's decision in *Pac. Lumber*, 584 F.3d at 251-53, as well as decisions by the Ninth and Tenth Circuits. *Purdue Pharma*, 69 F.4th at 74.

---

[6] As this Court has emphasized, the text of the Bankruptcy Code is the start of all discussion and actions in this Court. *In re Jones*, 2023 WL 6938266, at *4 (Bankr. S.D. Tex. Oct. 19, 2023) (Lopez, J.) (citing *In re Deberry*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha.") and *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

30.     In seeking to confirm the Plan, the Debtors are asking this Bankruptcy Court to reach to the very outer limits of its equitable powers under Section 105 of the Bankruptcy Code. Debtors ask that the Court approve gratuitous Third Party Releases that would extinguish valuable claims that thousands of persons (who are strangers to this bankruptcy) have against various nondebtor third parties, for no consideration, without any showing that those releases are relevant to the reorganization of Debtors, let alone an essential and critical element of the Plan.

**B.      This Court Lacks Jurisdiction over the Class and the Securities Action**

**1.      This Court Lacks Subject Matter Jurisdiction Over the Claims Purportedly Extinguished Under the Third Party Releases**

31.     This Court has no jurisdiction over Plaintiffs, the Class, or their claims in the Securities Action, and it cannot approve the Plan with respect to the Third Party Releases.

32.     28 U.S.C. § 1334(a) establishes subject matter jurisdiction in the United States District Courts for all cases under Title 11, but extends this power as well to "civil proceedings ... arising in or related to cases under title 11." *See id.* § 1334(b). The Supreme Court has defined jurisdiction under the "related to" clause to include litigation of claims owned by the debtor's estate and litigation between third parties that has an effect on the estate. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5 (1995) ("a bankruptcy court's 'related to' jurisdiction cannot by limitless.").

33.     The leading case in this area of law is *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *overruled in part on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995). In *Pacor*, the Third Circuit acknowledged the wide jurisdiction granted by Congress to bankruptcy courts to facilitate the administration of debtors' estates, but noted that this jurisdiction is "not without limit," explaining that "related to" jurisdiction still requires "some nexus between the 'related' civil proceeding and the title 11 case." *Id.* at 994.

10

34.     As the Third Circuit held in *Pacor*, "***jurisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist.***" *Id.* at 994 (quoting *In re Haug*, 19 B.R. 223, 224–25 (Bankr. D. Ore. 1982)). In *Pacor*, the Third Circuit found that a bare claim of indemnity "at best [] is a mere precursor to the potential third party claim for indemnification by Pacor against Manville" in which the debtor would be free to relitigate any issue necessary to the prior judgment. *Id.* at 995. The potential for a judgment against the debtor posed by the existence of a suit against the non-debtor was not only contingent (the nondebtor defendant might prevail) but it was indirect—any material effect on the estate would require a separate, subsequent lawsuit. *Id.*

35.     In *Zale Corp.*, the Fifth Circuit followed the *Pacor* rationale and found no "related to" jurisdiction over claims between non-debtors, stating:

> We begin our analysis by noting that a large majority of cases reject the notion that bankruptcy courts have "related to" jurisdiction over third-party actions. Those cases in which courts have upheld "related to" jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Conversely, courts have held that a third-party action does not create "related to" jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate.

62 F.3d at 753; *see also In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995) (similar); *In re Vitek*, 51 F.3d 530, 538 n. 39 (5th Cir. 1995) ("the broad latitude afforded bankruptcy courts in fashioning remedies should not be used in a way that tramples on the rights of … non-parties").

36.     As the Fifth Circuit cautioned in *Zale Corp.*, "[w]e must establish independently that a dispute is part of a *bankruptcy* case; the existence of power within the bankruptcy case does not imply an expansion of jurisdiction beyond it. To the contrary, it suggests that courts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes in which someone may be bankrupt." 62 F.3d at 755 (cleaned up, emphasis in original). "Accordingly, a bankruptcy court may potentially include an injunction

11

as part of a settlement only 'once jurisdiction is established.'" *Id.* (quoting *In re Davis*, 730 F.2d 176, 183-84 (5th Cir. 1984)).

37.     The chief jurisdictional (and other) deficiencies with the Third Party Releases are thoroughly illustrated in *Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022) (vacating approval by the bankruptcy court of a plan with "exceedingly broad third-party (non-debtor) releases"), a case with nearly identical circumstances to those presented here.

38.     "Third-party releases, such as those at issue here, carry much controversy, for they are a 'device that lends itself to abuse.'" *Id.* at 654 (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)). Indeed, the circuits that permit nonconsensual third party releases (unlike the Fifth, Ninth, and Tenth Circuits) have made clear that their use is disfavored and should be reserved for the rare or exceptional case. *Id.* (collecting cases from the Second, Third, Fourth, Sixth, and Eleventh Circuits).

39.     The court's description of the releases at issue in *Mahwah Bergen* apply equally to the Third Party Releases here:

> The Third-Party Releases at issue in this case represent the worst of this all-too-common practice, as they have no bounds. The sheer breadth of the releases can only be described as shocking. They release the claims of at least hundreds of thousands of potential plaintiffs not involved in the bankruptcy, shielding an incalculable number of individuals associated with Debtors in some form, from every conceivable claim — both federal and state claims — for an unspecified time period stretching back to time immemorial. In doing so, the releases close the courthouse doors to an immeasurable number of potential plaintiffs, while protecting corporate insiders who had no role in the reorganization of the company.

636 B.R. at 655. The *Mahwah Bergen* court held that in extinguishing these claims by approving the third party releases in the proposed plan, "the Bankruptcy Court exceeded the constitutional limits of its authority … and offended the most fundamental precepts of due process." *Id.* (citing *Stern v. Marshall*, 564 U.S. 462 (2011).

40.     The *Mahwah Bergen* court found that the bankruptcy court did not have authority to adjudicate the claims it purported to release, including prepetition securities claims against nondebtor officers and directors akin to those at issue here:

> The universe of released claims includes claims between non-debtors which may have no connection to the property of Mahwah's bankruptcy estate or the administration of the Bankruptcy Proceeding. For example, the Third-Party Release would bar securities claims, such as those brought by the Securities Plaintiffs, against former directors and officers of Mahwah, even if the claims arose before Mahwah filed for bankruptcy and those directors and officers had no involvement in the Bankruptcy Proceeding.

*Id.* at 670 ("None of these claims appear even related — much less integral — to the restructuring of the debtor-creditor relationship, such that the Bankruptcy Court could adjudicate them without running afoul of the Constitution").

