# EXHIBIT S

**Fill in this information to identify the case:**

Debtor 1   Core Scientific, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Southern District of Texas

Case number   22-90341

Official Form 410

# Proof of Claim

**12/15**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | **Who is the current creditor?** | Darin Feinstein |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.  From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- | --- |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Tom Kirkendall | |
| | | Name | Name |
| | | 2 Violetta Ct | |
| | | Number        Street | Number        Street |
| | | The Woodlands        TX        77381 | |
| | | City        State        ZIP Code | City        State        ZIP Code |
| | | Contact phone   713.703.3536 | Contact phone _____ |
| | | Contact email   bigtkirk@gmail.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| 4. | **Does this claim amend one already filed?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____ MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.  Who made the earlier filing? _____ |



Official Form 410

page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ Unliquidated _____. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**: $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No ☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/13/2023
                   MM / DD / YYYY

__/s/ Darin Feinstein_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Darin Feinstein |
| | First name          Middle name          Last name |
| Title | Co-Chair Board of Directors & Executive VP, Corporate Strategy |
| Company | Core Scientific, Inc. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | c/o Law Office of Tom Kirkendall, 2 Violetta Ct |
| | Number          Street |
| | The Woodlands                          TX          77381 |
| | City                          State     ZIP Code |
| Contact phone | 713.703.3536          Email  bigtkirk@gmail.com |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
|  | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.** | § |  |
|  | § |  |

**ADDENDUM TO PROOF OF CLAIM
OF DARIN FEINSTEIN**

Since January, 2022, Darin Feinstein has served as the Co-Chair of the Core Scientific, Inc. ("Core" or "the Company") Board of Directors and as the Executive Vice President, Corporate Strategy of Core. From July 2021 through January 2022, Mr. Feinstein served as the Co-Chair of the Core Board and Core's Chief Vision Officer. Under an employment contract and its corporate by-laws, Core indemnifies Mr. Feinstein from all claims and damages (both pre and post-petition) asserted against him relating to Core. Although payments made to Mr. Feinstein in connection with Core's indemnification are not unsecured claims, Mr. Feinstein files this proof of claim in an unliquidated amount out of an abundance of caution to notify all parties-in-interest in this case of his indemnification claims against the Company.

**Indemnification**

Mr. Feinstein's Employment Agreement dated October 10, 2021 with Core Scientific Holding Co., which the Company has disclosed publicly in its regulatory securities filings, provides for a complete indemnification of Mr. Feinstein:

> [T]he Company shall indemnify and hold Executive harmless, to the fullest extent permitted by the Delaware General Corporation Law, as amended from time to time, and the Company's Certificate of Incorporation or By- Laws, against all claims, expenses, damages,

1

> liabilities and losses incurred by Executive provided that Executive acted in good faith and in a manner Executive reasonably believed to be in or not opposed to the best interests of the Company, ….

Exhibit A (Core 10-K 2022 Ex. 10-29) at p. 3, ¶ 6.  This indemnification covers Mr. Feinstein in his capacities as an executive officer and as a director of Core:

> [I]n the event Executive is, or is threatened to be made, a party to any pending, contemplated or threatened action, suit, arbitration, or any other proceeding whether civil, criminal, administrative or investigative, and whether formal or informal ("Proceeding"), by reason of the fact that Executive is or was, or had agreed to become, an employee or director of the Company, is are or was serving at the request of the Company as an employee or director to another corporation, partnership, joint venture, business, person, trust, employee benefit plan or other entity, ….

*Id*.

Core's regulatory securities filings also confirm the indemnification of Mr. Feinstein and its officers and directors through bylaws and separate indemnification agreements to the fullest extent permitted under Delaware law:

> **Indemnification Agreements**
>
> Our certificate of incorporation contains provisions limiting the liability of executive officers and directors, and our bylaws provide that we will indemnify each of our executive officers and directors to the fullest extent permitted under Delaware law.
>
> We have entered into indemnification agreements with all of our directors and executive officers. The indemnification agreements provide that we will indemnify each of our directors, executive officers, and other key employees against any and all expenses incurred by such director, executive officer, or other key employee because of his or her status as one of our directors, executive officers, or other key employees, to the fullest extent permitted by Delaware law, our certificate of incorporation and our bylaws. In addition, the indemnification agreements provide that, to the fullest extent permitted by Delaware law, we will advance all expenses incurred by its directors, executive officers, and other key employees in connection with a legal proceeding involving his or her status as a director, executive officer, or key employee.

Core 10-K 2022, at 167.

Moreover, Core's regulatory securities filings include a Form Indemnification Agreement that it provides for an indemnity in third-party proceedings as well as a separate indemnification for expenses of a party who is wholly or partly successful:

> **2.    Indemnity in Third-Party Proceedings**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or witness or other participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

Exhibit B (Core 10-K 2022 Ex. 10-30) at p. 4, and:

> **4.    Indemnification for Expenses of a Party Who is Wholly or Partly Successful**. Notwithstanding any other provision of this Agreement, in circumstances where indemnification is not available under Section 2 or 3, as the case may be, to the fullest extent permitted by law and to the extent that Indemnitee is a party to, and is successful (on the merits or otherwise) in defense of, any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee or on Indemnitee's behalf in connection therewith. For purposes of this Section 4, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

*Id.* The Form Indemnity Agreement provides for prompt advance and reimbursement to Mr. Feinstein of his litigation expenses, including legal fees:

> **6. Advances of Expenses**. The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding prior to its final disposition, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 30 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege

3

accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company, *except*, with respect to advances of expenses made pursuant to Section 10(c), in which case Indemnitee makes the undertaking provided in Section 10(c). This Section 6 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding (or any part of any Proceeding) for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding (or any part of any Proceeding) referenced in Section 5(b) or 5(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

*Id*. at 5.

The foregoing indemnity obligations of Core are consistent with its corporate by-laws, which provide a broad indemnification of Mr. Feinstein and its other directors and executive officers under Delaware General Corporation Law:

**Section 47. Indemnification of Directors, Executive Officers, Employees and Other Agents**.

**(a)  Directors and Executive Officers**. The corporation shall indemnify to the full extent permitted under and in any manner permitted under the DGCL or any other applicable law, any person who is made or threatened to be made a party to or is otherwise involved (as a witness or otherwise) in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter, a "***Proceeding***"), by reason of the fact that such person is or was a director or executive officer (for the purposes of this Article XI, "executive officers" shall be those persons designated by the corporation as (a) executive officers for purposes of the disclosures required in the corporation's proxy and periodic reports or (b) officers for purposes of Section 16 of the 1934 Act) of the corporation, or while serving as a director or executive officer of the corporation, is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, including service with respect to an employee benefit plan (collectively, "***Another Enterprise***"), against expenses (including attorneys' fees), judgments, fines (including ERISA excise taxes or penalties) and amounts paid in settlement actually and reasonably incurred by him or her in connection with such Proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his

4

or her conduct was unlawful; provided, however, that the corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, provided, further, that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by applicable law, (ii) the proceeding was authorized by the Board of Directors, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the DGCL or any other applicable law or (iv) such indemnification is required to be made under subsection (d) of this Section 47.

Core 10-K 2022 Ex. 3-2, § 47(a). Likewise, the by-laws provide for prompt advancement and reimbursement of litigation expenses, including legal fees:

> **(c)   Expenses.** The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed Proceeding, by reason of the fact that such person is or was a director or executive officer of the corporation, or is or was serving at the request of the corporation as a director or executive officer of Another Enterprise, prior to the final disposition of the Proceeding, promptly following request therefor, all expenses (including attorneys' fees) incurred by any director or executive officer in connection with such Proceeding; provided, however, that if the DGCL requires, an advancement of expenses incurred by a director or executive officer in his or her capacity as a director or executive officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 47 or otherwise.

