# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

MEI PANG, Individually and on Behalf of All Others Similarly Situated,

       Plaintiff,

       v.

MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING,

       Defendants.

Case No. 1:22-CV-1191-DAE

CLASS ACTION

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 3

    A.   Core's Hosting Operations Were a Major Part of Its Business ............................. 3

    B.   Core Attempted to Pass Through Its Increased Power Costs to Its Hosting
        Customers in Contravention of Their Fixed Rate Contracts ................................. 4

    C.   Defendants Made False and Misleading Statements and Omissions
        About Core's Hosting Business ................................................................... 5

    D.   Customers Rejected the New Fees; Core's Efforts to Save its Hosting
        Business Through Pass-Through Surcharges Failed ................................... 6

III.   ARGUMENT ...................................................................................................... 7

    A.   Plaintiffs' Claims Are Not Precluded by the Bankruptcy Court's Order ............... 8

        1.   The Releases and Injunction Do Not Preclude Plaintiffs' Claims .............. 9

        2.   *Res Judicata* Does Not Bar Plaintiffs' Claims ............................................ 9

    B.   Plaintiffs' Claims Are Not Time-Barred ................................................... 10

    C.   The SAC Adequately Alleges Violations of the Securities Act ......................... 12

        1.   Rule 8(a) Pleading Standards Apply to Plaintiffs' § 11 Claims ............... 12

        2.   The SAC Adequately Alleges a Misleading Omission of Material
            Fact in the Registration Statement ............................................................. 13

    D.   The SAC Adequately Alleges Violations of Section 14(a) ................................. 15

    E.   The SAC Adequately Alleges Securities Fraud ................................................... 16

        1.   The SAC Alleges Actionable Statements and Omissions ........................ 16

        2.   The SAC Alleges a Strong Inference of Scienter ..................................... 19

            a.   Levitt and Sterling Knew or Recklessly Disregarded
                That Their Statements Were False or Misleading ......................... 20

            b.   The Core Operations Theory and SOX Certifications
                Bolster Plaintiffs' Direct Allegations of Scienter ......................... 23

        c.      Defendants' Purported Nonculpable Inferences Do
Not Outweigh Particularized Allegations of Knowledge ............. 24

        d.      Plaintiffs Need Not Allege Motive ............................................... 25

     3.     The SAC Adequately Alleges Loss Causation ......................................... 25

  F.    The SAC Adequately Alleges Control Person Claims ......................................... 29

IV.   CONCLUSION ....................................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ............................................................................... 20

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ............................................................................... 26

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................. 20

*Bond Opportunity Fund II, LLC v. Heffernan*,
340 F. Supp. 2d 146 (D.R.I. 2004) ....................................................................... 11

*Braun v. Eagle Rock Energy Partners, L.P.*,
223 F. Supp. 3d 644 (S.D. Tex. 2016) ................................................................. 15

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................ 22, 23

*Panella v. Tesco Corp.*,
2019 WL 1606349 (S.D. Tex. Mar. 29, 2019) ...................................................... 15

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ............................................................................... 24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................ 25

*Edwards v. McDermott Int'l, Inc.*,
2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) ...................................................... 16

*G.A. Thompson & Co. v. Partridge*,
636 F.2d 945 (5th Cir. 1981) ............................................................................... 29

*Genesee Cnty. Employees' Ret. Sys. v. FirstCash Holdings Inc.*,
667 F. Supp. 3d 295 (N.D. Tex. 2023) ............................................................ 27, 28

*Harrington v. Purdue Pharma L. P.*,
144 S. Ct. 2071 (2024) .......................................................................................... 9

*Heck v. Triche*,
775 F.3d 265 (5th Cir. 2014) ............................................................................... 30

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................................ 12

iii

*Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017)................................................................... 22

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)................................................................... 22

*In re Cassava Scis., Inc. Sec. Litig.*,
2023 WL 3442087 (W.D. Tex. May 11, 2023) ....................................................... 27

*In re Cobalt Int'l Energy, Inc.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ........................................................... 29

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................................... 28

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................................................... 11

*In re Dynegy, Inc.*,
770 F.3d 1064 (2d Cir. 2014)................................................................................. 10

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................... 12

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................... 12, 13, 30

*In re Fleming Companies, Inc. Sec. & Derivative Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004)................................................. 12, 20

*In re Kirwan Offices S.à.r.l.*,
592 B.R. 489 (S.D.N.Y. 2018)............................................................................... 10

*In re Lehman Bros. Sec. & Erisa Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................... 29

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) ...................................................................... 10

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014).................................................................... 25

*In re Millennium Lab Holdings II, LLC*,
575 B.R. 252 (D. Del. Bankr. 2017) ...................................................................... 10

*Izadjoo v. HelixEnergy Sols. Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017) ................................................................... 25

*Johnson v. Crown Enterprises, Inc.*,
398 F.3d 339 (5th Cir. 2005) ................................................................. 10

*Krim v. BancTexas Grp., Inc.*,
989 F.2d 1435 (5th Cir. 1993) ................................................................ 12

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................... 25

*Lane v. Page*,
727 F. Supp. 2d 1214 (D.N.M. 2010) ...................................................... 16

*Lind v. Vanguard Offset Printers, Inc.*,
857 F. Supp. 1060 (S.D.N.Y. 1994).......................................................... 11

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................ 27

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) .................................................................. 23

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) .................................................................. 12

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ................................................ 16, 20, 25, 26

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)................................................................................. 16

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) .................................................................. 22

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .................................................................. 24

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) .................................................................. 23

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .................................................................. 25

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)........................................... 13

*Patterson v. Mahwah Bergen Retail Grp., Inc.*,
636 B.R. 641 (E.D. Va. 2022)................................................................. 10

*Plagens v. Deckard*,
2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ...................................................... 29

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ................................................................................. 24

*PR Diamonds, Inc. v. Chandler*,
91 F. App'x 418 (6th Cir. 2004) ............................................................................ 25

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ................................................................ 26, 27, 28, 29

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .............................................................. 27

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ................................................................................. 25

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014) .................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................................................... 20

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................. 11

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
848 F.3d 366 (5th Cir. 2017) ................................................................................. 11

*Walker v. Beaumont Indep. Sch. Dist.*,
938 F.3d 724 (5th Cir. 2019) ................................................................................... 7

*Wasicek v. Sumo Logic, Inc.*,
2024 WL 3708033 (N.D. Cal. Aug. 5, 2024) ........................................................ 16

**Statutes**

15 U.S.C. § 78u-4(b)(2) .............................................................................................. 19

**Rules**

Fed. R. Civ. P. 15(a) ................................................................................................... 30

Fed. R. Civ. P. 15(c)(2) ............................................................................................... 10

**Regulations**

17 C.F.R. § 229.303 .................................................................................................... 13

Lead Plaintiff Morgan Hoffman and named plaintiffs Evan Achee, William J. Emanuel, Garrett Downing, and Tin Doan Huynh ("Plaintiffs") submit this memorandum in opposition to Defendants' motion (ECF No. 92, "Motion") to dismiss Plaintiffs' Second Amended Class Action Complaint (ECF No. 89, "SAC").

## I.      INTRODUCTION

In the SAC, Plaintiffs allege critical new facts to support Plaintiffs' amended claims for violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") against current and former officers and directors of Core Scientific, Inc. ("Core" or the "Company"). The SAC's new allegations are tailored to cure the deficiencies identified by the Court in Plaintiffs' first amended complaint ("FAC"). In the SAC, Plaintiffs again allege that Defendants made false and misleading statements and omissions in Core's SEC filings and in public statements, including in the Registration Statement and Proxy Statement issued by Core in connection with its "de-SPAC" merger, concerning Core's hosting business.