41.     As the *Mahwah Bergen* court explained, "the releases here implicate the constitutional limits on the Bankruptcy Court's ability to adjudicate claims, even if they do not constitute a judgment following a hearing on the merits of the claim." *Id*. That is because "[o]nce the Plan became final, the provisions therein, including the Third-Party Releases, became *res judicata* for subsequent parties trying to bring the claims." *Id.* (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009)). "Likewise, when the Bankruptcy Court declared the releases consensual settlements of the claims, they became final judgments on the merits for purposes of further litigation." *Id.* at 671 (citing *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987)). As the *Mahwah Bergen* court summarized, *id.* at 671:

> At bottom, the Bankruptcy Court extinguished the Released Claims, which amounts to adjudication of the claim for *Stern* purposes. ... To claim that the Bankruptcy Court can fully extinguish these claims based solely on their inclusion in the Plan — without any hearing on them or any findings about them —amounts to arguing that courts need not have the authority to extinguish claims so long as they provide no procedural safeguards in extinguishing the claims. Obviously, this cannot be.

42. An "independent statutory basis must exist for the bankruptcy court to exercise jurisdiction over the [released] claims," outside of the general equitable authority implicated by 11 U.S.C. § 105. *Id.* at 671 (citing *In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986)). Continuing, the *Mahwah Bergen* court explained, *id.*, that:

> Additionally, many of the claims lack any relation to the bankruptcy case, even affording "related to" jurisdiction the most liberal reading. … The Plan confirmation does not merely have a "tangential effect" on the Securities Litigation and other claims. Rather, the Plan has the ultimate effect — extinguishment — on the claims despite having — at most — a tangential effect on the bankruptcy estate. Therefore, the bankruptcy court has no independent authority on which to rely.

> Indeed, as discussed above, *Stern* and its progeny stand for the proposition that Congress cannot enlarge the subject matter jurisdiction of the bankruptcy courts beyond permissible constitutional limits. Thus, Congress could not eviscerate the limits of Article III jurisdiction by enacting § 105. Article III simply does not allow third-party non-debtors to bootstrap any and all of their disputes into a bankruptcy case to obtain relief. *See In re Midway Gold US, Inc.*, 575 B.R. 475, 519 (Bankr. D. Colo. 2017) ("If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply by including their release in a proposed plan, this [Bankruptcy] Court could acquire infinite jurisdiction.") (citations omitted). Moreover, the Court does not view releasing a claim held by a third-party non-debtor against another third-party non-debtor as an "appropriate" order to carry out the Bankruptcy Code. And certainly, given many of the released claims' complete attenuation to the bankruptcy estate and proceeding, these releases cannot be considered "necessary." Any finding by the Bankruptcy Court otherwise constitutes a clear error.

43. Conversely, the Securities Act and Exchange Act confer exclusive jurisdiction over the claims brought in the Securities Action to the district courts. *See Bargrizan v. Confederation Cap. Partners Ltd.*, 2022 WL 1098842, at *4 (W.D. Tex. Feb. 2, 2022) ("Section 27 of the Securities Exchange Act "grants district courts exclusive jurisdiction of 'all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder.'"); 15 U.S.C. § 78aa(a) (granting exclusive jurisdiction to district courts over Exchange Act claims); 15 U.S.C. § 77v(a) (granting exclusive jurisdiction to district courts and state courts over Securities Act claims).

44.     Finally, the law is clear that where subject matter jurisdiction is lacking, as it is here, it cannot be created by consent. "Whether one of the third-party non-debtors has consented to the release or chosen to opt-out does not confer this Court with jurisdiction to approve the releases. The Court cannot adjudicate matters outside its jurisdiction, even if the parties consent, because jurisdiction cannot be created by consent." *Midway*, 575 B.R. at 521-22; *see also In re Digital Impact, Inc.*, 223 B.R. 1, 15 (N.D. Okla. Bankr. 1998) ("subject matter jurisdiction may not be conferred upon this Court by agreement") (citing *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) and *Zale Corp.*, 62 F.3d at 754, 757 n.26).

### 2.     Purported Inaction by Third Parties Who Do Not Opt Out of the Releases Does Not Constitute Consent to Personal Jurisdiction

45.     Plaintiffs and the members of the Class are strangers to this bankruptcy. No verified Class member has filed a proof of claim in these cases. They are not debtors, they are not creditors, they have filed no allowed claims, are not entitled to vote on the Plan, and many long ago disposed of any Core securities they may have held. The Court has no personal jurisdiction over Plaintiffs or the Class with respect to their claims in the Securities Action against nondebtors.[7]

46.     Even if this Court had subject matter jurisdiction over the claims that are purportedly subject to the Third Party Releases, the Court lacks jurisdiction over the non-consenting persons and entities whose claims the Plan purports to extinguish. Debtors' notice and

---

[7] To the extent Debtors may argue that Hoffman filed the disallowed Class Claim and now cannot object to this Court's jurisdiction, Hoffman's claim was disallowed and sought only equitable relief as against the Debtors. To the extent Hoffman is deemed to have submitted to this Court's equitable jurisdiction with respect to his disallowed claim, he unequivocally objects to any assertion of this Court's jurisdiction with respect to his legal claims in the Securities Action. *See EEOC v. Tim Shepherd M.D., PA*, No. 3:17-CV-02569-X, 2019 WL 7879734, at *1 (N.D. Tex. Sept. 23, 2019) (citing *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 121 (N.D. Tex. 2006) ("The mere fact that plaintiffs filed proofs of claim" in the respective bankruptcy cases "did not convert the legal claims into equitable claims.")).

15

opt-out mechanism is inadequate to cure this deficiency because the *inaction* of purportedly failing to opt out of releases does not constitute affirmative or implied consent to jurisdiction.

> Applying this standard [the standard for consent set forth in *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015)] here, it becomes clear that the Bankruptcy Court erred as a matter of law in finding that failure to return the opt-out form could constitute consent to Article I adjudication. The Bankruptcy Court relied on the fact that the Releasing Parties received notice and an opportunity to opt out of the Third-Party Releases as the basis for consent… to the Third-Party Releases, [but did not determine] the threshold question of whether they consented to having the Bankruptcy Court adjudicate the released claims. This will not suffice to support a finding of consent to Article I adjudication for all of the Releasing Parties.

*Mahwah Bergen*, 636 B.R. at 674. In *Wellness* and *Roell v. Withrow*, 538 U.S. 580 (2003), the Supreme Court "ma[d]e clear that courts can discern the implication of consent to a non-Article III court based on a party's *actions*. However, they do not permit a finding of consent based on *inaction*." *Id.*, 636 B.R. at 674 (emphasis in original).