*Id.*, § 47(c).

## Claim Amount and Reservation of Rights

The amount of Mr. Feinstein's claim is unliquidated at this time. Mr. Feinstein will amend this proof of claim if he incurs claims in a liquidated amount. Mr. Feinstein reserves the right to file an administrative claim in the Core chapter 11 case.

5

EX-10.29 6 d172159dex1029.htm EX-10.29

**Exhibit 10.29**

### <u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of October 10, 2021, and between Darin Feinstein ("<u>Executive</u>") and Core Scientific Holding Co. (the "<u>Company</u>").

**WHEREAS**, the Company desires to employ Executive and Executive desires to be employed by the Company, on the terms set forth in this Agreement.

**NOW**, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Employment Term</u>. The Company hereby agrees to employ Executive, and Executive hereby agrees to be employed with the Company, upon the terms and conditions contained in this Agreement. Executive's employment with the Company pursuant to this Agreement shall be deemed to have commenced on September 17, 2021 (the "<u>Effective Date</u>") and shall continue until the fourth (4th) anniversary of the Effective Date (the "<u>Initial Term</u>") unless earlier terminated pursuant to <u>Section 8</u>; <u>provided</u>, that the term of this Agreement shall automatically be extended for one (1) additional year commencing on the fourth anniversary of the Effective Date and on each anniversary thereafter (each, a "<u>Renewal Term</u>") unless, not less than ninety (90) days prior to the commencement of any such Renewal Term, either party shall have given written notice to the other that it does not wish to extend this Agreement (a "<u>Non-Renewal Notice</u>"), in which case, Executive's employment under this Agreement shall terminate upon the close of business on the last day of the Initial Term or the then-current Renewal Term, as applicable. The period during which Executive is employed by the Company pursuant to this Agreement is hereinafter referred to as the "<u>Term</u>."

2.    <u>Employment Duties</u>. Executive shall have the title of Co-Chairman of the Board and Chief Vision Officer of the Company and shall have such duties, authorities and responsibilities as are consistent with such position and as the Board of Directors of the Company (the "<u>Board</u>") may designate from time to time. Executive shall also serve as a member of the Board. Executive shall report to the Board. Executive shall devote Executive's full working time and attention and Executive's best efforts to Executive's employment and service with the Company and shall perform Executive's services in a capacity and in a manner consistent with Executive's position for the Company; <u>provided</u>, that this <u>Section 2</u> shall not be interpreted as prohibiting Executive from (i) managing Executive's personal investments and other lawful business interests, including without limitation, serving on the board or as an executive of any investment banking or investment or asset management business, (ii) engaging in charitable or civic activities, (iii) participating on boards of directors or similar bodies of non-profit organizations, or (iv) subject to approval by the Board in its reasonable business judgment, participating on boards of directors or similar bodies of for-profit organizations, in each case of (i) – (iv), so long as such activities do not, individually or in the aggregate, (a) materially interfere with the performance of Executive's duties and responsibilities hereunder, (b) create a fiduciary conflict, or (c) result in a violation of <u>Section 13</u> of this Agreement. If requested, Executive shall also serve as an executive officer of any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Company (an "<u>Affiliate</u>") without any additional compensation.

1



3. <u>Base Salary and Bonus</u>. During the Term, the Company shall pay Executive a base salary at an annual rate of $60,000, payable in accordance with the Company's normal payroll practices for employees as in effect from time to time. The Board shall review Executive's base salary annually. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "<u>Base Salary</u>." If for any calendar year during the term of this Agreement (or partial year in the case of the year in which this Agreement terminates) the positive total shareholder return ("TSR") of the Company exceeds the TSR for the S&P 500 Index during the same period ("TSR Over Performance"), Executive shall be entitled to a bonus ("Bonus") equal to the product of .0375 multiplied by the amount of the increase in Company equity value attributable to TSR Over Performance. The Bonus amount is payable at the option and discretion of the Company in cash, bitcoin ("BTC") or shares of Company common stock having a fair market value on the date of issue equal to the amount of the Bonus.

4. <u>Equity Awards and Benefits</u>. Immediately prior to the effective date of the merger with and into XPDI pursuant to the Agreement and Plan of Merger dated July 20, 2021, subject to approval by the Board, Executive shall be granted options to purchase 5,000,000 shares of common stock of the Company pursuant to the Company's 2018 Omnibus Incentive Plan or such other or successor plan then established by Company Options granted to Executive hereunder or during the term of Executive's employment shall be issued pursuant to the Company's 2018 Omnibus Incentive Plan or such other successor plan established by Company (as amended from time to time, the "<u>Plan</u>") or otherwise as the Board shall determine in its discretion. Equity awards granted to Executive or his designees shall have such terms, conditions and vesting set forth in the applicable award agreement issued pursuant to the Plan. Notwithstanding the foregoing, equity awards granted to Executive hereunder shall fully vest if Executive's employment is terminated as a result of Executive's death or "Disability" (as defined in Section 8(b) hereof, or by Company without "Cause" (as defined in Section 10(a) hereof) or for "Good Reason" (as defined in Section 10(c) hereof).

5. <u>Benefits</u>. Executive shall be entitled to participate in any benefit plans, including medical, disability life insurance and disability offered by the Company as in effect from time to time (collectively, "<u>Benefit Plans</u>"), on the same basis as those generally made available to other executives of the Company, to the extent consistent with applicable law and the terms of the applicable Benefit Plan. The Company does not promise the adoption or continuance of any particular Benefit Plan and reserves the right to amend or cancel any Benefit Plan at any time in its sole discretion (subject to the terms of such Benefit Plan and applicable law).

6. <u>Indemnity and Director and Officer Insurance</u>. The Company agrees that in the event Executive is, or is threatened to be made, a party to any pending, contemplated or threatened action, suit, arbitration, or any other proceeding whether civil, criminal, administrative or investigative, and whether formal or informal ("<u>Proceeding</u>"), by reason of the fact that Executive is or was, or had agreed to become, an employee or director of the Company, is are or was serving at the request of the Company as an employee or director to another corporation, partnership, joint venture, business, person, trust, employee benefit plan or other entity, the Company shall indemnify and hold Executive harmless, to the fullest extent permitted by the Delaware General Corporation Law, as amended from time to time, and the Company's Certificate of Incorporation or By-Laws, against all claims, expenses, damages, liabilities and losses incurred by Executive, provided that Executive acted in good faith and in a manner Executive reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal Proceeding, had no reasonable cause to believe Executive's conduct was unlawful; provided,

2

further that Executive shall not be entitled to any such indemnification (A) in respect of any Proceeding based upon or attributable to Executive's gaining in fact any personal profit or advantage to which Executive was or is not entitled or resulting from Executive's fraudulent misconduct, (B) to the extent Executive has already received indemnification or payment pursuant to the Company's Certificate of Incorporation, By-laws or other governing documents or otherwise or (C) in respect of any Proceeding initiated by Executive, unless: (I) the Company has joined in or the Board has authorized such Proceeding or (II) Executive is obligated to bring a proceeding against the Company to enforce the Company's indemnity or expense advance obligations. Any such indemnification shall include advancement of costs and expenses. The indemnification obligations of the Company shall survive from the date hereof and continue until (i) ten years after the date that Executive shall have ceased to serve as an employee or director to the Company or (ii) the final termination of all Proceedings pending on the date set forth in clause (i) in respect of which Executive is granted rights of indemnification or advancement of expenses hereunder (the "Survival Period"), and shall survive after the Survival Period with respect to any indemnification claim as to which the Company has received notice on or prior to the end of the Survival Period. The Company's belief regarding a statute of limitations applicable to a claim, any position taken by the Company in response to a claim, or the determination of any judicial, quasi-judicial, or arbitral body in connection with a claim and any statute of limitations applicable to a claim(s) shall in no event relieve the Company from its obligation to indemnify Executive. In addition to Executive entering into a customary written Indemnification Agreement with the Company, for so long as Executive is a director on the Board, Executive will also be entitled to coverage under the Company's D&O (and other applicable) insurance policies as then in effect. The Company will also obtain on Executive's behalf and pay for a personal director's liability insurance policy.