At all relevant times Core had just two lines of business: (1) operating cryptocurrency mining rigs for its own benefit ("self-mining"), and (2) hosting mining rigs at its facilities on behalf of third-party customers ("hosting"). Electricity costs are the primary costs associated with the mining business, which involves running thousands of specialized computers to solve algorithms and generate cryptocurrency. To attract hosting customers, Core offered fixed-rate contracts where customers agreed to a fixed price for electricity costs that would be charged based on the power consumption attributed to that customer's rigs. However, by late 2021, the viability of its low-margin hosting business was threatened, as Core was squeezed between increasing power costs and its fixed rate hosting contracts. Unbeknownst to investors, Core's CEO, Defendant Levitt,

decided Core would attempt to pass its increased power costs through to its hosting customers via new "power cost pass-through" surcharges, despite the customers' fixed-rate contracts.

Defendants' statements during the Class Period misleadingly omitted several material facts. First, the Registration Statement omitted the material adverse trend that Core's hosting business had been just breaking even or losing money for the prior couple of years. Second, Defendants failed to disclose in August 2022 that Core had responded to increases in power costs by imposing pass-through surcharges on its hosting customers, concealing the serious risk that the ploy would jeopardize and fail to salvage Core's hosting business. Third, despite knowing that several key customers and Core's own auditor had fervently disputed the legality of the surcharges, Levitt once again misled investors, stating only that Core had "restructured [its] pricing to improve margins" and falsely claiming that "customer acceptance…validate[d] our new strategy."

Indeed, Core's strategy failed and it was unable to salvage its hosting business. One of Core's largest customers, Celsius Network LLC ("Celsius"), engaged Core in extensive litigation, publicly revealing the pass-through strategy and its ill effects for the first time and causing the price of Core's securities to plummet, harming investors. In September 2022, upon Celsius' first public filing concerning the dispute, Core's share price fell over 10%. In October 2022, Core issued a "going concern" warning and revealed that it was considering bankruptcy, due in part to "the increase in electricity costs" and "the litigation with Celsius." On this news, Core's share price fell over 78%. By December 2022, Core had filed for bankruptcy relief under Chapter 11.

The SAC adequately alleges each of the elements of its claims under Section 11 of the Securities Act and Sections 14(a) and 10(b) of the Exchange Act, as well as the control person claims. The Court should deny Defendants' Motion.

## II. STATEMENT OF FACTS

### A. Core's Hosting Operations Were a Major Part of Its Business

Core operates blockchain computing data centers and engages in cryptocurrency mining, primarily for Bitcoin. ¶74. Bitcoin mining on a commercial scale involves operating thousands of specialized computing machines ("miners") working to solve complex cryptographic algorithms to generate Bitcoins. ¶¶4, 64. Commercial Bitcoin mining requires specialized facilities and support services capable of housing, maintaining, and most importantly, powering, these fleets of machines. ¶¶4, 79. Core provides these facilities and services at large scale, with some of their capacity devoted to their own machines and some to third parties who contract with Core to host and operate machines for the third party's benefit ("hosting"). ¶¶79-81. Hosting revenues accounted for roughly 15% of Core's total revenues in 2021, and 25% in 2022. ¶77.

Electricity is the principal operating cost for any cryptocurrency mining fleet, as the miners consume large amounts of electricity. ¶5. Leveraging its scale and buying power, Core sought to obtain favorable long-term power contracts from utility providers to streamline power costs. ¶¶5, 80. Core's ability to obtain favorable power rates appealed to Core's hosting customers, who entered fixed-rate contracts with Core. ¶6. Under these fixed-rate contracts, customers principally paid a fixed rate per kilowatt-hour based on the actual monthly energy consumption attributed to the customer's hosted miners. *Id.*[1] This arrangement insulated customers from fluctuations in power rates. *Id.* The fixed rates for energy costs were the primary appeal for Core's customers, as it gave them predictable and stable input costs in running their mining operations. ¶7. In exchange,

---

[1] Customers paid Core in advance for their estimated usage at the agreed-upon fixed rate, subject to a subsequent "true-up" payment to adjust for actual usage. ¶6 n.3.

customers made substantial advance payments to Core, who could negotiate power agreements with utility companies with knowledge of its fixed hosting rates. *Id.*

Prior to January 2022, Core was a private company. Rather than going public through a traditional (and more strictly regulated) initial public offering ("IPO"), Core merged with a public special purpose acquisition company, or "SPAC," called Power & Digital Infrastructure Acquisition Corp. ("XPDI"). ¶¶87-91.[2] Core and XPDI entered into an agreement in July 2021 to complete a "de-SPAC" transaction (the "Merger"). ¶87. On January 3, 2022, Defendants issued a Proxy Statement soliciting the approval of the proposed Merger from XPDI shareholders, along with a substantively identical Prospectus issued in connection with (and forming part of) a Registration Statement registering the post-Merger Company's securities. ¶¶93-94.

### B. Core Attempted to Pass Through Its Increased Power Costs to Its Hosting Customers in Contravention of Their Fixed Rate Contracts

In late 2021, Core began to experience rising power costs, continuing into 2022. ¶¶8, 176. Unbeknownst to investors, Core's hosting business had been barely breaking even, or even losing money for the previous couple of years. ¶¶8, 101. Those razor-thin (or negative) margins fell even further when Core was squeezed between persistent increases in power costs and its fixed rate hosting contracts. ¶8. In response, Core's then-CEO, Levitt, decided that Core would attempt to pass through its increased power costs to its hosting customers. ¶¶8, 174-76.

In late 2021, Levitt told Core employees to "come up with a suggested plan" including a "Power Surcharge Fee" that would be charged to hosting customers for power cost increases. ¶¶9, 176. Core began rolling out a new version of its hosting contracts which, unlike the existing fixed-rate contracts, expressly permitted Core to pass through increases in Core's power costs to the

---

[2] References to "¶__" are to the paragraphs of the SAC.

customer. *Id.* Core sought to switch all of its hosting customers to these new contracts. *Id.* However, Core also began to take the position that its existing fixed-rate hosting agreements also allowed Core to pass through its increased power costs. ¶¶10, 176. Those contracts permitted Core to pass through to its customers "any new taxes, levies, tariffs or governmental fees and charges," and Core unilaterally decided that "tariffs" now meant utility costs. *Id.* Core began adding "power cost pass-through" surcharges to its hosting customers' invoices as early as May or June 2022. *Id.*

These surcharges were met with strenuous resistance. Core's auditor, Ernst & Young ("EY"), specifically evaluated and pushed back on the new fees, questioning the legal validity of Core's position. ¶¶11, 176. In fact, EY told Core that it should include an offsetting allowance in its financial statements to account for the likelihood that customers would dispute the surprising new surcharges. *Id.* Core's customers also rejected the new surcharges. Most notably, Celsius, one of Core's two largest customers, ardently disputed the new fees. ¶¶12, 166, 169-76. Several other hosting customers also challenged Core's new fees under their fixed rate contracts. ¶¶12, 176, 181. By July 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes. ¶¶176, 207. By June and July 2022, it was clear that Core's efforts to improve the profitability of its hosting business through pass-through surcharges had failed. ¶13.