47.     The *Mahwah Bergen* court found that it "cannot discern any actions undertaken by the Releasing Parties to support a finding that they knowingly and voluntarily consented to Article I adjudication of the claims that they released." *Id.* at 675. Indeed, as is true here with respect to the Release Opt-Out Form, "the distributed releases made no mention of agreeing to adjudication of their claims by an Article I court," and "the record is silent as to how many of the targeted shareholders actually received the notice." *Id.* In any event, the court explained that "hoping (without proving) that someone received a deficient document — without any further action from that person — does not meet the standard for knowing and voluntary consent to adjudication of a non-core claim by a bankruptcy court, as set forth by the Supreme Court in *Wellness*." *Id.* As the court elaborated, *id.* at 675:

> Additionally, the Supreme Court in both *Wellness* and *Roell* indicated that the implied consent standard that it set forth had its basis in the elimination of gamesmanship. *See, e.g., Wellness Int'l*, 575 U.S. at 685, 135 S.Ct. 1932 (noting that "checking gamesmanship" motivated the adoption of the consent standard). Yet, allowing inaction to imply consent encourages the very gamesmanship that the Supreme Court

16

intended to check. That is, non-debtors could tuck releases unrelated to a bankruptcy proceeding into bankruptcy plans, then secrete an opt-out opportunity into a convoluted legal document, send the document to non-parties previously unaware of the bankruptcy proceeding and use their non-response to extinguish all of their claims. This type of gamesmanship, aimed at extinguishing claims of unwitting individuals and providing a golden parachute to the parties drafting the plan, cannot be tolerated.

48. Plaintiffs and the members of the Class are strangers to the bankruptcy proceedings. This Court has no jurisdiction to extinguish their claims in the Securities Action for no consideration as the Plan and the Third Party Releases purport to do.

**C. The Proposed Notice Program and Release Opt-Out Form Do Not Constitute Consent to the Third Party Releases**

49. Under the Plan, the Disclosure Statement, and the Debtors' motion to approve the Plan, the Debtors purportedly caused to be mailed the proposed Combined Hearing Notice and Release Opt-Out Form to nominees who purchased equity securities "on behalf of the underlying beneficial owners of those equity securities during the period from January 3, 2022 through December 20, 2022," presumably attempting to cover one subset of the Class. However, the notice and the Release Opt-Out Form do not cure the nonconsensual nature of the Third Party Releases.

50. *First,* the scope of the notice program is patently inadequate. Debtors do not purport to attempt to provide such notice to other members of the Class, including those who purchased Core's warrants or purchased or sold options during the Class Period and those who held XPDI stock as of December 7, 2021. The notice provisions in the Disclosure Statement and Plan remain inadequate in this respect, as previously highlighted in Plaintiffs' Preliminary Objection. D.I. 1132. *See also* D.I. 1503-1 (declaration of Paul Mulholland regarding these and other deficiencies in the Plan's notice provisions, including the strikingly short time provided to receive, review, and respond to the notice and Release Opt-Out Form).

51.    In *Mahwah Bergen*, although the court noted that the debtors sent notice of the third party releases and opt-out form to "roughly 300,000 parties believed to be potential members of the putative class" in a securities class action, "[t]he record lacks any information about how many of the parties actually received the notice or any mention of efforts to determine the success of the attempts at notice regarding the securities fraud litigation," and that the debtors had received opt-out forms from only about "0.2% of those targeted by the notice." 636 B.R. at 660-61. Debtors here have provided no similar information regarding the effectiveness (or ineffectiveness) of their notice program here, except to the extent they point to 35 purported Class members who submitted proofs of claim. *See* D.I. 1313 at 10, n.10. Such a small claims rate is strong evidence that notice was insufficient. *See In re Think Fin.*, No. 17-33964, 2018 WL 9801454, at *5 (N.D. Tex. Bankr. Aug. 30, 2018). Based on over 1.66 billion shares traded during the Class Period, Mr. Mulholland explained that he would expect that "there would likely be thousands if not tens of thousands of proof of claim forms submitted in a PSLRA securities class action settlement" with a Court-approved Constitutionally adequate notice program, unlike the one propounded by Debtors here. D.I. 1503-1 ¶ 22.

52.    *Second*, the notice and Release Opt-Out Form provided no meaningful notice of the rights and claims being released in violation of due process requirements. Section 1125(a) of the Bankruptcy Code defines "adequate information" as "of a kind, and in sufficient detail" … that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." Here, the Release Opt-Out Form reproduces the language of the Third Party Releases, which can charitably be described as labyrinthine and confusing. This includes seven straight pages of single-spaced, all-bolded, and all-capitalized text (which obscures rather than highlights the importance of key terms), written in dense "legalese" with page-long sentences

18

containing myriad subclauses buried in a cascade of commas. *See* Ex. A at 3-9. The Opt-Out Form also incorporates a maze of interrelated language included in the release provisions that requires analyses of the meaning and scope of cross-referenced terms defined not in the form itself, but in extrinsic documents such as the 92-page Plan or the 113-page Disclosure Statement.

53.     Moreover, the Release Opt-Out Form does not provide—in plain English or otherwise—any explanation as to the what the claims in the Securities Action are, or who the members of the putative Class are. It does not provide the docket number or case name for the Securities Action, nor does it explain that a Lead Plaintiff and Lead Counsel have been appointed by the District Court to represent the Class in the Securities Action. It does not describe the value of the claims in the Securities Action, nor any purported consideration being provided in exchange for releasing those claims. The Release Opt-Out Form misleadingly states that the releases are provided "for good and valuable consideration, the adequacy of which is hereby confirmed," when in truth there is no consideration provided for the releases. In sum, the Release Opt-Out Form and other notices fail to provide sufficient information to enable a recipient to make an informed decision to consent to, or opt out of, the Third Party Releases.

54.     *Third*, Class members are not receiving *any* consideration or distribution from the Plan in exchange for the broad Third Party Releases, but are nevertheless being required to complete the onerous process of reviewing a 13-page opt-out form with interlacing references to several other documents not provided with the form (including the 113-page Disclosure Statement and 92-page Plan), and submitting it to Stretto, the Voting Agent, in order to preserve their rights in a different case, in a different court, in a different context, in which they may have already read that a lead plaintiff would be appointed to protect and prosecute their rights and that they need not take any further action to recover on their claims. This all assumes that Class members actually

19

receive timely and proper notice, understand this process, and then complete it perfectly (likely without the aid of counsel, putting them at an unfair advantage compared to Debtors in this Court). Any purported failure to opt out of the Third Party Releases pursuant to these procedures cannot constitute meaningful consent.