7.  Expense Reimbursement. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business expenses incurred by Executive in connection with the performance of Executive's duties hereunder in accordance with the Company's expense reimbursement policies and procedures in effect time to time, subject to presentation by Executive of documentation reasonably satisfactory to the Company that the applicable expense has been incurred. Executive shall be permitted to fly private for business travel and shall be reimbursed for use of Executive's own aircraft at a rate of $8,000 per flight hour or the reasonable actual cost of charter aircraft in the event Executive's aircraft is unavailable.

8.  Termination of Employment. The Term and Executive's employment hereunder may be terminated as follows:

(a)  Automatically in the event of the death of Executive;

(b)  At the option of the Company, by written notice to Executive or Executive's personal representative in the event of the Disability of Executive. As used herein, the term "Disability" shall mean Executive's inability to perform the essential duties, responsibilities, and functions of his position with the Company as a result of any mental or physical disability or incapacity, with or without reasonable accommodation (including for example but not by way of limitation, by providing reasonable accommodation in the form of protected leave) and such inability continues for at least 120 consecutive calendar days or 150 nonconsecutive days during any consecutive 12-month period after its commencement. Notwithstanding the foregoing, Executive shall not be terminated for "Disability" under circumstances that would violate

3

Executive's rights to reasonable accommodation or protected leave under applicable law protecting individuals with disabilities or requiring leave. Family and medical leave or disability leave provided under federal, state or local law may be unpaid as per the requirements of such laws; provided, however, that Executive shall be entitled to such payments and benefits under the Company's sick leave or disability leave programs as per the terms of such programs. The Company may terminate Executive's active employment because of a Disability by giving written notice to Executive at any time effective at or within twenty (20) days after the end period of leave as may be required under the family and medical leave laws or under federal, state or local disability laws, but the Company shall retain Executive as an inactive employee if necessary to maintain Executive's eligibility for any disability leave benefits. A reduction or elimination of the duties defined in Section 2 during the period Executive is designated as an inactive employee shall not constitute Good Reason. In the event of a dispute over the occurrence of a Disability, Executive agrees to submit to an examination by a doctor selected by the Company who will determine fitness for duties as defined in Section 2 above. If Executive's physician disagrees with the Company's physician's opinion, a third physician, mutually agreed upon by Executive and the Company, shall examine Executive and that physician's opinion shall be conclusive as to Executive's fitness for duty.

(c)  At the option of the Company for Cause, by delivering prior written notice to Executive specifying the facts and circumstances and the section of the Agreement on which the Company bases its determination of Cause;

(d)  At the option of the Company at any time without Cause, by delivering written notice of its determination to terminate to Executive;

(e)  At the option of Executive for Good Reason;

(f)  At the option of Executive without Good Reason, upon sixty (60) days prior written notice to the Company (which the Company may, in its sole discretion, make effective earlier than the termination date provided in such notice), or

(g)  Upon the close of business on the last day of the Initial Term or the then- current Renewal Term, as applicable, as a result of a Non-Renewal Notice.

9.  Payments by Virtue of Termination of Employment.

(a)  Within thirty (30) days following Executive's termination of employment, Executive shall receive: (a) payment of Executive's accrued and unpaid Base Salary as of the date of termination, (b) any accrued amounts or accrued benefits due to Executive in accordance with the Benefit Plans, programs or policies (other than severance), and (c) reimbursement of expenses under Section 7 incurred as of the date of termination. Executive hereby acknowledges and agrees that, other than the payments described in this Section 9 and set forth in any applicable award agreement under the Plan, upon the effective date of the termination of Executive's employment, Executive shall not be entitled to any other payments or benefits of any kind under any Company benefit plan or policy generally available to the Company's employees or otherwise and all other rights of Executive to compensation under this Agreement shall end as of such date.

(b)  In the event the Executive's employment is terminated by the Company without Cause, by the Executive for Good Reason, by either Party after a Change in Control, or as

4

a result of a Company Non-Renewal, the Executive shall be entitled to (i) the payments set forth in Section 9(a) and (ii) subject to Section 9(c) of this Agreement, (1) Base Salary continuation for twelve (12) months, payable in substantially equal installments in accordance with the Company's regular payroll practices, (2) Bonus, if any, for the year in which the termination occurs in an amount equal to the target bonus amount approved by the Board with respect to Executive and payable within thirty (30) days following Executive's termination of employment, and (3) if Executive timely elects coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), a cash payment equal to the full premium for actively employed executives of the Company with the same level of coverage, payable monthly in accordance with the Company's standard payroll practices for twelve (12) months following the date of termination; provided, that the first payment pursuant to this Section 9(b)(ii) shall be made on the next regularly scheduled payroll date following the sixtieth (60th) day after Executive's termination and shall include payment of any amounts that would otherwise be due prior thereto. Executive hereby acknowledges and agrees that, other than the payments described in this Section 9 and set forth in any applicable award agreement under the Plan, upon the effective date of the termination of Executive's employment, Executive shall not be entitled to any other payments or benefits of any kind under any Company benefit plan or policy generally available to the Company's employees or otherwise and all other rights of Executive to compensation under this Agreement shall end as of such date.

(c)    All payments and benefits due to Executive under this Section 9(b)(ii) which are not otherwise required by applicable law shall be payable only if Executive executes a release of claims in a form mutually agreed by the Parties and such release becomes irrevocable, within sixty (60) days following termination of employment. The form of release executed by the Parties shall include a release of any and all claims that the Company might have or assert against Executive. Failure to timely execute and return such release or the revocation of such release during the revocation period shall be a waiver by Executive of Executive's right to the payments in Section 9(b)(ii). In addition, the payments in Section 9(b)(ii) shall be conditioned on Executive's compliance with Sections 11 of this Agreement and on Executive's continued compliance with Section 13 of this Agreement.

10.    Definitions. For purposes of this Agreement,

(a)    "Cause" shall mean, (i) Executive's conviction of, or a plea of guilty or no contest to, any indictable criminal offense or any other criminal offense involving fraud, misappropriation or moral turpitude, (ii) Executive's continued failure to materially perform Executive's duties hereunder (for any reason other than illness or physical or mental incapacity) and failure to cure the same within thirty (30) days after the Company provides written notice consistent with Section 8(c) to Executive or a material breach of fiduciary duty, (iii) Executive's theft, fraud, or dishonesty with regard to the Company or any of its Affiliates or in connection with Executive's duties, (iv) Executive's material violation of the Company's code of conduct or similar written policies, (v) Executive's willful misconduct unrelated to the Company or any of its Affiliates having, or likely to have, a material negative impact on the Company or any of its Affiliates (economically or its reputation), (vi) an act of gross negligence or willful misconduct by Executive that relates to the affairs of the Company or any of its Affiliates, or (vii) material breach by Executive of any provisions of this Agreement. Notwithstanding the foregoing, Executive may only be terminated for "Cause" under (iv) or (vii) of this Section if he first receives written notice consistent with Section 8(c) from the Company and fails to cure the same within thirty (30) days after the Company provides such written notice. Notwithstanding anything else in this Agreement, a good faith error in judgment in the normal course of business shall not constitute Cause for termination.