### C. Defendants Made False and Misleading Statements and Omissions About Core's Hosting Business

In the Registration Statement, Proxy Statement, and during the Class Period, Defendants made several false and misleading statements and omissions of material fact, concealing from investors the truth about Core's struggling hosting business and the Company's misguided efforts to salvage the profitability of that business.

First, in the Registration Statement and Proxy Statement, Defendants failed to disclose the known, material trend that Core's hosting business had historically delivered profit margins that

were "somewhere between break-even to losing money…over the last couple of years." ¶¶101, 113. These undisclosed facts were likely to, and ultimately did, have materially adverse impacts on Core's financial condition, as the hosting business was one of only two meaningful business segments for Core going forward. These omissions violated Defendants' duty to disclose under Item 303 of SEC regulation S-K.

Second, Defendants made additional false and misleading statements and omissions in Core's quarterly report and public statements in August 2022. Defendants falsely asserted that Core's hosting customers were "generally billed on a fixed and recurring basis." ¶157. Defendants also made a misleading and inadequate risk disclosure concerning the risk of increased power costs and framing as hypothetical the risk of failing to obtain hosting customers at favorable prices, when that risk had already materialized. ¶159. Finally, Levitt misleadingly told investors that: Core had "restructured our [hosting business] pricing to improve margins over time," and falsely asserted that "customer acceptance, … validate[s] our new strategy." ¶163. Defendants made these statements despite knowing that, by that time, Core had already been imposing pass-through surcharges on its fixed-rate hosting customers and several customers had disputed those fees.

**D.      Customers Rejected the New Fees; Core's Efforts to Save its Hosting Business Through Pass-Through Surcharges Failed**

In September 2022, Celsius filed a motion for civil contempt in Celsius' bankruptcy proceedings, alleging that Core had imposed improper power cost pass-through surcharges. ¶¶14, 169. This filing revealed to investors for the first time that Core had been responding to increased power costs by attempting to pass through those costs to its hosting customers, despite their fixed-rate contracts. ¶170. On this news, the Company's stock price fell over 10%. ¶171.

In October 2022, Core revealed that due to, among other things, "the increase in electricity costs, … and the litigation with Celsius," the Company was exploring bankruptcy, as "substantial

doubt exists about the Company's ability to continue as a going concern." ¶¶15, 182. This public filing revealed to investors that: (1) Core's efforts to mitigate its increased electricity costs via the pass-through scheme had not worked and Core was unable to salvage the profitability of its hosting business; and (2) the ploy had even backfired by prompting the Celsius litigation. ¶184. On this news, Core's stock price fell 78.1%. ¶183. In December 2022, Core filed for bankruptcy and its securities were delisted, rendering Core's securities virtually worthless. ¶¶16, 185-87.

In Core's bankruptcy proceedings, Celsius filed an objection "to set the record straight with respect to the terms of the Celsius Contracts," *i.e.,* its hosting agreements with Core. ¶¶17, 173. Celsius and Core had "engaged in significant discovery" in connection with Celsius' September 2022 motion and Celsius's objection cited the results of that discovery, including details from Core's internal documents and deposition testimony from Core employees and executives. ¶18, 176. Celsius revealed in detail that, among other things: (1) Core's hosting business had paltry or even negative margins over the prior couple of years; (2) Core had attempted to address the unprofitability of its hosting business by passing through its own increased power costs to its hosting customers (including Celsius), despite the customers' fixed-rate contracts; and (3) several customers had forcefully disputed the pass-through surcharges by as early as June 2022. *Id.*

In less than a year, Core shareholders' investments were wiped out. By the time Core filed for bankruptcy, its stock price had completely collapsed before being delisted. ¶¶16, 187.

## III. ARGUMENT

The Court should deny Defendant's Motion because the SAC adequately alleges each of the claims asserted therein. In assessing a motion to dismiss a complaint under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

**A.      Plaintiffs' Claims Are Not Precluded by the Bankruptcy Court's Order**

Plaintiffs have appealed the order by the Bankruptcy Court that confirmed Core's plan of reorganization under Chapter 11. That plan contained gratuitous, nonconsensual releases and injunctions of claims having no connection to the bankruptcy, for no consideration whatsoever, including the claims against Defendants in this Action, based on a grossly deficient release opt-out scheme ("Third Party Releases"). Plaintiffs' appeal is fully briefed and pending before the District Court. *Hoffman v. Core Scientific, Inc.*, No. 24-cv-357 (S.D. Tex.) ("Bankr. Appeal").

Plaintiffs Hoffman, Achee, and Emmanuel appealed the Bankruptcy Court's Order confirming the Third Party Releases on several grounds. *See* Bankr. Appeal, Dkt. No. 17 (Appellants' Brief). *First*, the Bankruptcy Court lacked constitutional adjudicatory authority to extinguish the claims in this Action without any findings as to the sufficiency of the pleadings or claims. *Second*, the Bankruptcy Court lacked subject matter jurisdiction to release the claims, which bear no real connection to the debtor's estate. *Third*, the woefully deficient notice and opt-out process was insufficient to render the releases consensual and violated due process requirements. *Finally*, the Bankruptcy Court's denial of Plaintiffs' request to opt out on behalf of all class members ignored Hoffman's obligations as the Lead Plaintiff appointed by this Court pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In short, the Third Party Releases are a blatant attempt by Defendants (many of whom control Core) to secure a get-out-of-jail-free card for the claims in this Action and usurp this Court's authority over those claims.

Should Plaintiffs prevail on their appeal, the applicability of the Third Party Releases to Plaintiffs' claims in this Action will be moot. Even if Plaintiffs do not prevail, there are several reasons why the Third Party Releases do not require the dismissal of the SAC.

**1.      The Releases and Injunction Do Not Preclude Plaintiffs' Claims**

The Third Party Releases, by their own terms, "shall only be applicable to the maximum extent permitted by law." Defs.' Ex. N at 163. Thus, as the Third Party Releases are legally invalid for the reasons discussed in Plaintiffs' appeal brief, they do not operate to release Plaintiffs' claims.

Additionally, not all Plaintiffs are subject to the Third Party Releases. Plaintiffs Downing and Huynh did not receive the release opt-out notice. Per the Bankruptcy Court's Order, the releases apply only to those who received the release opt-out notice. Defs.' Ex. N at 14.[3]

The injunction provision also does not preclude Plaintiffs' claims. The injunction provision is coextensive with the Third Party Releases. *See* Defs.' Ex. N at 17. Thus, to the extent the Third Party Releases do not apply to Plaintiffs, neither does the injunction. To the extent Defendants assert that the injunction is so expansive as to bar *all* claims against the (non-debtor) Defendants, and is not subject to the opt-out procedures, it is nonconsensual and therefore barred by the Supreme Court's decision in *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024).

**2.      *Res Judicata* Does Not Bar Plaintiffs' Claims**

Defendants' assertion that the release of Plaintiffs' claims are subject to the doctrine of *res judicata* is without merit. First, the parties were not identical. Only Plaintiff Hoffman filed a proof of claim in the bankruptcy, which was disallowed.[4] None of the Defendants were debtors, and to the extent they filed claims against the debtor's estate they were not aligned with the debtor. The

---

[3] The Third Party Releases also do not apply to other class members, as the opt-out notice was sent only to certain Class Period purchasers (Defs. Ex. N at 98 (Art. 1.238, defining "Other Beneficial Owners")), not class members who held as of the Merger voting date, or who held XPDI shares that were converted to Core shares via the Merger, or who traded warrants or options. *See* ¶¶1-2.