55.     Debtors are attempting to flip the class action mechanism on its head. Class actions are designed to protect the rights of absent class members—using the robust protections and mechanisms of Rule 23—without requiring them to affirmatively opt-in to the class unless and until there is a recovery to share in via a claims submission process. *See* Fed. R. Civ. P. 23. By attempting to require members of the Class, strangers to this bankruptcy, to affirmatively ***opt-out of releases*** of their Securities Action claims, Debtors are purporting to require them to ***opt-in to the Class*** at a point when no such affirmative steps are required in the Securities Action itself.

56.     This case demonstrates precisely why courts around the country have held that a purported failure to opt out of nondebtor third party releases in bankruptcy proceedings does not constitute consent to those releases. *See, e.g., In re SunEdison, Inc.,* 576 B.R. 453, 460-61 (Bankr. S.D.N.Y. 2017) ("The Debtors' argument that the Non-Voting Releasors' silence should be deemed their consent to the Release is not persuasive because the Debtors have not identified the source of their duty to speak. … Accordingly, the Court concludes that the Non-Voting Releasors did not consent to the Release."); *In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) ("it cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release, and that is what the Court must find under the law to approve a third-party release absent the satisfaction of the *Continental* standard.") (collecting cases); *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("the Court concludes that the opt out mechanism is not sufficient to support the third party

releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled

to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a

third party release."). The same reasoning applies here. Debtors' proposed opt-out mechanism

does not render the Third Party Releases consensual.

57.     The court in *Mahwah Bergen*, 636 B.R. at 687-88, explained why a similar notice

and opt-out procedure failed to comport with due process requirements:

> Third-party releases in bankruptcy actions based only on a failure to opt out also
> raise serious due process concerns, because they lack the critical due process
> protections of Rule 23. *See Bell v. Brockett*, 922 F.3d 502, 511 (4th Cir. 2019)
> ("Rule 23's adequacy requirements provide critical safeguards against the due
> process concerns inherent in all class actions."). In the seminal case on due process
> in class actions, the Supreme Court held that when "a fully descriptive notice is sent
> [by] first-class mail to each class member, with an explanation of the right to 'opt
> out,' [that procedure] satisfies due process" even if the absent class member would
> be bound absent an affirmative opt in. *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965.
>
> However, the Supreme Court's basis for this holding underscores the lack of due
> process present here. First, "[t]he notice must be the best practicable, reasonably
> calculated, under all circumstances, to apprise interested parties of the pendency of
> the action and afford them an opportunity to present their objections." *Id.* at 812,
> 105 S.Ct. 2965 (quotations omitted). Second, the "notice should describe the action
> and the plaintiffs' rights in it." *Id.* Third, "an absent plaintiff [must] be provided
> with an opportunity to remove himself from the class by executing and returning
> an 'opt out' or 'request for exclusion' form to the court." *Id.* Fourth, "the Due
> Process Clause of course requires that the named plaintiff at all times adequately
> represent the interests of the absent class members." *Id.*
>
> In this case, the Third-Party Releases fail three of the four elements required to
> afford due process. First, the Bankruptcy Court found the notice "sufficient."
> (Bankr. Confirm. Op. at 31.) But, "sufficient" falls short of the "best practicable,
> reasonably calculated" standard set forth by the Supreme Court. Although the Court
> will not now fully undertake the analysis of whether the notice constituted the "best
> practicable, reasonably calculated" notice "under the circumstances," it seems
> unlikely that the notice would meet that higher standard. Second, the notice did not
> describe the released claims or the rights given up by the absent Releasing Parties.
> Nor did it mention the only purported benefit (the illusory "mutual release") to the
> Releasing Parties as consideration for their release. Describing the bankruptcy
> action and generally stating that the absent party would release all claims does not
> identify the specific claims subject to release. It does not "describe the action and
> the plaintiffs' rights in it." The notice satisfies the third element of providing the
> absent Releasing Parties the opportunity to opt out. Finally, as discussed above, the

absent class members had no one to adequately represent their interests. Accordingly, allowing the release of claims based only on the failure to opt out does not comport with due process.

In conclusion, the Court finds that the Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual. Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case there is a lack of sufficient affirmation of consent.

### D.      There Are No Unusual or Rare Circumstances Present Here to Merit Approval of the Nonconsensual Third Party Releases

58.     Even in the Fifth Circuit, some courts have nonetheless allowed nonconsensual nondebtor releases provided certain factors were satisfied: "(1) identity of interest between the debtor and the third-party, (2) substantial contribution of assets to reorganization, (3) release is necessary to the reorganization, (4) majority of affected creditors have overwhelmingly accepted plan treatment, and (5) plan provides payment of all, or substantially all, of affected classes' claims." *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) (denying confirmation of plan due to improper third party releases, noting that "[t]he Court finds no authority in the Bankruptcy Code or in case law that allows the Court to construe the release provision as complying with any applicable provisions of the Bankruptcy Code.").

> For the first factor, most courts look to whether or not indemnity or contribution exists between the debtor and third party. Substantial contribution, the second factor, has included cash, insurance proceeds, subordination of claims, and forfeiture of claims. Factor three looks at whether or not the release is necessary because without the release the reorganization would not happen. Most courts have held that factor four is satisfied when over ninety percent of the impacted creditors approve the plan. As for the fifth factor, most courts have held that full payment is necessary. The factors do not all have to be present to approve the non-consensual nondebtor release; the courts have generally balanced the factors, looking at the specific facts in each case.

*Id.* (cleaned up). None of these factors are satisfied here, individually or considered holistically.

59.     *First*, to the extent that the Securities Action Defendants may be indemnified by Core, such indemnity is contingent upon Plaintiffs prevailing in the Securities Action and its source

22

is primarily director and officer insurance policies which are unquestionably not part of the Debtors' estate. *Vitek*, 51 F.3d at 535 ("when a debtor corporation owns a liability policy that exclusively covers its directors and officers, … that the proceeds of that D&O policy are not part of the debtor's bankruptcy estate."). Virtually every chapter 11 plan with broad releases and injunctions like those in the Plan here would be confirmable if the existence of some indemnity obligation were a sufficient basis for enjoining nondebtors' claims against third party corporate officers and directors. *In re Continental Airlines*, 203 F.3d 203, 217 (3d Cir. 2000) ("granting permanent injunctions to protect non-debtor parties on the bases of theoretical identity of interest alone would turn bankruptcy principles on their head. Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.").