5

(b)  "Good Reason" shall mean, without Executive's consent, (i) any material diminution in Executive's responsibilities, authorities or duties, (ii) any material reduction in Base Salary, other than across the board reductions for all executives, and (iii) a relocation of Executive's principal place of employment by more than fifty (50) miles from Executive's residence in Austin, Texas; provided, that no event described in clause (i), (ii) or (iii) shall constitute Good Reason unless (A) Executive has given the Company written notice of the termination, setting forth the conduct of the Company that is alleged to constitute Good Reason, within sixty (60) days following the occurrence of such event, and (B) Executive has provided the Company at least sixty (60) days following the date on which such notice is provided to cure such conduct and the Company has failed to do so. Failing such cure, a termination of employment by Executive for Good Reason shall be effective on the day following the expiration of such cure period.

(c)  For the purposes of any equity awards granted under the Plan, "Change in Control" shall mean (i) the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its subsidiaries (taken as a whole) to any "person" or "group" (as such terms are defined in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) other than the Initial Shareholders or (ii) any person or group, other than the Initial Shareholders Affiliated Sponsor Entities, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the voting equity of the Company, including by way of merger, consolidation or otherwise. In determining whether any person or group constitutes a "person" or "group" for purposes of subsections (i) or (ii) above, the Initial Shareholders shall be excluded from such "person" or "group". For purposes of determining whether (i) or (ii) has occurred, an issuance of shares of the Company by the Company (or its successor), whether through an initial public offering, other primary issuance or otherwise, shall be excluded. Notwithstanding the foregoing, a Change in Control shall not occur unless such transaction constitutes a change in the ownership of the Company, a change in effective control of the Company, or a change in the ownership of a substantial portion of the Company's assets under Section 409A. "Initial Shareholders" shall mean each of the shareholders of the Company and their respective affiliates as of the Effective Date.

11.  Return of Company Property. Within ten (10) days following the effective date of Executive's termination for any reason, Executive, or Executive's personal representative shall return all property of the Company or any of its Affiliates in Executive's possession, including, but not limited to, all Company-owned computer equipment (hardware and software), telephones, facsimile machines, tablet computers and other communication devices, credit cards, office keys, security access cards, badges, identification cards and all copies (including drafts) of any documentation or information (however stored) relating to the business of the Company or any of its Affiliates, the Company's or any of its Affiliates' customers and clients or their respective prospective customers or clients.

12.  Resignation as Officer or Director. Upon the effective date of Executive's termination, Executive shall be deemed to have resigned from Executive's position and, to the extent applicable, as an officer of the Company, as a member of the Board or similar governing body of the Company or any of its Affiliates, and as a fiduciary of any Company benefit plan. On

6

or immediately following the effective date of any such termination of Executive's employment, Executive shall confirm the foregoing by submitting to the Company in writing a confirmation of Executive's resignation(s).

13. Confidentiality; Non-Solicitation; Non-Competition.

(a) Confidential and Proprietary Information. Executive agrees that all materials and items produced or developed by Executive for the Company or any of its Affiliates or obtained by Executive from the Company or any of its Affiliates either directly or indirectly pursuant to this Agreement shall be and remains the property of the Company and its Affiliates. Executive acknowledges that he will, during Executive's association with the Company, acquire, or be exposed to, or have access to, materials, data and information that constitute valuable, confidential and proprietary information of the Company and its Affiliates, including, without limitation, any or all of the following: business plans, practices and procedures, pricing information, sales figures, profit or loss figures, this Agreement and its terms, information relating to customers, clients, intellectual property, suppliers, technology, sources of supply and customer lists, research, technical data, trade secrets, or know-how, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, policies, training manuals and similar materials used by the Company in conducting its business operations, personnel information of any Person employed by the Company, potential business combinations, and such other information or material as the Company may designate as confidential and/or proprietary from time to time (collectively hereinafter, the "Confidential and Proprietary Information"). During Executive's employment with the Company and at all times thereafter, Executive shall not, directly or indirectly, use, misuse, misappropriate, disclose or make known, without the prior written approval of the Board, to any party, firm, corporation, association or other entity, any such Confidential and Proprietary Information for any reason or purpose whatsoever, except as may be required in the course of Executive's performance of Executive's duties hereunder. In consideration of the unique nature of the Confidential and Proprietary Information, all obligations pertaining to the confidentiality and nondisclosure thereof shall remain in effect until the Company and its Affiliates have released such information; provided, that the provisions of this Section 13(a) shall not apply to the disclosure of Confidential and Proprietary Information to the Company's Affiliates together with each of their respective shareholders, directors, officers, accountants, lawyers and other representatives or agents, nor to a Permitted Disclosure as defined in Section 13(b) below. In addition, it shall not be a breach of the confidentiality obligations hereof if Executive is required by applicable law to disclose any Confidential and Proprietary Information; provided, that in such case, Executive shall (x) give the Company the earliest notice possible that such disclosure is or may be required and (y) cooperate with the Company, at the Company's expense, in protecting to the maximum extent legally permitted, the confidential or proprietary nature of the Confidential and Proprietary Information which must be so disclosed. Upon termination of Executive's employment, Executive agrees that all Confidential and Proprietary Information, directly or indirectly, in Executive's possession that is in writing or other tangible form (together with all duplicates thereof) will promptly (and in any event within 10 days following such termination) be returned to the Company and will not be retained by Executive or furnished to any person, either by sample, facsimile film, audio or video cassette, electronic data, verbal communication or any other means of communication. Notwithstanding the foregoing or anything else in this Agreement, Executive may disclose the terms of this Agreement and information regarding his compensation arrangements with his spouse, and his tax, legal and financial advisors.

7

(b)    Permitted Disclosure. This Agreement does not limit or interfere with Executive's right, without notice to or authorization of the Company, to communicate and cooperate in good faith with any self-regulatory organization or U.S. federal, state, or local governmental or law enforcement branch, agency, commission, or entity (collectively, a "Government Entity") for the purpose of (i) reporting a possible violation of any U.S. federal, state, or local law or regulation, (ii) participating in any investigation or proceeding that may be conducted or managed by any Government Entity, including by providing documents or other information, or (iii) filing a charge or complaint with a Government Entity, provided that in each case, such communications, participation, and disclosures are consistent with applicable law. Additionally, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Executive files a lawsuit for retaliation by an employer for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney and use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order. All disclosures permitted under this Section 13(b) are herein referred to as "Permitted Disclosures."

(c)    Confidentiality of this Agreement and its Terms. Executive acknowledges that the terms of this Agreement are intended to be confidential between the Parties and except in response to a lawful subpoena, court order or governmental administrative request, Executive will not discuss the terms of this Agreement with any third party. The only exceptions will be that Executive may discuss the fact and terms of this Agreement with his spouse, attorneys, and financial advisor(s).