[4] The Bankruptcy Court denied Hoffman's motion for class treatment, *i.e.* to act on behalf of Class members as per his Lead Plaintiff obligations. Thus Hoffman could not act on behalf of the other Plaintiffs, including Downing and Huynh, so it cannot be said that other Plaintiffs interests were adequately represented in the bankruptcy proceedings.

Defendants who were former officers and directors of XPDI, which no longer existed at the time of the bankruptcy, but not of Core, were not in privity with Core during the bankruptcy. Plaintiffs Downing and Huynh had no role at any stage of the bankruptcy proceedings.

Second, the Bankruptcy Court's confirmation order was not a final judgment on the merits. The Bankruptcy Court made absolutely no findings of fact or law regarding the substantive or procedural sufficiency of Plaintiffs' allegations, and its order predated the SAC.[5] *In re Kirwan Offices S.à.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018) (confirmation of a Chapter 11 plan with third-party releases "does not address the merits of the claims being released"); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 273 (D. Del. Bankr. 2017) ("An order confirming a plan with [third party] releases, therefore, does not rule on the merits of the [] claims being released").[6]

### B. Plaintiffs' Claims Are Not Time-Barred

Plaintiffs' claims under Section 11 and Section 14(a) are not time-barred because the relevant allegations in the SAC relate back to the timely filing of the FAC. Rule 15(c) provides that amended pleadings relate back to the date of the earlier pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). "The purpose of the rule is accomplished if the initial complaint gives the defendant fair notice that litigation is arising out of a specific factual situation." *Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339, 342 (5th Cir.

---

[5] Notably, the Bankruptcy Court had already rejected Plaintiffs' request to opt out of the releases on behalf of the putative class they seek to represent, and had Plaintiffs opted out individually, they would have forfeited their standing to object to and appeal the confirmation of the plan, abdicating their obligations to protect the interest of the putative class. *E.g., Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 664 (E.D. Va. 2022); *In re Dynegy, Inc.*, 770 F.3d 1064, 1067, 1070 (2d Cir. 2014); *In re Mallinckrodt PLC*, 639 B.R. 837, 877 (Bankr. D. Del. 2022).

[6] Internal quotations and citations are omitted unless otherwise indicated. References to "Def. Br." are to Defendants' motion to dismiss the SAC. Dkt. No. 92.

2005). Here, Defendants do not assert the faintest whiff of unfair prejudice or surprise arising from Plaintiffs' amended Section 11 and Section 14(a) allegations in the SAC.

Just like the SAC, the FAC alleged violations of Section 11 and Section 14(a) by the same Defendants, based on misrepresentations and omissions in Core's Registration Statement and Proxy Statement concerning undisclosed facts about Core's hosting business. The SAC alleges that Core failed to disclose the material trend that its hosting business was not profitable. The FAC alleged that Core failed to disclose the steps Core had taken to address the profitability of its hosting business. Thus, the allegations in the SAC do not "differ in both time and type from those the original pleading set forth," *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 382 (5th Cir. 2017) (interpreting FCA relation-back provision), nor are they "based on … different disclosures" from the FAC. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016) (finding Section 11 claims did not relate back to prior Section 10(b) claims that did not allege claims based on registration statement).

Courts have found that similar pleadings relate back for statute of limitations purposes. *See, e.g., In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 840–41 (S.D. Tex. 2004) (new Section 11 claims related back to prior Section 10(b) claims that were based on statements contained in the same registration statement); *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 155 (D.R.I. 2004) ("although the proposed amendment sets forth additional reasons for the plaintiffs' claims that the [subject SEC filings] were misleading, the new allegations relate to the same filings referenced in the original and amended complaints and they do not alter the claims that those filings omitted material facts"); *Lind v. Vanguard Offset Printers, Inc.*, 857 F. Supp. 1060, 1068–69 (S.D.N.Y. 1994) (amended complaint relates back because "it incorporates additional omissions and misrepresentations" regarding the same document).

## C. The SAC Adequately Alleges Violations of the Securities Act

Section 11 of the Securities Act was designed to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). The elements of a claim under Section 11 are: (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). "A 'material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Id.* Scienter is not an element of a Section 11 claim. *See Huddleston*, 459 U.S. at 382; *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001).

### 1. Rule 8(a) Pleading Standards Apply to Plaintiffs' § 11 Claims

Notice pleading under Rule 8(a) is all that is required for Plaintiffs' Securities Act claims. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 596 (S.D. Tex. 2002). The heightened pleading requirements of Rule 9(b) do not apply here because: (1) the SAC's Section 11 allegations do not sound in fraud; and (2) Plaintiffs disavowed allegations of fraud in connection with those claims. First, although the Court found that the Section 11 claims in the FAC were "rooted in concealing from investors pass through costs," and thus were "based on the same underlying facts and allegations" as Plaintiffs' fraud claims in the FAC, Dkt. No. 73 at 8, that is not the case here. The SAC alleges entirely distinct statements underlying Plaintiffs' Section 11 claims and Plaintiffs' Section 10(b) fraud claims. *Compare* ¶¶99-100 *with* ¶¶155-64.

Second, the SAC expressly disavows, and does not incorporate, any fraud allegations in its Section 11 claims. ¶¶124-25, 138-39. Thus, Plaintiffs' Section 11 claims are not "grounded in fraud." Def. Br. at 16 n.13. *See In re Fleming Companies, Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *44 (E.D. Tex. June 16, 2004) (citing *Schlotzsky's*, 238 F.3d 363); *In re Enron Corp.*

12

*Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003) ("*Enron II*"). In any event, Defendants do not identify a single instance in which Plaintiffs' Section 11 claims fail to satisfy Rule 9(b) standard.

### 2. The SAC Adequately Alleges a Misleading Omission of Material Fact in the Registration Statement

The SAC alleges an omission of material fact in the Registration Statement, which violated Defendants' duty to disclose under Item 303 of Regulation S-K ("Item 303"). ¶¶97-113. Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that … are reasonably likely to have a material … unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Dkt. No. 73 (the Court's decision on the motion to dismiss the FAC) at 20 and n.1 (recognizing Item 303 can support claims under Section 11).

Here, the undisclosed trend was that Core's hosting business had delivered margins that were "somewhere between break-even to losing money" over the prior "couple of years." ¶99. Levitt admitted that during his deposition in November 2022. ¶101. That omission violated Item 303 because the undisclosed facts were known to Core and Defendants, as was the high likelihood that they would have a material impact on Core's overall financial condition. ¶100.

Levitt's admission meant that this trend was known for more than a year prior to the filing of the Registration Statement. Other Core executives also confirmed the trend, further demonstrating that it was "known" at the time the Registration Statement was filed. ¶¶102-03.[7] A former Core employee who worked on margin analysis also corroborated that Core's hosting business was not profitable in January 2022, when the Registration Statement was filed. ¶109.

---

[7] To be clear, "plaintiffs need not plead defendants' knowledge, as there is no scienter requirement in Section 11." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) ("[t]he issue is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent").