60.     *Second*, the Securities Action Defendants have made no contribution of assets to the Debtors' reorganization, much less a substantial one. This case stands in stark contrast to the *Purdue Pharma* case currently before the Supreme Court. In *Purdue Pharma*, the nondebtor third party Sackler family received certain releases while contributing approximately $5.5-6.0 billion to the reorganization. 69 F.4th at 81. Unlike here, the Sacklers received releases only when they contributed *billions* of dollars to the reorganization plan, made substantial additional concessions, and the plan was expressly approved by over 95% of the personal injury classes of creditors. *Id.* at 81-83. The Supreme Court may *still yet* disallow such third party releases even in those circumstances, which were considerably more favorable for the persons granting the releases as compared with here.

61.     *Third*, the Third Party Releases bear no importance to the Plan, much less are they "necessary" to the reorganization. There is no basis to suggest that the Plan would be in any way inhibited due to a lack of the Third Party Releases. If these releases are either abandoned by

Debtors or ruled by this Court or the District Court to be unenforceable or otherwise unlawful, there would be no material impact on the reorganization of Debtors.

62.     *Fourth*, there has been no majority acceptance of the Plan by the *impacted* creditors, which here includes the Class of thousands of current or former equity holders. The lack of responses to the inadequate notice or lack of opt-outs does not constitute implied consent to the Plan or the Third Party Releases.

63.     *Fifth*, there has not been full payment of substantially all of the Class's claims. *See Mahwah Bergen*, 636 B.R. at 691 ("the Plan does not create a separate fund to pay the claims released or provide any other mechanism to consider or pay the securities claims. … Because the Plan extinguishes these claims entirely without giving any value in return, this weighs strongly against granting the Release."). Plaintiffs and the Class stand to receive nothing of any value in exchange for the release of their claims in the Securities Action. Even where nondebtor third party releases are consensual, unlike here, they are confirmable only where they are "given in exchange for and are supported by fair, sufficient, and adequate consideration provided by each and all of the parties providing such releases." *In re Lincolnshire Campus, LLC*, 441 B.R. 524, 533 (Bankr. N.D. Tex. 2010). Here, there is *no* consideration provided for the sweeping Third Party Releases, as detailed above.

E.     **The Third Party Releases Are Similarly Invalid As Part of Any Purported Settlement under Section 1123(b)(3)(A)**

64.     The Third Party Releases cannot be valid as part of any purported "settlement" under Section 1123(b)(3)(A) where, as here, the Class is receiving *nothing* for the broad Third Party Releases and has no meaningful rights or information regarding consent.

65.     In *Bigler*, the court recognized that *Pacific Lumber* does not restrict the availability of settlements of claims under Section 1123(b)(3)(A), and "thus provides an avenue for a Chapter

11 plan to provide for releases of liability for non-debtors." 442 B.R. at 543-44. However, the court

also recognized that "such releases must satisfy the requirements of a valid settlement of claims

under the Code," meaning they "require, *inter alia*, consent and consideration by each participant

in the agreement to be valid." *Id*.

66.     Accordingly, the court in *Bigler*, 442 B.R. at 544, recognized that a plan containing

non-debtor, third party releases, such as the Third Party Releases at issue here, was unconfirmable

where it purported to release claims by non-parties to the bankruptcy:

> Because the Plan language … applies to parties … who have voted against the Plan,
> and may even extend to individuals and entities who are not even parties to this
> case, the language . . . may include people and entities who do not consent to the
> release … As a result, Article 12.1 violates the requirements of consent and
> consideration for a valid settlement of claims.

## **PROPOSED RESOLUTION**

67.     To resolve the deficiencies in the Plan and Disclosure Statement objected to herein

with respect to the Third Party Releases, Plaintiffs propose that Debtors include in the Plan and

Disclosure Statement the following language clarifying that the direct claims of Plaintiffs and the

Class against non-Debtor defendants in the Securities Action are unencumbered by the Third Party

Releases:

> Notwithstanding anything to the contrary herein or in the Plan, the claims or causes
> of action asserted or that may be asserted by the Plaintiffs in the action captioned
> *Pang v. Levitt, et al.*, No. 22-cv-1191 (W.D. Tex.) (the "Securities Action"), on
> their own behalf and on behalf of any person or entity who is a member of the
> putative Class as defined in the Securities Action (the "Class"), or as such Class
> may be modified or certified by order of the court in the Securities Action, the Third
> Party Releases, injunctive provisions, and exculpation provisions contained in the
> Plan and this Order shall not release, enjoin, extinguish or otherwise affect in any
> way the claims and causes of action asserted or that may be asserted by the Plaintiffs
> or the Class against any non-Debtor defendants in the Securities Action, except to
> the extent any claims or causes of action are asserted derivatively or otherwise on
> behalf of Debtors (the "Company Claims"). The Plaintiffs, the Class, and all other
> Persons (other than the Persons expressly authorized to prosecute Company Claims

25

under the Plan, as applicable) shall be permanently enjoined from asserting or proceeding with the prosecution of any Company Claims.

68.     Alternatively, the Court may exercise its discretion to permit Plaintiffs to exercise an omnibus opt-out of the Third Party Releases on behalf of themselves and the Class, as first raised in Plaintiffs' Motion for Class Treatment. D.I. 1228. Debtors never objected specifically to the omnibus opt-out, *see* D.I. 1313, and the Court did not specifically address that portion of Plaintiffs' motion. *See* D.I. 1522. This will cost the Debtors' estates and other creditors nothing, but it will preserve the status quo ante with respect to the rights and claims Plaintiffs and the Class have against the nondebtor Securities Action Defendants in the Securities Action.

## **CONCLUSION**

69.     For the reasons stated above and throughout Plaintiffs' other filings in this Court, Plaintiffs respectfully request that the Court deny Debtors' motion to approve the Plan and the Disclosure Statement to the extent they contain the Third Party Releases as currently constituted.