(d)    Non-Solicitation. Executive agrees that during the Restricted Period (defined below), Executive will not, without written consent of the Company, directly or indirectly, including causing, encouraging, directing or soliciting any other Person (defined below) to, contact, approach or solicit (except as so long as Executive continues to be employed by the Company and makes such contact, approach or solicitation on behalf of the Company and excluding offspring of Executive) for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor or otherwise) or actually hire any Person who is or has been employed or retained in the operation of the Company's Business (defined below) by the Company or its Affiliates during the period commencing one year prior to the date hereof and ending on the date of termination of the Restricted Period, or induce, interfere with or solicit, or attempt to induce, interfere with or solicit, any Person that is a current or former customer, vendor, supplier or other business relation of the Company or its Affiliates into any business relationship that might harm the Company's Business. The restrictions in this Section 13(d) shall not prohibit a general solicitation to the public through general advertising or similar methods of solicitation by search firms not specifically directed at employees of the Company. "Restricted Period" means the period beginning on the Effective Date and ending on the one (1) year anniversary of the date on which Executive's employment is terminated. "Person" means an individual, a partnership, a corporation, an association, a limited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof. "Business" means crypto mining and competing blockchain businesses; "Business" shall not include any non-competing blockchain business.

8

(e) <u>Non-Competition</u>. Executive agrees that during the Restricted Period, Executive will not, within or with respect to the geographical area of (i) the United State of America and (ii) all other areas of the world in which the Company is then engaged in Business. (the "<u>Restricted Area</u>"), except in the furtherance of the Company's Business directly or indirectly own, operate, lease, manage, control, participate in, consult with, advise, permit the Employee's name to be used by, provide services for, or in any manner engage in (other than ownership for investment purposes of less than two percent (2%) of a publicly traded company) any company or other entity or organization that, directly or indirectly, engages in the Business of the Company in the Restricted Area (A) as conducted by the Company during the course of Executive's employment with the Company or (B) planned to be conducted by the Company pursuant to a product or business plan developed prior to the termination of Executive's employment with the Company, provided such plans were documented and the Executive was aware of these plans. Notwithstanding the foregoing, however, nothing herein shall prohibit Executive from engaging in any of the activities described above as a result of the activities of investment banking, investment or asset management businesses owned, operated, managed, controlled, or invested in by Executive or such entities with which Executive is affiliated or as to which Executive counsels, advises or is otherwise engaged by or with.

(f) <u>Nondisparagement</u>. Executive agrees not to disparage or make defamatory statements about the Company, its subsidiaries, affiliates or predecessors, or their past and present investors, officers, directors or employees, or any of their affiliates. Nothing in this <u>Section 13(f)</u> shall interfere with Executive's ability to make the Permitted Disclosures as defined in <u>Section 13(b)</u> above. The Company agrees to instruct its executive officers not to disparage or make defamatory statements about Executive. Nothing in this Agreement shall be interpreted, however, to preclude: (1) either the Company or its subsidiaries, officers and/or directors from making any truthful statements about Employee to the extent required by applicable law or regulation, in connection with any proceeding (regardless of whether between Employee and the Company) or in the course of any regulatory or administrative inquiry, review or investigation or other proceeding that may be conducted by a government agency or (2) the Executive from making any truthful statements about the Company to the extent required by applicable law or regulation, in connection with any proceeding (regardless of whether between Employee and the Company) or in the course of any regulatory or administrative inquiry, review or investigation or other proceeding that may be conducted by a government agency. Notwithstanding the foregoing, competitive speech other than legally actionable defamation or, comparisons of products and/or services by Executive on behalf of future employers following the expiration of the Restricted Period shall not be a violation of this Section 13(f).

(g) <u>Acknowledgement</u>. Executive acknowledges, agrees and stipulates that: (i) the terms and provisions of this Agreement are reasonable and constitute an otherwise enforceable agreement; (ii) the consideration provided by the Company under this Agreement is not illusory; and (iii) the consideration given by the Company under this Agreement, including, without limitation, the provision by the Company of confidential information to Executive as contemplated by <u>Section 13(a)</u>, gives rise to the Company's interest in restraining and prohibiting Executive from engaging in the activities described in <u>Sections 13(c)</u> and <u>13(d)</u>, and Executive's covenant not to engage in these activities is designed to enforce Executive's consideration (or return promises), including, without limitation, Executive's promise to not disclose confidential information under this Agreement.

9

(h)    Tolling. In the event of any violation of the provisions of this Section 13, Executive acknowledges and agrees that the post-termination restrictions contained in this Section 13 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

14.    Cooperation. From and after an Executive's termination of employment, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided, that the Company shall reimburse Executive for Executive's reasonable costs and expenses (including legal counsel selected by Executive and reasonably acceptable to the Company) and such cooperation shall not unreasonably burden Executive or unreasonably interfere with any subsequent employment that Executive may undertake.

15.    Injunctive Relief and Specific Performance. Executive understands and agrees that Executive's covenants under Sections 11, 13 and 14 are special and unique and that the Company and its Affiliates may suffer irreparable harm if Executive breaches any of Sections 11, 13, or 14 because monetary damages would be inadequate to compensate the Company and its Affiliates for the breach of any of these sections. Accordingly, Executive acknowledges and agrees that the Company shall, in addition to any other remedies available to the Company at law or in equity, be entitled to obtain specific performance and injunctive or other equitable relief by a federal or state court in Delaware to enforce the provisions of Sections 11, 13 and/or 14 without the necessity of posting a bond or proving actual damages, without liability should such relief be denied, modified or vacated, and to obtain attorney's fees in respect of the foregoing if the Company prevails in any such action or proceeding. Executive also recognizes that the territorial, time and scope limitations set forth in Section 13 are reasonable and are properly required for the protection of the Company and its Affiliates and in the event that any such territorial, time or scope limitation is deemed to be unreasonable by a court of competent jurisdiction, the Company and Executive agree, and Executive submits, to the reduction of any or all of said territorial, time or scope limitations to such an area, period or scope as said court shall deem reasonable under the circumstances.

16.    Section 280G. Notwithstanding anything to the contrary in this Agreement, if Executive is a "disqualified individual" (as defined in section 280G(c) of the Internal Revenue Code of 1986, as amended (the "Code")), and the payments and benefits provided for in this Agreement, together with any other payments and benefits which Executive has the right to receive from the Company or any of its Affiliates, would constitute a "parachute payment" (as defined in section 280G(b)(2) of the Code), then the payments and benefits provided for in this Agreement shall be either (a) reduced (but not below zero) so that the present value of such total amounts and benefits received by Executive from the Company and its affiliates will be one dollar ($1.00) less than three times Executive's "base amount" (as defined in section 280G(b)(3) of the Code) and so that no portion of such amounts and benefits received by Executive shall be subject to the excise tax imposed by section 4999 of the Code or (b) paid in full, whichever produces the better net after-tax position to Executive (taking into account any applicable excise tax under section 4999 of the Code and any other applicable taxes). The reduction of payments and benefits hereunder, if applicable, shall be made by reducing, first, payments or benefits to be paid in cash hereunder in the order in which such payment or benefit would be paid or provided (beginning with such payment or benefit that would be made last in time and continuing, to the extent necessary, through to such payment or benefit that would be made first in time) and, then,

10

reducing any benefit to be provided in-kind hereunder in a similar order. The determination as to whether any such reduction in the amount of the payments and benefits provided hereunder is necessary shall be made by the Company in good faith. If a reduced payment or benefit is made or provided and through error or otherwise that payment or benefit, when aggregated with other payments and benefits from the Company (or its affiliates) used in determining if a "parachute payment" exists, exceeds one dollar ($1.00) less than three times Executive's base amount, then Executive shall immediately repay such excess to the Company upon notification that an overpayment has been made. Nothing in this <u>Section 16</u> shall require the Company to be responsible for, or have any liability or obligation with respect to, Executive's excise tax liabilities under section 4999 of the Code.