The SAC also alleges that the profitability of Core's hosting business was material to investors. The Registration Statement stated that "[g]oing forward, we anticipate that our mining and hosting operations will comprise all or substantially all of our business activities." ¶106. The hosting business generated $80 million in revenue in 2021, or roughly 15% of Core's total revenues for the year. ¶77. In 2022, those numbers increased to $160 million and 25%, respectively. *Id.* In March and May 2022, Levitt and Sterling each confirmed during earnings conference calls that "self mining and hosting will represent an ever-increasing share of our revenue." ¶¶107-08. Thus, the omission of the historical unprofitability of Core's hosting business was material to investors.

Defendants incorrectly assert that Plaintiffs allege the undisclosed trend was Core' failure to break out the profitability of its hosting business for the first nine months of 2021.[8] The SAC actually alleges the undisclosed trend was the unprofitability of the hosting business for the prior "couple of years," not just for that partial-year span, which undersold the magnitude of the trend. Critically, Defendants did ***not*** disclose the hosting margins for the fourth quarters of 2020 and 2021. While Defendants disclosed data showing a 5.4% margin for the first nine months of 2021, Def. Br. at 17, they did not disclose data from the then-completed fourth quarter that was even worse. Core's hosting business *lost* over $1.1 million that quarter on over $27.6 million in revenue (a margin of -4.1%), bringing the hosting margin for ***all of 2021*** down to 2.0%, or 63% *lower* than for the three quarters disclosed. ¶105.[9] Similarly, Defendants did not disclose that for the fourth quarter of 2020 the hosting margin was over 30% *lower* than the first three quarters of 2020.

---

[8] The SAC's allegations that the Registration Statement did not disclose the hosting margins for these nine months were incorrect, an inadvertent oversight. Nonetheless, this does not diminish Plaintiffs' allegations of an Item 303 violation.

[9] These figures are calculated from Core's 2022 annual report, incorporated by reference into the SAC. ¶105. Fourth quarter values are calculated as the annual totals (from the 2022 annual report) less the first three quarters (from the Registration Statement). Defs.' Ex. A and B at F-100.

There is no merit to Defendants' argument that the relevant information "could easily be calculated" based on financial statements in the Registration Statement, because the fourth quarter data was not disclosed. Thus, the Registration Statement did not disclose the material adverse trend that Plaintiffs actually allege in the SAC: that Core's hosting business was "somewhere between break-even to losing money" over the prior "couple of years." ¶99.

### D. The SAC Adequately Alleges Violations of Section 14(a)

The elements of a claim under Section 14(a) of the Exchange Act are: (1) a false or misleading statement or omission of material fact; (2) made with at least negligence; (3) in a proxy statement that was an essential link in the corporate action that caused the plaintiff's injury. *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 649 (S.D. Tex. 2016). Plaintiffs' claims under Section 14(a) are based on omissions in the Proxy Statement which are identical to the omissions in the Registration Statement, as discussed above. Thus, for the same reasons the SAC adequately alleges Section 11 claims, the SAC also adequately alleges Section 14(a) claims.

Buried in a footnote, Defendants argue that Plaintiffs' Section 14(a) claims fail to allege loss causation. Def. Br. at 18 n.15. Defendants provide no support for this conclusory assertion.[10] The SAC alleges that Plaintiffs were damaged by the misleading Proxy Statement because had they known the truth, "they would have voted against the Merger and/or exercised their redemption rights to receive approximately $10 in cash per share of XPDI stock." ¶115. The SAC also alleges that Plaintiffs "were denied the opportunity to make an informed decision in voting on the Merger or redeeming their shares," resulting in the approval of the Merger. ¶128. Accordingly, Plaintiffs "did not receive their fair share of the value of the assets and business of the combined entity, and

---

[10] The only case cited by Defendants, *Panella v. Tesco Corp.*, 2019 WL 1606349, at *3 (S.D. Tex. Mar. 29, 2019), merely notes that loss causation is an element of a Section 14(a) claim. *Panella* contains no findings or analysis of this issue, which the court does not even reach. *Id.*

suffered damages when the price of the Company's securities declined." *Id.* These allegations are sufficient to allege loss causation. *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at \*6 (S.D. Tex. Apr. 13, 2021); *Lane v. Page*, 727 F. Supp. 2d 1214, 1239 (D.N.M. 2010); *Wasicek v. Sumo Logic, Inc.*, 2024 WL 3708033, at \*20 (N.D. Cal. Aug. 5, 2024).

### E.        The SAC Adequately Alleges Securities Fraud

The elements of a claim under Section 10(b) of the Exchange Act are: (i) a false statement or omission of material fact in connection with the sale or purchase of a security; (ii) made with scienter; (iii) upon which the plaintiff relied; and (iv) that caused plaintiff's losses. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). The Court assesses these claims under "the usual contours of a Rule 12(b)(6)" analysis, except that the inference of scienter must be strong and the misleading statements must be pleaded with particularity, as required by the PSLRA. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

#### 1.        The SAC Alleges Actionable Statements and Omissions

The SAC alleges several false and misleading statements and omissions of material fact during the Class Period. Specifically, the SAC alleges that Levitt and Sterling (and Core) made false and misleading statements and omissions in Core's quarterly report for the second quarter of 2022 ("Q2 10-Q," containing Statements 1-3), and that Levitt made false and misleading statements in Core's second quarter earnings call ("Q2 Earnings Call," Statement 4).

Defendants concede that the Court previously found Statement 4 was actionable. Def. Br. at 20 n.16; Dkt. No. 73 at 27-29 (addressing "Statement 8" in the FAC). Their challenges to Statements 1-3 fall flat. The Court previously found that Statements 1-2 are actionable. Dkt. No. 73 at 25-27 (addressing "Statement 7" in the FAC). To the extent the Court's prior analysis is somewhat unclear, as it appears to address two separate statements (identical to Statements 1 and

2 in the SAC) together as "Statement 7" and mistakenly attributes the statements to the Q1 10-Q instead of the Q2 10-Q, Plaintiffs explain below why each statement is actionable in the SAC.

> **Statement 1** (¶157): "…our [hosting] customers are generally billed on a fixed and recurring basis …."

**Statement 1** was false and misleading because when this statement was made in August 2022, (1) for several months prior, Core had been implementing its plan to "migrate all [hosting] customers" to new contracts that expressly permitted power cost pass-through charges; and (2) Core had also already begun imposing pass-through charges on its supposedly fixed-rate customers. Thus, the SAC alleges that Core was actually billing its new and existing customers on a variable basis, not a "fixed" basis, whether permitted by contract or not. ¶158.

The SAC alleges Statement 1 was false and misleading for reasons aligned with the Court's decisions on Defendants' motions to dismiss and for reconsideration. Dkt. Nos. 73 and 86. The SAC does not allege that Statement 1 was false and misleading based on the "future plans theory." Dkt. No. 86 at 14. Instead, the SAC alleges Core had already begun implementing its plan to "migrate all [hosting] customers" to new contracts that expressly permitted pass-through charges (¶176) and it had already begun imposing pass-through charges on its fixed-rate customers (¶¶176, 204-06 (customers disputed pass-through charges from May and June 2022 invoices)), rendering those contracts variable-rate, not fixed-rate. ¶158. The Court previously found that the identical statement contained in the Q1 10-Q in May 2022 was actionable because "by this time, the pass-through strategy was … concrete and just a couple months away from when customers began to dispute the pass-through costs." Dkt. No. 73 at 27.[11] When Statement 1 was made in August 2022, the strategy had been implemented and the disputes were already known.