Dated: December 15, 2023

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/Stuart L. Cochran*
Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile:  (214) 691-6311
scochran@condontobin.com

*Liaison Counsel for Lead Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (admitted pro hac vice)
Joshua Baker (admitted pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10116

Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Stuart L. Cochran*
Stuart L. Cochran

# EXHIBIT A

**Other Beneficial Owner**

      **OPTIONAL:**       **RELEASE OPT OUT FORM**

      You are receiving this opt out form (the "**Release Opt Out Form**") because you (i) are or may be a Holder of a Claim against Core Scientific, Inc. and its debtor affiliates (collectively, the "**Debtors**") that is not entitled to vote on the *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors*, filed on November 16, 2023 (Docket No. 1438) (as may be modified, amended, or supplemented, the "**Plan**")[1] or (ii) are a current or former shareholder of equity securities of the Debtors, purchased during the period from January 3, 2022 through December 20, 2022, inclusive (an "**Other Beneficial Owner**") that holds or may hold a claim that will be released pursuant to the Plan.   A holder of Claims, Interests, and/or an Other Beneficial Owner is deemed to grant the third-party releases set forth below unless such holder affirmatively opts out on or before the Opt Out Deadline (as defined below).

      **THIS RELEASE OPT OUT FORM PROVIDES YOU WITH THE OPTION TO NOT GRANT THE VOLUNTARY RELEASE CONTAINED IN SECTION 10.6(b) OF THE PLAN.   PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF CLAIMS OR INTEREST, OR AS AN OTHER BENEFICIAL OWNER, WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN BUT DO NOT OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS IN THE PLAN.  TO THE EXTENT THAT YOU HAVE AN ALLOWED CLAIM OR INTEREST, YOU WILL RECEIVE THE SAME RECOVERY AND TREATMENT ON ACCOUNT OF YOUR CLAIM OR INTEREST UNDER THE PLAN REGARDLESS OF WHETHER YOU ELECT TO NOT GRANT THE VOLUNTARY RELEASE CONTAINED IN SECTION 10.6(b) OF THE PLAN.   IF YOU ELECT TO NOT GRANT THE VOLUNTARY RELEASE CONTAINED IN SECTION 10.6(b) OF THE PLAN, HOWEVER, YOU MAY NOT BE A "RELEASED PARTY" WITH RESPECT TO THE VOLUNTARY THIRD-PARTY RELEASE BY RELEASING PARTIES.   IF YOU ARE ENTITLED TO VOTE ON THE PLAN AND VOTE TO ACCEPT THE PLAN, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN.**

      **IF YOU ARE AN OTHER BENEFICIAL OWNER AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN, YOU WILL BE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS SET FORTH IN SECTION 10.6(b) OF THE PLAN, INCLUDING THE RELEASE OF ANY OF YOUR CLAIMS ASSERTED OR ASSERTABLE AGAINST THE DEBTORS' DIRECTORS AND OFFICERS IN THE SECURITIES CLASS ACTION LAWSUIT PENDING AGAINST IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS.**

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors*, filed on November 16, 2023 (Docket No. 1439) (as may be modified, amended, or supplemented, the "**Disclosure Statement**"), as applicable.

**Other Beneficial Owner**

**YOU WILL BE DEEMED TO HAVE RELEASED WHATEVER CLAIMS YOU MAY HAVE AGAINST THE DEBTORS AND MANY OTHER PEOPLE AND ENTITIES (INCLUDING THE DEBTORS' OFFICERS AND DIRECTORS) UNLESS YOU RETURN OR ELECTRONICALLY SUBMIT THIS RELEASE OPT OUT FORM BY DECEMBER 13, 2023 AT 5:00 P.M. (PREVAILING CENTRAL TIME) (THE "OPT OUT DEADLINE").**

If you believe you are a holder of a Claim, Interest, or an Other Beneficial Owner with respect to the Debtors or Released Parties (as defined below) and choose to opt out of the third-party releases set forth in Section 10.6(b) of the Plan, please submit your election to opt out through one of the following methods: (i) completing, signing, dating, and returning this Release Opt Out Form promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to the Voting Agent at the address set forth below, so that it is received by the Voting Agent prior to the Opt Out Deadline, or (ii) by completing and signing the Release Opt Out Form via the Online Portal located at https://balloting.stretto.com/CoreScientific/OptOut/OtherBeneficialOwners

**To ensure that your hard copy Release Opt Out Form is counted, clearly sign and return your Release Opt Out Form in the enclosed pre-addressed, or via first-class mail, overnight courier, or hand delivery to:**

| STRETTO'S ADDRESS FOR RECEIPT OF RELEASE OPT OUT FORM |
|---|
| CORE SCIENTIFIC, INC. BALLOT PROCESSING CENTER C/O STRETTO, INC. 410 EXCHANGE, SUITE 100 IRVINE, CA 92602 |

**THIS RELEASE OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE OPT OUT DEADLINE.  IF THE RELEASE OPT OUT FORM IS RECEIVED AFTER THE OPT OUT DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1. Amount of Claim**. The undersigned hereby certifies that, as of September 25, 2023, the undersigned was the Holder (or authorized signatory of such a Holder) of Claims or Interests in the amount set forth below, or is an Other Beneficial Owner.

| Class 4 (Other Secured Claims) | Amount:  $_____ |
|---|---|
| Class 7 (Priority Non-Tax Claims) | Amount:  $_____ |
| Other Beneficial Owner | Shares: _____ |

2

Other Beneficial Owner

**Item 2.**        **Releases.**

The Plan contains the following release provisions:

**SECTION 10.6(a)**     <u>**RELEASES BY THE DEBTORS**</u>**.**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING THE OBLIGATIONS OF THE DEBTORS UNDER THE PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE PLAN, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY, RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AND CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTION), THE DIP FACILITY, THE CONVERTIBLE NOTES AGREEMENTS, THE MINER EQUIPMENT LENDER AGREEMENTS, THE MORTGAGE AGREEMENTS, THE GENERAL CONTRACTS, ANY AND ALL AGREEMENTS RELATING TO M&M LIENS, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT), THE DISCLOSURE STATEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE PLAN SETTLEMENTS, THE NEW SECURED CONVERTIBLE NOTES DOCUMENTS, THE**

3

**Other Beneficial Owner**

**NEW SECURED NOTES DOCUMENTS, THE CONTINGENT PAYMENT OBLIGATIONS DOCUMENTS, THE NEW MINER EQUIPMENT LENDER DEBT DOCUMENTS, THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENT, THE RIGHTS OFFERING, THE BACKSTOP COMMITMENT LETTER, THE INITIAL DIP LOAN DOCUMENTS, THE DIP FACILITY, THE TERMINATED RSA, THE RSA, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE NEW COMMON INTERESTS), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH IN SECTION 10.6(A) OF THE PLAN (I) SHALL ONLY BE APPLICABLE TO THE MAXIMUM EXTENT PERMITTED BY LAW; (II) SHALL NOT BE CONSTRUED AS (A) RELEASING ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD (*PROVIDED* THAT ACTUAL FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE DEBTOR RELEASES ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, (B) RELEASING ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION HELD BY THE DEBTORS ARISING FROM AN ACT OR OMISSION THAT IS DETERMINED BY A FINAL ORDER OR BY A FEDERAL GOVERNMENT AGENCY TO HAVE CONSTITUTED A VIOLATION OF ANY FEDERAL SECURITIES LAWS OR (C) RELEASING ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