17.    Miscellaneous.

(a)    All notices hereunder, to be effective, shall be in writing and shall be deemed effective when delivered by hand or mailed by (i) certified mail, postage and fees prepaid, or (ii) nationally recognized overnight express mail service, as follows:

> If to the Company:
> Core Scientific Holding Co.
> Email: tduchene@corescientific.com
> To: Todd M. DuChene

> If to Executive:

At Executive's home address as then shown in the Company's personnel records, or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(b)    This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and its successors and assigns.

(c)    This Agreement contains the entire agreement between the parties with respect to the subject matter hereof supersedes all other agreements, term sheets, offer letters, and drafts thereof, oral or written, between the parties hereto with respect to the subject matter hereof. No promises, statements, understandings, representations or warranties of any kind, whether oral or in writing, express or implied, have been made to Executive by any person or entity to induce Executive to enter into this Agreement other than the express terms set forth herein, and Executive is not relying upon any promises, statements, understandings, representations, or warranties other than those expressly set forth in this Agreement.

(d)    No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by all of the parties hereto. No waiver of any provisions of this Agreement shall be valid unless in writing and signed by the party charged with waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver, unless so provided in the waiver.

11

(e)    If any provisions of this Agreement (or portions thereof) shall, for any reason, be held invalid or unenforceable, such provisions (or portions thereof) shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining provisions of this Agreement (or portions thereof) shall nevertheless be valid, enforceable and of full force and effect. If any court of competent jurisdiction finds that any restriction contained in this Agreement is invalid or unenforceable, then the parties hereto agree that such invalid or unenforceable restriction shall be deemed modified so that it shall be valid and enforceable to the greatest extent permissible under law, and if such restriction cannot be modified so as to make it enforceable or valid, such finding shall not affect the enforceability or validity of any of the other restrictions contained herein.

(f)    This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(g)    The section or paragraph headings or titles herein are for convenience of reference only and shall not be deemed a part of this Agreement. The parties have jointly participated in the drafting of this Agreement, and the rule of construction that a contract shall be construed against the drafter shall not be applied. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(h)    Notwithstanding anything to the contrary in this Agreement:

(i)    The parties agree that this Agreement shall be interpreted to comply with or be exempt from Section 409A of the Code and the regulations and authoritative guidance promulgated thereunder to the extent applicable (collectively "Section 409A"), and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. In no event whatsoever will the Company, any of its affiliates, or any of their respective directors, officers, agents, attorneys, employees, executives, shareholders, investors, members, managers, trustees, fiduciaries, representatives, principals, accountants, insurers, successors or assigns be liable for any additional tax, interest or penalties that may be imposed on Executive under Section 409A or any damages for failing to comply with Section 409A.

(ii)    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A, and for purposes of any such provision of this Agreement, references to a "resignation," "termination," "terminate," "termination of employment" or like terms shall mean separation from service. If any payment, compensation or other benefit provided to

12

Executive in connection with the termination of Executive's employment is determined, in whole or in part, to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is a specified employee as defined in Section 409A(2)(B)(i) of the Code, no part of such payments shall be paid before the day that is six (6) months plus one (1) day after the date of termination or, if earlier, ten business days following Executive's death (the "New Payment Date"). The aggregate of any payments that otherwise would have been paid to Executive during the period between the date of termination and the New Payment Date shall be paid to Executive in a lump sum on such New Payment Date. Thereafter, any payments that remain outstanding as of the day immediately following the New Payment Date shall be paid without delay over the time period originally scheduled, in accordance with the terms of this Agreement.

(iii)    All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which Executive incurs such expense. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind, benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(iv)    If under this Agreement, an amount is paid in two or more installments, for purposes of Section 409A, each installment shall be treated as a separate payment. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(i)    All questions concerning the construction, validity and interpretation of this Agreement and the exhibits to this Agreement will be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereby irrevocably and unconditionally submit in any legal action or proceeding arising out of or relating to this Agreement to the exclusive jurisdiction of either a state court located in the State of Delaware, with subject matter jurisdiction over the action or the United States District Court or in the Federal Courts located in Delaware, and, in any such action or proceeding, consent to jurisdiction in such courts and waive any objection to the venue in any such court. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(j)    Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he/she is bound, (ii) Executive is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the

13

Company, this Agreement shall be the valid and binding obligation of Executive on and after the Effective Date, enforceable in accordance with its terms. Executive hereby acknowledges and represents that he has had the opportunity to consult with independent legal counsel or other advisor of Executive's choice and has done so regarding Executive's rights and obligations under this Agreement, that he is entering into this Agreement knowingly, voluntarily, and of Executive's own free will, that he is relying on Executive's own judgment in doing so, and that he fully understands the terms and conditions contained herein.

(k)    The Company shall have the right to withhold from any amount payable hereunder any Federal, state and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

(l)    The covenants and obligations of the Company under Sections 9, 13, 14, 15 and 17 hereof, and the covenants and obligations of Executive under Sections 11, 12, 13, 14, 15 and 17 hereof, shall continue and survive any expiration of the Term, termination of Executive's employment or any termination of this Agreement.

[*signature page follows*]

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

CORE SCIENTIFIC HOLDING CO.

/s/ Todd DuChene

By:    Todd M. DuChene
Title:  General Counsel

EXECUTIVE

/s/ Darin Feinstein

Name: Darin Feinstein

EX-10.30 7 d172159dex1030.htm EX-10.30

**EXHIBIT 10.30**

**CORE SCIENTIFIC, INC.**
**INDEMNIFICATION AGREEMENT**

This **INDEMNIFICATION AGREEMENT** (this "*Agreement*") is dated as of _____, 20__ and is between Core Scientific, Inc., a Delaware corporation (the "*Company*"), and _____ ("*Indemnitee*").

**RECITALS**

A.   Indemnitee's service to the Company substantially benefits the Company.

B.   Individuals are reluctant to serve as directors or officers of corporations or in certain other capacities unless they are provided with adequate protection through insurance or indemnification against the risks of claims and actions against them arising out of such service.

C.   Indemnitee does not regard the protection currently provided by applicable law, the Company's governing documents and any insurance as adequate under the present circumstances, and Indemnitee may not be willing to serve as a director or officer without additional protection.

D.   In order to induce Indemnitee to continue to provide services to the Company, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, Indemnitee as permitted by applicable law.

E.   This Agreement is a supplement to and in furtherance of the indemnification provided in the Company's certificate of incorporation and bylaws, and any resolutions adopted pursuant thereto, and this Agreement shall not be deemed a substitute therefor, nor shall this Agreement be deemed to limit, diminish or abrogate any rights of Indemnitee thereunder.

**AGREEMENT**

The parties agree as follows:

1.   **Definitions**.

(a)   "*Beneficial Owner*" shall have the meaning given to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"); provided, however, that "Beneficial Owner" shall exclude any Person otherwise becoming a Beneficial Owner solely by reason of (i) the stockholders of the Company approving a merger of the Company with another Person, or entering into tender or support agreements relating thereto, provided such merger was approved by the Company's board of directors, or (ii) the Company's board of directors approving a sale of securities by the Company to such Person.