---

[11] The Court's analysis of "Statement 7" in the FAC, Dkt. No. 73 at 26-27, directly cites only the "fixed basis" statement contained in the first quarter 10-Q filings, as alleged in ¶200 of the FAC, but the preamble to that analysis shows the Court was considering the identical "Statement 7 from

The Court already rejected Defendants' argument, Def. Br. at 19, that "generally" renders this statement not false or misleading. Dkt. No. 73 at 15-16 ("Plaintiffs particularly pled that Core was not just planning on making exceptions to a few customers."). The same reasoning applies here, and even more so because by August 2022 Core's efforts to impose pass-through charges were not merely future plans but actions that had been underway for months.

> **Statement 2** (¶159): "Continued increases in power costs and unfavorable prices for digital assets will impact our ability to attract customers for our services, harm our growth prospects and could have a continuing material adverse effect on our business, financial condition and results of operations.
>
> … If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations."

**Statement 2** was a purported risk disclosure that was inadequate and contained two misleading sentences. The first sentence (**Statement 2a**) was misleading because it was not the increased power costs themselves that were a risk to Core's hosting business, it was that Core *responded* to its increased power costs by attempting, and failing, to impose power cost pass-through charges on its fixed-rate customers. This omission concealed the material risk that Core would be unable to save its hosting business as its fixed-rate customers refused to pay the pass-through charges or left Core altogether. ¶160. The second sentence (**Statement 2b**) was misleading because it portrayed the Company's inability "to obtain hosting customers at favorable pricing terms" as a hypothetical scenario. In reality, when Statement 2 was made in August 2022, Core had already been imposing pass-through fees (*i.e.*, "favorable pricing terms") on its fixed-rate

---

22Q2 10-Q." Dkt. No. 73 at 25. The FAC alleged the identical statement was false and misleading in both quarterly reports. FAC ¶¶200, 213. The SAC alleges only the August statement. ¶157.

hosting customers for months, and those customers were already disputing those charges, thus the risk that Core "*could*" be "unable to obtain hosting customers" had already materialized. *Id.*

Defendants cite the Court's prior decision that similar statements made in the January 2022 Registration Statement were not actionable, Dkt. No. 73 at 11-12, but they ignore the Court's finding that the identical statements, when made in the August 2022 Q2 10-Q, *were* actionable. Dkt. No. 73 at 26-27. The critical difference is that Plaintiffs allege particularized facts showing that by the time the Q2 10-Q was filed, the pass-through strategy had been implemented and several disputes had arisen. *See id.* The SAC alleges a direct, not "attenuated," relationship between the misleading statements and the omitted facts, thus Statement 2 is actionable.

> **Statement 3** (¶161):   Appended as exhibits to the Q2 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Levitt and Sterling, wherein they certified that the Q2 10-Q "does not contain" any false or misleading statements or omissions of material fact and that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

**Statement 3** (SOX certifications) was false and misleading because Levitt and Sterling knew, or were severely reckless in not knowing, that the Q2 10-Q contained false and misleading statements and omissions of material fact (*i.e.*, Statements 1-2), and accordingly, the Q2 10-Q did not fairly present Core's financial condition and results. ¶162. Defendants argue only that the falsity of Statement 3 derives solely from the falsity of Statements 1 and 2. Def. Br. at 20. Statements 1 and 2 are actionable, therefore Statement 3 is actionable as well.

### 2.     The SAC Alleges a Strong Inference of Scienter

The PSLRA requires a securities fraud complaint to state with particularity facts that give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). On a motion to dismiss, the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). "At the pleading stage, … a plaintiff … must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" *Lormand*, 565 F.3d at 250 (citing *Tellabs*, 551 U.S. at 328). The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 251 (quoting *Tellabs*, 551 U.S. at 324).

Plaintiffs need not establish actual knowledge. "Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014).

### a. Levitt and Sterling Knew or Recklessly Disregarded That Their Statements Were False or Misleading

The SAC alleges new, particularized facts showing that Levitt and Sterling knew about the implementation of the pass-through scheme and receipt of customer disputes well before the false and misleading statements they made.[12] ¶¶188-208. "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Plaintiffs sufficiently allege scienter where they "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Fleming*, 2004 WL 5278716, at *10 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432–33 (5th Cir. 2002)).

The SAC's new scienter allegations cure the deficiencies identified by the Court in the FAC. The SAC does not engage in group pleading, Dkt. No. 73 at 32-34, but instead alleges particularized facts as to both Levitt and Sterling. The Court previously noted that, as to scienter, "when and how Defendants might have learned about foisting pass through costs onto [hosting

---

[12] Defendants do not dispute that their scienter is properly imputed to Core for the purposes of establishing a primary violation by Core with respect to control person claims, as discussed below.

customers] is critical." *Id.* at 39. Whereas the Court found that the FAC "did not allege that any Defendant knew about these [customer] complaints… and when Defendants were otherwise made aware of them," *id.* at 35, the SAC alleges new facts as to when and how Levitt and Sterling each learned about the pass-through scheme and customers' rejections of the surcharges.

Levitt himself decided that Core would attempt to pass its increased power costs on to its hosting customers. ¶196. Levitt asked Core employees to "come up with a suggested plan" that included a "Power Surcharge Fee" charged to hosting customers to offset Core's increased power rates. *Id.* Levitt approved the pass-through scheme himself and directed Core employees to implement it, including during monthly discussions in early 2022. ¶197.

Core's auditor expressly disagreed with Core's position and questioned its legal validity. ¶199. In fact, the auditor told Core to include an offsetting allowance when recording revenue, to account for the likelihood that customers would dispute the charges. *Id.* Indeed, Core did receive vigorous pushback from its hosting customers by June 2022, including challenges to the legality of the surcharges. ¶¶202-06. By July 2022, Core had racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes. ¶207. Core lost customers accounting for as much as 88.7% of its hosting revenues and 22.1% of its total revenues. ¶¶177-78.

The SAC alleges critical new facts from former Core employees reporting firsthand as to Levitt and Sterling's participation in meetings taking place *months before* the August 2022 statements, during which the pass-through scheme and customers' disputes were discussed. According to FE2, Levitt participated in phone meetings in June or July 2022, during which the pass-through charges and customers' pushback and disputes were discussed. ¶201.[13] FE3 also

---

[13] The SAC alleges not just "amorphous" discussions of "customer pushback," Def. Br.at 23, but that hosting customers disputed Core's pass-through charges, which were discussed during the same meetings. ¶201. This case is unlike the cases cited by Defendants where the confidential

reported that both Levitt and Sterling participated in at least one phone call around March-May 2022, during which they discussed the pass-through scheme. *Id.* Jeffrey Pratt, Core's Senior Vice President of Partnerships, who reported directly to Levitt (¶103), personally received a lot of pushback from customers. ¶202. According to FE2, customers began to dispute the pass-through charges "as soon as we billed" them. *Id.* According to FE3, Core's Client Services department received customer complaints about the pass-through charges from "everybody," and forwarded those complaints to Levitt and Sterling, among other Core executives. ¶203.[14] FE1 reported that Sterling also participated in monthly meetings in the summer of 2022, in which Core's pass-through tactics and customers' pushback and disputes were discussed, corroborating FE3's account. ¶180.