**SECTION 10.6(b)     <u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>.**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTEGRATED AFTER THE EFFECTIVE DATE, EACH RELEASING PARTY, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED, AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES**

**Other Beneficial Owner**

WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION ASSERTED OR THAT MAY BE ASSERTED ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING ANY CLAIMS OR CAUSES OF ACTION BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AND CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTION), THE DIP FACILITY, THE CONVERTIBLE NOTES AGREEMENTS, THE MINER EQUIPMENT LENDER AGREEMENTS, THE MORTGAGE AGREEMENTS, THE GENERAL CONTRACTS, ANY AND ALL AGREEMENTS RELATING TO M&M LIENS, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT), THE DISCLOSURE STATEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE PLAN SETTLEMENTS, THE NEW SECURED CONVERTIBLE NOTES DOCUMENTS, THE NEW SECURED NOTES DOCUMENTS, THE CONTINGENT PAYMENT OBLIGATIONS DOCUMENTS, THE NEW MINER EQUIPMENT LENDER DEBT DOCUMENTS, THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENT, THE RIGHTS OFFERING, THE BACKSTOP COMMITMENT LETTER, THE INITIAL DIP LOAN DOCUMENTS, THE DIP FACILITY, THE TERMINATED RSA, THE RSA, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE NEW COMMON INTERESTS), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH IN

5

**Other Beneficial Owner**

SECTION 10.6(B) OF THE PLAN (I) SHALL ONLY BE APPLICABLE TO THE MAXIMUM EXTENT PERMITTED BY LAW; AND (II) SHALL NOT BE CONSTRUED AS (A) RELEASING ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD (*PROVIDED* THAT ACTUAL FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE THIRD-PARTY RELEASES ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, OR (B) RELEASING ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

SECTION 10.7      <u>EXCULPATION</u>.

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT, IN WHOLE OR IN PART, FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE, OF THE CHAPTER 11 CASES, THE DEBTORS, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE DIP FACILITY, THE CONVERTIBLE NOTES AGREEMENTS, THE MINER EQUIPMENT LENDER AGREEMENTS, THE MORTGAGE AGREEMENTS, THE GENERAL CONTRACTS, ANY AND ALL AGREEMENTS RELATING TO M&M LIENS, AND RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT), THE DISCLOSURE STATEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE PLAN SETTLEMENTS, THE NEW SECURED CONVERTIBLE NOTES DOCUMENTS, THE NEW SECURED NOTES DOCUMENTS, THE CONTINGENT PAYMENT OBLIGATIONS DOCUMENTS,THE NEW MINER EQUIPMENT LENDER DEBT DOCUMENTS, THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENT, THE RIGHTS OFFERING, THE BACKSTOP COMMITMENT LETTER, THE INITIAL DIP LOAN DOCUMENTS, THE DIP FACILITY, THE

6

Other Beneficial Owner

TERMINATED RSA, THE RSA, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE NEW COMMON INTERESTS), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS, SUCH EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES.  THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH ALL APPLICABLE LAWS WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATIONS SET FORTH IN SECTION 10.7 OF THE PLAN (I) SHALL ONLY BE APPLICABLE TO THE MAXIMUM EXTENT PERMITTED BY LAW; AND (II) SHALL NOT BE CONSTRUED AS (A) EXCULPATING ANY EXCULPATED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD (*PROVIDED* THAT ACTUAL FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE EXCULPATIONS ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, OR (B) EXCULPATING ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

SECTION 10.5      INJUNCTION.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTION 10.6(A) OR SECTION 10.6(B), SHALL BE DISCHARGED PURSUANT TO SECTION 10.3 OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 10.7, AND ALL SUBCONTRACTORS AND ALL OTHER PARTIES IN INTEREST ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST,

**Other Beneficial Owner**

AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, AND/OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO SECTION 10.7 WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS (X) SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT EITHER IN A FILED PROOF OF CLAIM, OR IN ANOTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR THAT OTHERWISE INDICATES THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE OR (Y) SUCH RIGHT TO SETOFF ARISES UNDER A POSTPETITION AGREEMENT WITH THE DEBTORS OR AN EXECUTORY CONTRACT THAT HAS BEEN ASSUMED BY THE DEBTORS AS OF THE EFFECTIVE DATE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, AND/OR TREATED, ENTITLED TO A DISTRIBUTION, OR CANCELLED PURSUANT TO THE PLAN OR OTHERWISE DISALLOWED; *PROVIDED* THAT SUCH PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST, OR INTERESTS IN, A DEBTOR, A REORGANIZED DEBTOR, OR AN ESTATE SHALL NOT BE PRECLUDED FROM EXERCISING THEIR RIGHTS AND REMEDIES, OR OBTAINING THE BENEFITS, SOLELY PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.

SUBJECT IN ALL RESPECTS TO SECTION 11.1, NO ENTITY OR PERSON MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST ANY RELEASED PARTY OR EXCULPATED PARTY THAT AROSE OR ARISES FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS (WHICH INCLUDES, FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AND CAUSES OF ACTION ASSERTED OR ASSERTABLE IN THE SECURITIES CLASS ACTION), THE DIP FACILITY, THE CONVERTIBLE NOTES AGREEMENTS, THE MINER EQUIPMENT LENDER AGREEMENTS, THE MORTGAGE AGREEMENTS, THE

8

Other Beneficial Owner

GENERAL CONTRACTS, ANY AND ALL AGREEMENTS RELATING TO M&M LIENS, AND ANY AND ALL RELATED AGREEMENTS, INSTRUMENTS, AND/OR OTHER DOCUMENTS, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE PLAN (INCLUDING THE PLAN SUPPLEMENT), THE DISCLOSURE STATEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE PLAN SETTLEMENTS, THE NEW SECURED CONVERTIBLE NOTES DOCUMENTS, THE NEW SECURED NOTES DOCUMENTS, THE CONTINGENT PAYMENT OBLIGATIONS DOCUMENTS,THE NEW MINER EQUIPMENT LENDER DEBT DOCUMENTS, THE EXIT FACILITY DOCUMENTS, THE NEW WARRANTS AGREEMENT, THE RIGHTS OFFERING, THE BACKSTOP COMMITMENT LETTER, THE INITIAL DIP LOAN DOCUMENTS, THE DIP FACILITY, THE TERMINATED RSA, THE RSA, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE NEW COMMON INTERESTS), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO THE FOREGOING WITHOUT THE BANKRUPTCY COURT (I) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A CLAIM OF WILLFUL MISCONDUCT, FRAUD OR GROSS NEGLIGENCE AGAINST A RELEASED PARTY OR EXCULPATED PARTY AND (II) SPECIFICALLY AUTHORIZING SUCH ENTITY OR PERSON TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH RELEASED PARTY OR EXCULPATED PARTY. THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION TO DETERMINE WHETHER A CLAIM OR CAUSE OF ACTION IS COLORABLE AND, ONLY TO THE EXTENT LEGALLY PERMISSIBLE AND AS PROVIDED FOR IN SECTION 11.1, SHALL HAVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.