(b)   A "*Change in Control*" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

(i)   *Acquisition of Stock by Third Party.* Any Person (as defined below) becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities;



**(ii)** *Change in Board Composition.* During any period of two consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constituted the Company's board of directors and any Approved Directors cease for any reason to constitute at least a majority of the members of the Company's board of directors. "***Approved Directors***" means new directors (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 1(b)(i), 1(b)(iii) or 1(b)(iv)) whose election or nomination by the board of directors (or, if applicable, by the Company's stockholders) was approved by a vote of at least two thirds of the directors then still in office who either were directors at the beginning of such two-year period or whose election or nomination for election was previously so approved;

**(iii)** *Corporate Transactions.* The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect a majority of the board of directors or other governing body of such surviving entity; or

**(iv)** *Liquidation.* The approval by the Company's board of directors of a complete liquidation or the dissolution of the Company or an agreement for the sale, lease or disposition by the Company of all or substantially all of the Company's assets; or

**(v)** *Other Events.* Any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar schedule or form) promulgated under the Exchange Act, whether or not the Company is then subject to such reporting requirement, *except* the completion of the Company's initial public offering shall not be considered a Change in Control.

**(c)** "***Corporate Status***" describes the status of a person who is or was a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise.

**(d)** "***DGCL***" means the General Corporation Law of the State of Delaware.

**(e)** "***Disinterested Director***" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

**(f)** "***Enterprise***" means the Company and any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary.

**(g)** "***Expenses***" include all reasonable and actually incurred attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond or other appeal bond or their equivalent, and (ii) for purposes of Section 10(d),

2

Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)    "*Independent Counsel*" means a law firm, or a partner or member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company, any Enterprise or Indemnitee in any matter material to any such party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term Independent Counsel shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(i)    "*Person*" shall have the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act; *provided*, *however*, that Person shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(j)    "*Proceeding*" means any threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative or investigative nature, whether formal or informal, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of the Company, (ii) any action taken by Indemnitee or any action or inaction on Indemnitee's part while acting as a director or officer of the Company, or (iii) the fact that he or she is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

(k)    "*to the fullest extent permitted by applicable law*" means to the fullest extent permitted by all applicable laws, including without limitation: (i) the fullest extent permitted by DGCL as of the date of this Agreement and (ii) the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

(l)    In connection with any Proceeding relating to an employee benefit plan: references to "*fines*" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "*serving at the request of the Company*" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "*not opposed to the best interests of the Company*" as referred to in this Agreement.

3

**2.   Indemnity in Third-Party Proceedings**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or witness or other participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

**3.   Indemnity in Proceedings by or in the Right of the Company**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a witness or other participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Delaware Court of Chancery or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Delaware Court of Chancery or such other court shall deem proper.

**4.   Indemnification for Expenses of a Party Who is Wholly or Partly Successful**. Notwithstanding any other provision of this Agreement, in circumstances where indemnification is not available under Section 2 or 3, as the case may be, to the fullest extent permitted by law and to the extent that Indemnitee is a party to, and is successful (on the merits or otherwise) in defense of, any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee or on Indemnitee's behalf in connection therewith. For purposes of this Section 4, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

**5.   Exclusions**. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any Proceeding (or any part of any Proceeding):

**(a)**   for which payment has actually been made to or on behalf of Indemnitee under any statute, insurance policy, indemnity provision, vote or otherwise, except with respect to any excess beyond the amount paid;

**(b)**   for an accounting or disgorgement of profits pursuant to Section 16(b) of the Exchange Act, or similar provisions of federal, state or local statutory law or common law, if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

**(c)**   for any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "***Sarbanes-Oxley Act***"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

4

(d)    initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees, agents or other indemnitees, unless (i) the Company's board of directors authorized the Proceeding (or the relevant part of the Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, (iii) otherwise authorized in Section 10(d) or (iv) otherwise required by applicable law; provided, for the avoidance of doubt, Indemnitee shall not be deemed for purposes of this paragraph, to have initiated any Proceeding (or any part of a Proceeding) by reason of (i) having asserted any affirmative defenses in connection with a claim not initiated by Indemnitee or (ii) having made any counterclaim (whether permissive or mandatory) in connection with any claim not initiated by Indemnitee; or

(e)    if prohibited by the DGCL or other applicable law.

6.    **Advances of Expenses**. The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding prior to its final disposition, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 30 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company, *except*, with respect to advances of expenses made pursuant to Section 10(c), in which case Indemnitee makes the undertaking provided in Section 10(c). This Section 6 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding (or any part of any Proceeding) for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding (or any part of any Proceeding) referenced in Section 5(b) or 5(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

7.    **Procedures for Notification and Defense of Claim**.

(a)    Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding. The failure by Indemnitee to notify the Company will not relieve the Company from any liability that it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Company.

(b)    If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect that may be applicable to the Proceeding, the Company shall give prompt notice of the commencement of the Proceeding to the insurers in accordance with the procedures set forth in the applicable policies. The Company shall thereafter take all commercially reasonable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)    In the event the Company may be obligated to make any indemnity in connection with a Proceeding, the Company shall be entitled to assume the defense of such Proceeding with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, conditioned or delayed, upon the delivery to Indemnitee of written notice of its election to do so. After delivery of such notice, approval

5

of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Company's assumption of the defense of any such Proceeding, the Company shall be obligated to pay the fees and expenses of Indemnitee's separate counsel to the extent (i) the employment of separate counsel by Indemnitee is authorized by the Company, (ii) counsel for the Company shall have reasonably concluded that there is a conflict of interest between the Company and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the Company is not financially or legally able to perform its indemnification obligations, or (iv) the Company shall not have retained, or shall not continue to retain, counsel to defend such Proceeding. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense. The Company shall not be entitled, without the consent of Indemnitee, to assume the defense of any claim brought by or in the right of the Company.

(d) Indemnitee shall give the Company such information and cooperation in connection with the Proceeding as may be reasonably appropriate.

(e) The Company shall not be liable to indemnify Indemnitee for any settlement of any Proceeding (or any part thereof) effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in a settlement to which the Company has given its prior written consent, such settlement shall be treated as a success on the merits in the settled action, suit or proceeding.

(f) The Company shall not settle any Proceeding (or any part thereof) in a manner that imposes any penalty or liability on Indemnitee not paid by the Company without Indemnitee's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

8. **Procedures upon Application for Indemnification**.

(a) To obtain indemnification, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and as is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Proceeding. Any delay in providing the request will not relieve the Company from its obligations under this Agreement, except to the extent such failure is prejudicial.

(b) Upon written request by Indemnitee for indemnification pursuant to Section 8(a), a determination with respect to Indemnitee's entitlement thereto shall be made as follows, provided that a Change in Control shall not have occurred: (i) by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors; (ii) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors; (iii) if there are no such Disinterested Directors or, if a majority of Disinterested Directors so direct, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee; or (iv) if so directed by the Company's board of directors, by the stockholders of the Company. If a Change in Control shall have occurred, then a determination with respect to Indemnitee's entitlement to indemnification shall be made by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee. If it is determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within 10 days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including

6

providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) actually and reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company, to the extent permitted by applicable law.

(c)    In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 8(b), the Independent Counsel shall be selected as provided in this Section 8(c). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Company's board of directors, and the Company shall give written notice to Indemnitee advising him or her of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Company's board of directors, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either event, Indemnitee or the Company, as the case may be, may, within 10 days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 1, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 8(a) and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, either the Company or Indemnitee may petition a court of competent jurisdiction for resolution of any objection that shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 8(b). Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 10(a), the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(d)    The Company shall pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

9.    **Presumptions and Effect of Certain Proceedings**.

(a)    In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement, and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption by clear and convincing evidence.