Levitt and Sterling "omitted information readily apparent to the speaker." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 459 (S.D. Tex. 2016). Levitt spoke directly on the issue of Core's attempts to "restructure our pricing" and "[i]nitial customer acceptance," ¶163, demonstrating his knowledge or reckless disregard (and misrepresentation) of the pass-through tactics and customers' reactions. *Id.* at 484 (allegations that "[the CEO's] own statements on earnings calls" misleadingly discussed the relevant issues supported an inference of scienter). Therefore, the SAC alleges particularized facts showing that by August 2022, Levitt and Sterling had known *for months* about Core's undisclosed pass-through scheme and customer disputes, creating a compelling inference that they made Statements 1-4 with scienter.

---

witness's allegations could not reasonably be tied to the specific undisclosed conduct at issue. *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 433 (5th Cir. 2019) and *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 719 (W.D. Tex. 2010).

[14] Unlike the witness's statements in *Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578 (W.D. Tex. 2017), FE3's account of disputes being forwarded to Core executives is corroborated by FE2's and FE3's firsthand accounts of those same executives discussing the pass-through scheme and customer disputes during meetings.

### b.	The Core Operations Theory and SOX Certifications Bolster Plaintiffs' Direct Allegations of Scienter

The SAC also alleges "special circumstances" that bolster a compelling inference of scienter as to Core's highest ranking executives: Levitt and Sterling. An officer's position can further support scienter where "special circumstances" are alleged, including "transactions critical to the company's continued vitality [and] omitted information readily apparent to the speaker." *Carlton*, 184 F. Supp. 3d at 459 (citing *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016)). "No one 'special circumstance' is dispositive," such that Plaintiffs need only allege "*some combination* of four considerations that might tip the scales in favor of an inference of scienter." *Id.* at 484 (quoting *Diodes*, 810 F.3d at 959).

Unlike in *Neiman v. Bulmahn*, 854 F.3d 741, 744 (5th Cir. 2017), which concerned the production of one oil well out of 104 in which the company had an interest, here Core had only two closely-related business segments, self-mining and hosting, which "comprise[d] all or substantially all of [Core's] business activities." ¶191. The hosting segment comprised roughly 15% of Core's revenues in 2021 and 25% in 2022. ¶192. Power costs were the primary expense associated with Core's business. ¶194. As several Core executives admitted during their depositions in the Celsius litigation, Core's hosting business "might not [have been] viable" unless Core took action in light of increased power costs and fixed-rate hosting contracts. ¶¶101-03, 195. Thus, Core's hosting business, and its pass-through surcharge scheme aimed at saving that business, were "critical to the company's continued vitality." *Carlton*, 184 F. Supp. 3d at 459.[15]

---

[15] In *Carlton*, the court noted that "although KiOR had 183 employees"—over 50% more employees than Core—"making it substantially larger than the companies to which the Fifth Circuit has applied the 'core-business' exception in other cases, there is no bright-line rule based on the company's size." 184 F. Supp. 3d at 484 (finding CEO's scienter adequately alleged).

Considered collectively, in conjunction with the new allegations showing Levitt and Sterling's direct knowledge, these allegations support a strong inference of scienter. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342–43 (5th Cir. 2008); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424–25 (5th Cir. 2001).

As the Court previously recognized, that Levitt and Sterling signed SOX certifications in connection with the Q2 10-Q filing can support an inference of scienter if there are facts establishing that they had "reason to know, or should have suspected…that the financial statements contained material misstatements or omissions." Dkt. No. 73 at 34. The SAC pleads that Levitt and Sterling knew, or at minimum should have suspected, that Core was engaging in the pass-through scheme and that its hosting customers were disputing the pass-through surcharges, months prior to the Q2 10-Q filing. Thus, their SOX certifications add to an inference of scienter.

### c. Defendants' Purported Nonculpable Inferences Do Not Outweigh Particularized Allegations of Knowledge

Defendants' proffered nonculpable inferences are borderline at best. That Core's auditor expressly disputed the legality of the pass-throughs and recommended Core include an allowance to account for anticipated customer disputes does not cut *against* a finding of scienter. The Court merely found that those allegations were not sufficiently particularized on their own to support an inference of scienter in the FAC. Dkt. No. 73 at 35. That Core's legal team had to get "comfortable" with the pass-through scheme indicates they originally were not comfortable with the plan, and does not support a strong nonculpable inference. Moreover, the legality of the pass-through scheme is not what the SAC alleges caused the challenged statements to be false and misleading.

Defendants' assertions that Levitt was referring to "new customers" in Statement 4, Def. Br. at 25, is simply an unsupported backdoor argument that Statement 4 was not misleading. The Court already found that Statement 4 was misleading because the "restructured" pricing and

"customer acceptance" referred to fixed-rate customers, as alleged in the FAC and SAC. Dkt. No. 73 at 27-29. Likewise, Defendants' mischaracterization of Statement 2 as referring to new, future customers, contradicts the allegations of the SAC and speaks only to the issue of falsity (as addressed above), not an inference of nonculpable intent.

### d.      Plaintiffs Need Not Allege Motive

While motive allegations "might meaningfully enhance the strength of scienter," they are not necessary. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684–85 (5th Cir. 2014). "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see also PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 436 (6th Cir. 2004). Moreover, "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *E.g., Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014). That other Defendants purchased shares does not negate Levitt's and Sterling's scienter.[16]

### 3.      The SAC Adequately Alleges Loss Causation

The Rule 8(a) notice pleading standard applies to allegations of loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). To sufficiently allege loss causation, a plaintiff need only allege that that when the relevant truth about the fraud began to leak out, it caused the price of stock to depreciate and thereby proximately cause the plaintiff's economic loss. *Lormand*, 565 F.3d at 255. The truth that emerged must be "'related to' or 'relevant to' the defendants' fraud

---

[16] Unlike here, the plaintiffs in *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) did not allege facts showing the defendant officers' knowledge or reckless disregard for the misstated or omitted facts.

and earlier misstatements," meaning that "the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014).

"A corrective disclosure is a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." Dkt. No. 73 at 42. A corrective disclosure need not "precisely mirror" the alleged misrepresentations. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). "[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures," *Lormand*, 565 F.3d at 261, which may be disclosed to the market by third parties. *Id.* at 264. Allegations of partial disclosures "must be viewed together with the totality of the other alleged partial disclosures." *Amedisys*, 769 F.3d at 324.

The SAC alleges that the truth came out through a series of disclosures partially revealing the truth about Core's hosting business. *First*, on September 28, 2022, Celsius filed a motion in Celsius's bankruptcy proceedings ("Celsius Motion"), revealing that Core had imposed pass-through surcharges on Celsius despite the parties' fixed rate agreement. ¶¶169-70. On this news, Core's stock price fell by approximately $0.15 per share, or over 10%. ¶171. *Second*, on October 27, 2022, Core filed a current report with the SEC revealing that the Company was considering bankruptcy due to, among other things, "the increase in electricity costs,… and the litigation with Celsius," and "substantial doubt exists about the Company's ability to continue as a going concern." ¶182. On this news, Core's stock price fell by about $0.79 per share, or over 78%. ¶183.