**SECTION 5.17     CANCELLATION OF LIENS.**

(a)     Except as otherwise specifically provided in the Plan, including sections 4.4 and 4.6 of the Plan, all notes, instruments, certificates evidencing debt of the Debtors and Existing Common Interests will be cancelled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and

9

**Other Beneficial Owner**

to make any further distributions to the applicable Holders on account of their Allowed Claims and Interests.

(b)     After the Effective Date and following (i) the distributions to Holders on account of Allowed Convertible Notes Secured Claims and Allowed Miner Equipment Lender Secured Claims and/or (ii) with regard to Allowed M&M Lien Secured Claims, satisfaction of the applicable M&M Lien Takeback Debt, the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the Convertible Notes Secured Claims, Miner Equipment Lender Secured Claims, and M&M Lien Secured Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Holders of the M&M Lien Secured Claims, Miner Equipment Lender Secured Claims, the Notes Agent, and/or Convertible Noteholders, including, without limitation, UCC-3 termination statements.

**Relevant Definitions Related to Release and Exculpation Provisions**:

*"Exculpated Parties"* means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; and (ii) Equity Committee and its members, each solely in their capacity as such.

*"Related Parties"* means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such, and any and all other Persons or Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities.

*"Released Parties"* means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Equity Committee and its members that are party to the RSA, solely in their capacities as such; (iv) the Backstop Parties; (v) the Settling Miner Equipment Lenders; (vi) Brown Corporation; (vii) Holliwood LLC; (viii) the Ad Hoc Noteholder Group; (ix) the Consenting Creditors; (x) the Exit Lenders; (xi) the Notes Agent, solely in its capacity as such; and (xii) with respect to each of the foregoing Persons in clauses (i) through (xi), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

*"Releasing Parties"* means collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Reorganized Debtors; (iii) with respect to each of the foregoing

10

**Other Beneficial Owner**

Persons in clauses (i) through (ii), all Related Parties; (iv) the Released Parties; (v) the Holders of all Claims or Interests that vote to accept the Plan; (vi) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan; (vii) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth in the Plan; and (viii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but did not opt out.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF CLAIMS OR AN OTHER BENEFICIAL OWNER WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN BUT DO NOT OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS IN SECTION 10.6(b) OF THE PLAN.**

**By checking the box below, the undersigned Holder of a Claim not entitled to vote or Other Beneficial Owner identified in Item 1 above, having received notice of the opportunity to opt out of granting the releases contained in Section 10.6(b) of the Plan:**

☐ **Elects to <u>OPT OUT</u> of the releases contained in Section 10.6(b) of the Plan.**

**Item 3.**    **Certifications**. By signing this Release Opt Out Form, the undersigned certifies that:

a.    as of the Voting Record Date, either: (i) the Holder is the Holder of the Claims set forth in Item 1; (ii) the Holder is an authorized signatory for an entity that is the Holder of the Claims set forth in Item 1; or (iii) it is an Other Beneficial Owner;

b.    the undersigned has received a copy of the Release Opt Out Form and that the Release Opt Out Form is made pursuant to the terms and conditions set forth therein;

c.    if applicable, the undersigned has submitted the same election concerning the releases with respect to all Claims in a single Class set forth in Item 1; and

d.    that no other Release Opt Out Form with respect to the amount(s) of Claims identified in Item 1 or on account of being an Other Beneficial Owner have been submitted or, if any other Release Opt Out Forms have been submitted with respect to such Claims or on account of being an Other Beneficial Owner, then any such earlier Release Opt Out Forms are hereby revoked.

11

**Other Beneficial Owner**

| | |
|---|---|
| Name of Holder or Other Beneficial Owner: | |
| Signature: | |
| Name of Signatory (if different from Holder or Other Beneficial Owner): | |
| Title (if applicable): | |
| City, State, Zip Code: | |
| Telephone Number: | |
| Date Completed: | |

**IF YOU WISH TO OPT OUT, PLEASE COMPLETE, SIGN, AND DATE THIS RELEASE OPT OUT FORM AND RETURN IT TO THE VOTING AGENT BY *JUST ONE* OF THE FOLLOWING METHODS: MAIL, OVERNIGHT OR HAND DELIVERY, OR BY ONLINE TRANSMISSION VIA ONLINE PORTAL:**

| STRETTO'S ADDRESS FOR RECEIPT OF RELEASE OPT OUT FORM |
|---|
| CORE SCIENTIFIC, INC. BALLOT PROCESSING CENTER C/O STRETTO, INC. 410 EXCHANGE, SUITE 100 IRVINE, CA 92602 |

**THE OPT OUT DEADLINE IS DECEMBER 13, 2023 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

12

**Other Beneficial Owner**

**USE OF ONLINE OPT-OUT FORM**

**You may submit your Release Opt Out Form by electronic, online transmission solely through the Online Portal found on the Debtors' case information website and following the directions set forth on the Online Portal regarding submitting your Release Opt Out Form as described more fully below.**

**1.      Please visit https://balloting.stretto.com/CoreScientific/OptOut/OtherBeneficialOwners**

**2.      Follow the directions to submit your Release Opt Out Form. If you choose to submit your Release Opt Out Form via the Online Portal, you should not return a hard copy of your Release Opt-Out Form.**

**THE ONLINE PORTAL IS THE SOLE MANNER IN WHICH RELEASE OPT OUT FORMS MAY BE DELIVERED VIA ELECTRONIC TRANSMISSION.**

**RELEASE OPT OUT FORMS SUBMITTED BY FACSIMILE OR EMAIL WILL NOT BE COUNTED.**

13