(b)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner that he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

7

**(c)** For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith to the extent Indemnitee relied in good faith on (i) the records or books of account of the Enterprise, including financial statements, (ii) information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, (iii) the advice of legal counsel for the Enterprise or its board of directors or counsel selected by any committee of the board of directors or (iv) information or records given or reports made to the Enterprise by an independent certified public accountant, an appraiser, investment banker or other expert selected with reasonable care by the Enterprise or its board of directors or any committee of the board of directors. The provisions of this Section 9(c) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

**(d)** Neither the knowledge, actions nor failure to act of any other director, officer, agent or employee of the Enterprise shall be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

10. **Remedies of Indemnitee**.

**(a)** Subject to Section 10(e), in the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 6 or 10(d), (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 8 within 30 days after the later of the receipt by the Company of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made (A) within ten days after a determination has been made that Indemnitee is entitled to indemnification or (B) with respect to indemnification pursuant to Sections 4, 5 and 10(d), within 30 days after receipt by the Company of a written request therefor, or (v) the Company or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of his or her entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his or her option, may seek an award in arbitration with respect to his or her entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 12 months following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 10(a); *provided, however,* that the foregoing clause shall not apply in respect of a proceeding brought by Indemnitee to enforce his or her rights under Section 4. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

**(b)** Neither (i) the failure of the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination by the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders that Indemnitee has not met the applicable standard of conduct, shall create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made pursuant to Section 8 that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 10 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits, and

8

Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 10, the Company shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be, and the burden of proof shall be by clear and convincing evidence.

(c)  To the fullest extent not prohibited by law, the Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 10 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Section 10 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 10, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)  To the extent not prohibited by law, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee in connection with any action for indemnification or advancement of Expenses from the Company under this Agreement, any other agreement, the Company's certificate of incorporation or bylaws or under any directors' and officers' liability insurance policies maintained by the Company to the extent Indemnitee is successful in such action, and, if requested by Indemnitee, shall (as soon as reasonably practicable, but in any event no later than 30 days, after receipt by the Company of a written request therefor) advance such Expenses to Indemnitee, subject to the provisions of Section 6. Indemnitee hereby undertakes to repay such advances to the extent the Indemnitee is ultimately unsuccessful in such action or arbitration.

(e)  Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of the Proceeding.

11.  **Contribution**. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amounts incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid or to be paid in settlement, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the events and transactions giving rise to such Proceeding; and (ii) the relative fault of Indemnitee and the Company (and its other directors, officers, employees and agents) in connection with such events and transactions.

12.  **Non-Exclusivity**. The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Company's certificate of incorporation or bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Company's certificate of incorporation and bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change, subject to the restrictions expressly set forth herein or therein. Except as expressly set forth herein, no right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

9

**13.    Primary Responsibility**. The Company acknowledges that to the extent Indemnitee is serving as a director on the Company's board of directors at the request or direction of a private equity or venture capital fund or other entity and/or certain of its affiliates (collectively, the "*Secondary Indemnitors*"), Indemnitee may have certain rights to indemnification and advancement of expenses provided by such Secondary Indemnitors. The Company agrees that, as between the Company and the Secondary Indemnitors, the Company is primarily responsible for amounts required to be indemnified or advanced under the Company's certificate of incorporation or bylaws or this Agreement and any obligation of the Secondary Indemnitors to provide indemnification or advancement for the same amounts is secondary to those Company obligations. To the extent not in contravention of any insurance policy or policies providing liability or other insurance for the Company or any director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, the Company waives any right of contribution or subrogation against the Secondary Indemnitors with respect to the liabilities for which the Company is primarily responsible under this Section 13. In the event of any payment by the Secondary Indemnitors of amounts otherwise required to be indemnified or advanced by the Company under the Company's certificate of incorporation or bylaws or this Agreement, the Secondary Indemnitors shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee for indemnification or advancement of expenses under the Company's certificate of incorporation or bylaws or this Agreement or, to the extent such subrogation is unavailable and contribution is found to be the applicable remedy, shall have a right of contribution with respect to the amounts paid. The Secondary Indemnitors are express third-party beneficiaries of the terms of this Section 13.

**14.    No Duplication of Payments**. Subject to Section 13, the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received payment for such amounts under any insurance policy, contract, agreement or otherwise.

**15.    Insurance**. To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, trustees, general partners, managing members, officers, employees, agents or fiduciaries of the Company or any other Enterprise, Indemnitee shall be covered by such policy or policies to the same extent as the most favorably-insured persons under such policy or policies in a comparable position.

**16.    Subrogation**. Subject to Section 13, in the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

**17.    Services to the Company**. Indemnitee agrees to serve as a director or officer of the Company or, at the request of the Company, as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of another Enterprise, for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his or her resignation or is removed from such position. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee. Indemnitee specifically acknowledges that any employment with the Company (or any of its subsidiaries or any Enterprise) is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, with or without notice, except as may be otherwise expressly provided in any executed, written

10

employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), any existing formal severance policies adopted by the Company's board of directors or, with respect to service as a director or officer of the Company, the Company's certificate of incorporation or bylaws or the DGCL. No such document shall be subject to any oral modification thereof.

18. **Duration.** All agreements and obligations of the Company contained herein will continue during the period Indemnitee is an Agent of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and will continue thereafter so long as Indemnitee will be subject to any proceeding by reason of his or her corporate status as an Agent, whether or not he or she is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement. This Agreement will be binding on and inure to the benefit of and be enforceable by the parties of this Agreement and their respective successors (including any direct or indirect successor by purchase, merger, consolidation, or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors, and personal and legal representatives.

19. **Successors**. This Agreement shall be binding upon the Company and its successors and assigns, including any direct or indirect successor, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. Further, the Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

20. **Severability**. Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

21. **Enforcement**. The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.

22. **Entire Agreement**. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; *provided*, *however*, that this Agreement is a supplement to and in furtherance of the Company's certificate of incorporation and bylaws and applicable law.

11

23.   **Modification and Waiver**. No supplement, modification or amendment to this Agreement shall be binding unless executed in writing by the parties hereto. No amendment, alteration or repeal of this Agreement shall adversely affect any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his or her Corporate Status prior to such amendment, alteration or repeal. No waiver of any of the provisions of this Agreement shall constitute or be deemed a waiver of any other provision of this Agreement nor shall any waiver constitute a continuing waiver.

24.   **Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

(a)   if to Indemnitee, to Indemnitee's address, facsimile number or electronic mail address as shown on the signature page of this Agreement or in the Company's records, as may be updated in accordance with the provisions hereof; or

(b)   if to the Company, to Core Scientific, Inc., 106 East 6th Street, Suite 900-145, Austin, Texas 78701, Attention: General Counsel, or at such other current address as the Company shall have furnished to Indemnitee, with a copy to Cooley LLP, 55 Hudson Yards, New York, NY 10001, Attention: Nicolas Dumont and Daniel Peale.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent *via* a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer or, if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

25.   **Applicable Law and Consent to Jurisdiction**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 10(a), the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court of Chancery, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Delaware, The Corporation Trust Company, Wilmington, Delaware as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court of Chancery, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court of Chancery has been brought in an improper or inconvenient forum.

26.   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

12

27.   **Captions**. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

(*signature page follows*)

13

The parties are signing this Indemnification Agreement as of the date stated in the introductory sentence.

**CORE SCIENTIFIC, INC.**

By: _____

Name: _____

Title: _____

_____

**[INDEMNITEE NAME]**

Address: _____

_____

[*Signature Page to Indemnification Agreement*]