The Celsius Motion was a partial corrective disclosure that revealed to investors for the first time that, in response to increased power costs that threatened the viability of Core's hosting business, Core was attempting to pass through its increased costs to its hosting customers despite

their fixed-rate contracts. ¶170. This partial corrective disclosure was corroborated by the evidence contained in Celsius's later filing, the objection which included internal Core documents and deposition testimony from Core's executives ("Celsius Objection"). ¶¶173-76.[17] "Viewed collectively, these partial disclosures 'gradually informed the market of the relevant truth'" regarding Core's pass-through surcharge scheme, "and, thus, collectively constitute a corrective disclosure that adequately pleads loss causation." *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *12 (W.D. Tex. May 11, 2023) (Ezra, J.).[18]

In contrast to the Court's finding as to the FAC, Dkt. No. 73 at 42-43, the SAC does not rely on the merits of Celsius' legal claims against Core regarding their contract dispute. Rather, it is the disclosure of the underlying facts revealed in the Celsius Motion, and corroborated by the Celsius Objection, which Plaintiffs allege caused their loss. While the facts revealed in the Celsius filings were "unadjudicated," Dkt. No. 73 at 43, that distinction applies equally to media publications, reports by short sellers or whistleblowers, or analyst questions, the likes of which are regularly accepted as sufficient to allege loss causation. *Amedisys*, 769 F.3d at 322.[19] As controlling Fifth Circuit precedent holds, "[t]o require, … a conclusive [] finding of fraud merely

---

[17] While the Celsius Objection is not alleged as a corrective disclosure, that is only because Core was already in bankruptcy and its stock was delisted. "[N]o stock price drop need accompany the subsequent [corroborating] corrective disclosure." *Rok v. Identiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

[18] That Celsius ultimately settled its claims against Core, Def. Br. at 27, in no way negates the corrective nature of the Celsius Motion, as Celsius did not recant its factual allegations or evidence. Those disclosed facts were the corrective disclosure, which was in no way dependent upon the legality of the contract dispute. ¶170. The settlement was resolved by a transaction entailing Core selling a Texas mining location to Celsius in exchange for cash and the release of claims. Any admission by Celsius was the product of settlement negotiations and carries little probative weight.

[19] The Celsius motion was unlike the allegations in the regulatory lawsuit alleged to be a corrective disclosure in *Genesee Cnty. Employees' Ret. Sys. v. FirstCash Holdings Inc.*, 667 F. Supp. 3d 295, 330 (N.D. Tex. 2023), because as the *Genesee* court repeatedly emphasized, the regulatory lawsuit "ha[d] not advanced past the pleadings stage."

to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." *Id.* at 324-25.[20]

The SAC alleges that the October 2022 "going concern" warning also partially revealed the relevant truth. ¶184. After the Celsius Motion, investors knew that Core's response to its increased power costs involved attempting to impose power cost pass-through charges on its fixed-rate hosting customers and had led directly to the Celsius dispute. Therefore, when Core attributed its insolvency in part to "the increase in electricity costs" and "the litigation with Celsius," it revealed that (1) Core's pass-through scheme had not worked and Core was unable to salvage the profitability of its hosting business, and (2) the ploy had backfired by prompting the Celsius litigation, which contributed materially to Core's insolvency. *Id.*[21]

Finally, Defendants' argument that other factors also partly caused Plaintiffs' losses is misplaced. At the pleading stage, the Court should not weigh a plaintiff's plausible inference of loss causation against competing inferences. *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 906 (W.D. Tex. 2008). Defendants point to the fact that power costs had increased and Core's hosting business had lost money in the second quarter of 2022, Def. Br. at 28, but these facts were revealed

---

[20] Alternatively, the September 28 filing represented a materialization of the risk concealed by Defendants' misrepresentations and omissions. ¶170. The concealed risk was that Core would be unable to salvage the profitability of its hosting business as its fixed-rate customers refused to pay the pass-through charges or left Core altogether, and that risk partially materialized as Celsius disputed the pass-through charges. *Id.* While this Court declined to adopt the materialization-of-the-risk theory, Plaintiffs preserve this argument in the event of an appeal. The Fifth Circuit has held that formal corrective disclosures are not the only means by which a plaintiff can adequately plead that the alleged fraud proximately caused the plaintiff's losses. *Amedisys*, 769 F.3d at 322.

[21] Alternatively, the October 2022 "going concern" warning served as a materialization of the concealed risk that Core would be unable to salvage the profitability of its hosting business with its undisclosed plan to mitigate its increased power costs via pass-through charges and its hosting customers may reject those efforts and terminate their business with Core, and that risk partially materialized as Core was unable to save its hosting business in light of "the increase in electricity costs" and "the litigation with Celsius," contributing materially to Core's insolvency. ¶184.

*prior* to the corrective disclosures and thus cannot explain the stock price drops immediately following the disclosures. Defendants point to no confounding facts revealed at the time of the Celsius Motion that explain the associated stock drop. As to the October disclosure, Plaintiffs need only allege that they "would have been spared all *or an ascertainable portion* of the [] loss absent the fraud." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011) (emphasis in original); *Plagens v. Deckard*, 2023 WL 2711263, at *24 (N.D. Ohio Mar. 30, 2023). Core attributed its insolvency to four factors, two of which were increased electricity costs and the Celsius litigation, which the SAC alleges partially revealed Defendants' fraud. Thus, "it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a substantial amount of price drop." *Amedisys*, 769 F.3d at 320-21.

## F.     The SAC Adequately Alleges Control Person Claims

Plaintiffs allege control person claims against the XPDI Director Defendants under Section 15 of the Securities Act and against the XPDI Director Defendants, Levitt, and Sterling under Section 20(a) of the Exchange Act.[22] To state a control person claim, Plaintiffs must allege: (i) an underlying primary violation; and (ii) that the defendant directly or indirectly possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Control person liability does not require participation in the underlying violation. *Id.* at 958. Courts in this Circuit "apply a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control-person liability." *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *9 (S.D. Tex. Jan. 19, 2016).

---

[22] The XPDI Director Defendants are Defendants Eilers, Brombach, Gaynor, Dabbar, Sullivan, and Widham. ¶47.

29

The SAC alleges sufficient facts to find primary violations by Core for the purposes of control person liability. ¶¶132, 150, 222. As the Court previously held, "the complaint may allege violations by Core, for purposes of control person liability, without seeking to hold Core itself liable for those violations." Dkt. No. 73 at 49. The SAC adequately alleges primary violations.

As to the second element, control, Plaintiffs need allege only "that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014). Plaintiffs allege Defendants' ability to control Core's actions, including their participation in the management and day-to-day operations of Core, access to confidential information, and/or ratification of the challenged statements. ¶¶46-47, 49, 93-96 (XPDI Director Defendants signed the Proxy Statement and approved the Merger), 133-36 (alleging exercises of power by XPDI Director Defendants), 152, 156 (Sterling signed Q2 2022 10-Q), 161 (Levitt and Sterling signed SOX certifications), and 223-25 (detailing exercises of power by Levitt and Sterling). Defendants signed documents containing the alleged misrepresentations and omissions, and/or endorsed those documents by approving and recommending the Merger, thus they had the ability to control the issuance of those documents. A company's directors "who are authorized to sign and do sign the corporation's financial documents and registration statements, are controlling persons." *Enron II*, 258 F. Supp. 2d at 598 and 642 ("Outside Directors' votes relating to corporate business are evidence of their control").

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. To the extent the Court grants Defendants' Motion, Plaintiffs request that the Court grant leave to amend. Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given").

Dated: September 12, 2024

Respectfully submitted,

**CONDON TOBIN SLADEK
THORNTON NERENBERG PLLC**

By: */s/Stuart L. Cochran*
Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700 Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
scochran@condontobin.com

*Liaison Counsel for Lead Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen (*pro hac vice*)
Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (213) 519-5876
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*