**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MEI PANG, Individually and on Behalf of All Others Similarly Situated<br><br>   Plaintiff,<br><br>  v.<br><br>MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING,<br><br>   Defendants. | Case No. 1:22-cv-01191-DAE |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**
**SECOND AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT.....................................................................................................................2

I.      CORE'S BANKRUPTCY PLAN PRECLUDES PLAINTIFFS' CLAIMS........................2

      A.      The Plan's Gatekeeping Injunction Bars Plaintiffs' Claims ...................................2

      B.      The Plan's Third-Party Release Bars Plaintiffs' Claims .......................................3

II.      PLAINTIFFS FAIL TO STATE CLAIMS UNDER SECTIONS 11 AND 14(A)..............6

      A.      Plaintiffs' Section 11 And 14(a) Claims Are Time-Barred ......................................6

      B.      Core's Disclosure Of Its Hosting Margins Defeats Plaintiffs' Claims ...................7

      C.      Plaintiffs Fail To Plead Loss Causation Under Section 14(a) ...............................10

III.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(B)...........................10

CONCLUSION.................................................................................................................15

**Page**

**Cases**

*Andres Holding Corp. v. Villaje Del Rio, Ltd.*,
2010 WL 4117020 (W.D. Tex. Oct. 19, 2010) ............................................................6

*Bayou Fleet, Inc. v. Alexander*,
234 F.3d 852 (5th Cir. 2000) ....................................................................................4

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................................................................14

*Croatan Books, Inc. v. Baliles*,
583 F. Supp. 857 (E.D. Va. 1984) ............................................................................5

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ......................................................................7

*In re Emergency Room Mobile Servs., L.L.C.*,
529 B.R. 676 (N.D. Tex. 2015) ................................................................................3

*Eubanks v. F.D.I.C.*,
977 F.2d 166 (5th Cir. 1992) ................................................................................4, 5

*In re GDC Technics, LLC*,
643 B.R. 417 (Bankr. W.D. Tex. 2022) ..................................................................10

*Harrington v. Purdue Pharma L. P.*,
144 S. Ct. 2071 (2024) ..........................................................................................2, 3

*Howard v. Liquidity Servs., Inc.*,
177 F. Supp. 3d 289 (D.D.C. 2016) ........................................................................12

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*,
537 F.3d 527 (5th Cir. 2008) ..................................................................................12

*Rubenstein ex rel. Jefferies Fin. Grp. v. Adamany*,
2023 WL 6119810 (2d Cir. Sept. 19, 2023) ..........................................................10

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) ....................................................................................9

*KFC Corp. v. Kazi*,
2014 WL 4914427 (W.D. Ky. Sept. 30, 2014) ........................................................4

*In re Kirwan Offices S.à.r.l.*,
　592 B.R. 489 (S.D.N.Y. 2018) ...............................................................................3, 4

*Levinhar v. MDG Med., Inc.*,
　2009 WL 4263211 (Del. Ch. Nov. 24, 2009) ..............................................................5

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
　988 F. Supp. 2d 406 (S.D.N.Y. 2013) .......................................................................12

*In re Patriot Am. Hospitality Sec. Litig.*,
　2001 U.S. Dist. LEXIS 28669 (N.D. Cal. Aug. 17, 2001) ........................................10

*Patterson v. Mahwah Bergen Retail Grp., Inc.*,
　636 B.R. 641 (E.D. Va. 2022) .....................................................................................4

*Republic Supply Co. v. Shoaf*,
　815 F.2d 1046 (5th Cir. 1987) .....................................................................................4

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
　935 F.3d 424 (5th Cir. 2019) ......................................................................................13

*Ret. Sys. v. Chubb Corp.*,
　394 F.3d 126 (3d Cir. 2004) .......................................................................................10

*Sandoz v. Waterdrop Inc.*,
　2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023), *aff'd sub nom. Mi v. Waterdrop*
　*Inc.*, 2024 WL 159191 (2d Cir. Jan. 16, 2024) ...........................................................8

*Stadnick v. Vivint Solar, Inc.*,
　861 F.3d 31 (2d Cir. 2017)........................................................................................8, 9

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
　802 F. Supp. 2d 1125 (C.D. Cal. 2011).......................................................................7

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
　202 F. Supp. 2d 8 (S.D.N.Y. 2001) .............................................................................9

*United States v. Corp. Mgmt., Inc.*,
　78 F.4th 727 (5th Cir. 2023) ....................................................................................6, 7

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
　848 F.3d 366 (5th Cir. 2017) .......................................................................................7

*In re Vrusho*,
　634 B.R. 660 (Bankr. D.N.H. 2021) ............................................................................5

*Williams v. United States*,
　2022 WL 10331389 (S.D. Ga. Aug. 9, 2022)..............................................................6

*In re Zale Corp.*,
  62 F.3d 746 (5th Cir. 1995) .................................................................................................3

## <u>Statute</u>

28 U. S. C. § 158(a) .............................................................................................................3

## <u>Other Authorities</u>

17 CFR § 249.310.................................................................................................................8

46 Am. Jur. 2d Judgments § 532 .........................................................................................5

18A Wright & Miller, Fed. Prac. & Proc. Juris. § 4435 (3d ed.).........................................4

Defendants respectfully submit this Reply in Support of their Motion to Dismiss the SAC[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state causes of action under Sections 11 and 15 of the Securities Act and Sections 10(b), 14(a), and 20(a) of the Exchange Act.

## PRELIMINARY STATEMENT

Plaintiffs allege a scheme by which Defendants, while disclosing that rising power costs posed a fundamental threat to Core's digital asset mining hosting business, conspired to conceal minute details of the consequences of that threat, such as a *single quarter* of hosting margins and the precise manner in which certain customers reacted to Core's new invoicing strategy. Even if these minutiae of Core's hosting business—which accounted for less than *3 percent* of Core's gross profits at the relevant time—were material, Plaintiffs' claims are squarely foreclosed by this Court's prior analysis, Plaintiffs' own admissions, and the terms of Core's bankruptcy Plan.

Rather than offering any new or different loss causation argument to support their doomed Section 10(b) claims, Plaintiffs rely on the same purported corrective disclosures the Court has already rejected. Even if they had adequately alleged an actionable misrepresentation and scienter (they have done neither), Plaintiffs' Section 10(b) claims should be dismissed for the same reasons the Court previously identified. As for the Section 11 and 14(a) claims, even if they were somehow timely despite being filed well after the statute of limitations, Plaintiffs' opposition brief concedes an error in how they are pleaded in the SAC that leaves nothing plausible left. Plaintiffs simply failed to read the purportedly deficient disclosures they cite, which provide the very hosting margins they falsely allege were omitted. In any event, all of Plaintiffs' claims are barred by the plain language of Core's confirmed bankruptcy Plan, which requires that each and every claim "asserted or assertable" in this very case be filed in the Bankruptcy Court.

---

[1] All terms used but not defined herein have the meanings ascribed in Defendants' opening brief.

## ARGUMENT

## I.    CORE'S BANKRUPTCY PLAN PRECLUDES PLAINTIFFS' CLAIMS

### A.    The Plan's Gatekeeping Injunction Bars Plaintiffs' Claims

Plaintiffs concede they have made no attempt to comply with the gatekeeping injunction contained in Core's confirmed bankruptcy Plan (the "Gatekeeping Injunction"). The Plan enjoins any "entity or person" from pursuing any claims "asserted or assertable" in "the Securities Class Action"—*i.e.*, this case—without the Bankruptcy Court's express authorization. Ex. N § 10.5. The Gatekeeping Injunction further confirms that the Bankruptcy Court has "sole and exclusive jurisdiction" both "to determine whether a Claim or Cause of Action is colorable" and "to adjudicate the underlying colorable Claim or Cause of Action." *Id.* The Plan thus bars Plaintiffs from asserting their claims in this Court, warranting dismissal.

Plaintiffs' only response to the Gatekeeping Injunction is to argue (Opp. at 9) that since "[t]he injunction provision is coextensive with the Third Party Releases … to the extent the Third Party Releases do not apply to Plaintiffs, neither does the injunction." But that assumption is incorrect. Unlike the releases, which apply only to "Releasing Parties" who received notice and a chance to opt out, Ex. N § 1.267, the Gatekeeping Injunction does not incorporate the defined term "Releasing Parties" and thus contains no notice requirement. Instead, it flatly prohibits *all* "entities" and "persons" from pursuing enjoined claims without the Bankruptcy Court's authorization.

Lacking any textual justification for their violation of the Gatekeeping Injunction, Plaintiffs claim (Opp. at 9) that it is unlawful under the Supreme Court's recent decision *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024). But expressly "[c]onfining [itself] to the question presented," the Court in *Harrington* held "*only* that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to *discharge* claims against a nondebtor without the consent of affected claimants." *Id.* at 2088;

*accord In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995).[2] That holding has no bearing on the Gatekeeping Injunction, which merely channels claims to the Bankruptcy Court rather than discharging them. Such channeling injunctions are commonplace and authorized by statute. *In re Emergency Room Mobile Servs., L.L.C.*, 529 B.R. 676, 691 (N.D. Tex. 2015).

At any rate, even if Plaintiffs had a plausible argument that the injunction runs afoul of *Harrington*, this is not the proper forum in which to raise it. Rather, Plaintiffs must do so as part of their appeal of the Bankruptcy Court's confirmation order. The Supreme Court has held that "[a] party cannot collaterally attack [a] Bankruptcy Court's Section 105 Injunction in the federal courts" but rather must "appeal 'to the district court for the judicial district in which the bankruptcy judge is serving.'" *Celotex v. Edwards*, 514 U.S. 300, 313 (quoting 28 U. S. C. § 158(a)). Accordingly, this Court should dismiss all of Plaintiffs' claims as barred by the Gatekeeping Injunction.

**B.     The Plan's Third-Party Release Bars Plaintiffs' Claims**

Even if Plaintiffs could escape the Gatekeeping Injunction, their claims were separately released, and that release operates as *res judicata* here. Plaintiffs take issue with two elements of *res judicata* (or "claim preclusion"): (1) a final judgment on the merits and (2) identity of parties. Both arguments fail.

*First*, Plaintiffs argue that the requirement for a "final judgment on the merits" means that releases appearing in a confirmed bankruptcy plan can never be *res judicata* because they "'do[] not address the merits of the claims being released.'" Opp. at 10 (quoting *In re Kirwan Offices S.à.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018)). But this argument was rejected decades ago, including in this Circuit, which has held that "[e]ven where the question of the release … was not

---

[2] Unless otherwise stated, all emphasis is added, and all internal citations are omitted.

actually litigated," so long as "the bankruptcy court, applying bankruptcy law, confirmed the Plan and disposed of [the] liability … in an order that was final and appealable," the release is "a final judgment on the merits" for *res judicata* purposes. *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1053 (5th Cir. 1987); *accord Patterson v. Mahwah Bergen Retail Grp.*, 636 B.R. 641, 670 (E.D. Va. 2022). Plaintiffs' authority is in accord, providing that such releases "effectively cancel[]" the released claims. *Kirwan*, 592 B.R. at 504; *see also* 18A Wright & Miller, Fed. Prac. & Proc. Juris. § 4435 (3d ed.) ("on the merits" is "an unfortunate phrase" because "an entire claim may be precluded by a judgment that does not rest on any examination whatever of the substantive rights asserted").[3]

*Second*, Plaintiffs contend (Opp. at 9) that they were not all "parties" to Core's bankruptcy because only Hoffman filed a proof of claim. But "'a confirmed plan of reorganization is binding upon ***every entity that holds a claim or interest*** even though a holder of a claim or interest … ***has not filed a claim***.'" *Eubanks v. F.D.I.C.*, 977 F.2d 166, 171 (5th Cir. 1992). Accordingly, "[all] creditors and equity security holders are considered parties to [bankruptcy] proceedings for *res judicata* purposes." *KFC Corp. v. Kazi*, 2014 WL 4914427, at *3 (W.D. Ky. Sept. 30, 2014). In

---

[3] Indeed, in numerous contexts, the resolution of claims has claim-preclusive effect even without an adjudication on the particular issues in dispute, such as where the parties embody a settlement in a consent judgment, *e.g.*, *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 858 (5th Cir. 2000), or where a plaintiff twice dismisses a case before an answer is filed, *see* Fed. R. Civ. P. 41(a)(1)(B). Plaintiffs cite nothing to the contrary. *Kirwan* evaluated whether a bankruptcy court acts pursuant to its core or non-core jurisdiction when confirming a plan that includes third-party releases. 592 B.R. at 504. In embracing the former view, the court observed that it was not "address[ing] the merits of the claims being released," which might implicate non-core jurisdiction, but rather "***effectively cancel[ing] those claims***." *Id*. Similarly, in *In re Millennium Lab Holdings II, LLC*, the court's observation that it was not ruling on the merits of the claims being released accompanied its conclusion that it had "constitutional adjudicatory authority" to enter a confirmation order with third-party releases without making findings of fact or law. 575 B.R. 252, 273 (D. Del. Bankr. 2017). Neither court was determining whether "Third-Party Releases [are] *res judicata* for subsequent parties trying to bring the claims," a question already answered in the affirmative by a uniform body of authority. *Patterson*, 636 B.R. at 670; *Shoaf,* 815 F.2d at 1053.

any event, Hoffman was Plaintiffs' "virtual representative" in the bankruptcy, providing "sufficient identity … to apply the principles of res judicata." *Eubanks*, 977 F.2d at 170.[4]

Plaintiffs concede (Opp. at 9-10) that all Defendants were privies of Core and therefore parties to its bankruptcy except those former XPDI directors who never became directors of Core. But even former directors are in privity with the debtor company for *res judicata* purposes. *Levinhar v. MDG Med., Inc.*, 2009 WL 4263211, at \*10 (Del. Ch. Nov. 24, 2009). Moreover, these individuals were still directors and therefore in privity at the time of their alleged unlawful conduct. *Croatan Books, Inc. v. Baliles*, 583 F. Supp. 857, 863 (E.D. Va. 1984) ("privity within the meaning of the doctrine of *res judicata* is privity as it exists in relation to the subject matter of the litigation" (citing 46 Am. Jur. 2d Judgments § 532)). At any rate, those directors who did appear in the bankruptcy acted as their "virtual representative." *Eubanks*, 977 F.2d at 170.

*Finally*, while conceding that all other Plaintiffs received notice of and are thus "subject to" the release, Plaintiffs argue (Opp. at 9) that Downing and Huynh did not. But notice was sent to their attorneys (Ex. CC at 40), and "[t]he general rule in bankruptcy cases, as well as other types of cases, is that notice served upon counsel satisfies any requirement to give notice to the party." *In re Vrusho*, 634 B.R. 660, 668 (Bankr. D.N.H. 2021).[5] At minimum, because Downing and Huynh lack standing as to Plaintiffs' Section 11 and 14(a) claims, and all Plaintiffs with standing as to those claims concededly received notice, those claims should be dismissed.[6]

---

[4] Notwithstanding the Bankruptcy Court's denial of his motion for class treatment (Opp. at 9 n.4), Hoffman had a fiduciary duty and statutory right to act on behalf of the class under the PSLRA.

[5] While it is not clear from the pleadings when Downing and Huynh retained counsel, the SAC was filed just months after the Plan was confirmed. *See* ECF 92-15 (dated Jan. 16, 2024).

[6] While Plaintiffs lodge picayune objections to the sufficiency of the Plan's notice and opt-out scheme (Opp. at 8-9), *res judicata* does not permit this Court to second-guess the merits of the Bankruptcy Court's decision. Similarly, while Plaintiffs suggest (Opp. at 8) that the effect of the Plan on their claims will be "moot" if they prevail on their appeal, they disregard the controlling

## II. PLAINTIFFS FAIL TO STATE CLAIMS UNDER SECTIONS 11 AND 14(A)

### A. Plaintiffs' Section 11 And 14(a) Claims Are Time-Barred

Plaintiffs concede (Opp. at 10-11) that their Section 11 and 14(a) claims are time-barred unless relation back saves them. It does not. While it is true that the new claims, like the old ones, relate in some sense to "the profitability of [Core's] hosting business," *id.*, "[c]ourts have routinely warned that the commonality required for relation back should not be viewed at too high a level of generality." *Williams v. United States*, 2022 WL 10331389, at *8 (S.D. Ga. Aug. 9, 2022), *report and recommendation adopted*, 2022 WL 4482732 (S.D. Ga. Sept. 27, 2022). Accordingly, "relation back is generally improper when, though a new pleading shares some elements in common with the original pleading, it faults the defendant for conduct different than that alleged in the original complaint." *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 743 (5th Cir. 2023).

The alleged conduct here is obviously different. Plaintiffs' current theory is that the Proxy and Registration Statements should have disclosed that Core's hosting margins had been near-zero "over the previous couple of years." ¶ 19.[7] The FAC alleged a completely distinct Item 303 violation based on Defendants' purported failure to disclose the details of Core's efforts to pass through rising power costs to its customers. While both claims touch in some way on the profitability of Core's hosting business, such "surface-level similarity … is not sufficient to support relation back." *Williams*, 2022 WL 10331389, at *8. Likewise, claims do "not relate back" when they "assert[] a new ground for relief supported by facts that differ in both time and type

---

authority establishing that a confirmed plan that is on appeal is still a final judgment for *res judicata* purposes. *Andres Holding Corp. v. Villaje Del Rio, Ltd.*, 2010 WL 4117020, at *2 (W.D. Tex. Oct. 19, 2010). Unless and until they prevail on their appeal, Plaintiffs' claims are released and enjoined. For the same reason, Plaintiffs' argument (Opp. at 9) that the Third-Party Release applies only "to the maximum extent permitted by law," and therefore supposedly not at all, is not properly asserted in this Court.

[7] Citations to "¶ __" refer to the SAC.

from those the original pleading set forth," as is necessarily the case here, where the new claims concern past margins rather than present pass-through efforts. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 382 (5th Cir. 2017).

Plaintiffs cite (Opp. at 11) authority where new securities claims related back to old ones based on the same SEC filings, but those cases involved new claims that concerned either ***the exact same statements*** as the old claims, *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 840-41 (S.D. Tex. 2004), or new information unavailable at the time the original complaint was filed. That is not the case here, and no precedent supports the proposition that any claim based on an SEC filing automatically relates back to any other claim based on the same filing. *E.g.*, *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1133-34 (C.D. Cal. 2011) (no relation back even where "the Original Complaint relate[d] to the same offerings and the same offering materials as the FAC" because "the complaints differ[ed] with respect to the specific facts alleged regarding those offering materials").  That would allow plaintiffs to amend their complaints *ad nauseum* after each successive dismissal by finding a new statement to challenge.

Plaintiffs' new claims accuse Defendants of entirely "different" conduct, *Corp. Mgmt*, 78 F.4th at 743, "assert[] a new ground for relief supported by facts that differ in both time and type," *Vavra*, 848 F.3d at 382, and "differ with respect to the specific facts alleged regarding the offering materials," *Stichting*, 802 F. Supp. 2d at 1133-34.  They do not relate back and are time-barred.

### B. Core's Disclosure Of Its Hosting Margins Defeats Plaintiffs' Claims

The SAC's Section 11 and 14(a) claims turn solely on the allegation that the Proxy and Registration Statements failed to disclose the margins of Core's hosting business "over the last couple of years," *i.e.*, 2020 and 2021. ¶ 113.  But Plaintiffs now concede (Opp. at 14 n.8) that this allegation rested on an "an inadvertent oversight," *i.e.*, their stunning failure, after months of litigation, to actually read the disclosures that they claim support this action.  As Plaintiffs now

admit, Core disclosed its hosting margins for the first nine months of both 2020 and 2021. *Id.* (conceding the purported non-disclosure is now limited to "the fourth quarters of 2020 and 2021").

This means the only conceivable omissions could be Core's hosting margins in the fourth quarters of 2020 and 2021. But Core ***could not have*** disclosed its Q4 2021 margins in the Proxy and Registration Statements, the latter of which was filed just one business day after that quarter closed. It is settled that "a company has no obligation to report its quarterly financial results before they have been finalized." *Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, at *10 (S.D.N.Y. Feb. 3, 2023), *aff'd sub nom. Mi v. Waterdrop Inc.*, 2024 WL 159191 (2d Cir. Jan. 16, 2024) (dismissing claim alleging registration statement improperly omitted financial results for quarter that had closed 36 days earlier). Here, the Registration Statement was declared effective on December 30, 2021—***prior*** to quarter close—and the Proxy Statement was filed on January 3, 2022—just three calendar days after quarter close. It is absurd to suggest Core should have reported its earnings for 2021—a year in which its revenue exceeded $500 million—in that three-day timeframe, especially when it was not required to do so until 90 days after the end of the fiscal year. 17 CFR § 249.310.

Plaintiffs' entire challenge therefore rests on the purported omission of the gross margin of Core's hosting business for ***a single quarter*** in the middle of a 21-month period. Unsurprisingly, Plaintiffs fail to cite any authority premising an Item 303 violation on such a thin reed. Under "the traditional materiality test long employed by courts, including the Supreme Court, in the omission context," the operative question is "whether there is a ***substantial likelihood*** that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having ***significantly*** altered the total mix of information made available." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 37 (2d Cir. 2017). Plaintiffs miss this mark by a mile. While they complain (Opp. at 14) that the Q4 2020 hosting margin of was "over 30% *lower* than the first three quarters of

"2020," it was 38% **higher** than the margin Core disclosed for the first three quarters of 2021. The "omitted" data thus fell in lockstep with the clear downward trend evident from the six surrounding quarters that were disclosed.[8] Especially where the Proxy and Registration Statements contained detailed risk disclosures indicating that Core's hosting business was struggling in the face of rising power costs (Br. at 3-5), and hosting accounted for just **2.9%** of Core's gross profits at the relevant time, *see* ECF 92-2 at F-100, the suggestion that this scintilla of data would have "significantly altered" the "total mix" of information available to an investor considering the Merger is untenable. *Stadnick*, 861 F.3d at 37 (the "omission [a single quarter of data] d[oes] not violate Section 11").[9]

In any event, Plaintiffs' assertion that Core failed to disclose its Q4 2020 hosting margin is simply wrong. That figure can be calculated from data included in the Proxy and Registration Statements,[10] revealing a margin of 8.2%—on trend with the slide in profitability from the first

---

[8] Plaintiffs also ignore that Core had disclosed a hosting margin of 20.2% for 2019. ECF 92-2 at 191. An investor aware that Core's hosting margins had declined from 20% in 2019, to 13% in the first three quarters of 2020, to 5% in the first three quarters of 2021 would be fully informed of the downward trend in that metric even without Q4 2020 data. *Stadnick*, 861 F.3d at 37.

[9] *Accord In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (single quarter decline of 9% in operating income not a "trend" under Item 303); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 221 (5th Cir. 2004) (five-month decline in natural gas prices).

[10] Core's annual financial statements for 2020 disclose that it generated $41.6 million of hosting-related revenue in 2020, which leaves $9.5 million in hosting-related revenue for Q4 2020 after subtracting the revenue from the first three quarters of 2020. *Compare* ECF 92-2 at F-65 *with* ECF 92-2 at F-100. The cost of that revenue—the other number needed to calculate gross margin—is also ascertainable. The Proxy and Registration Statements note that from 2019 to 2020, Core experienced "an increase of $11.0 million in cost of equipment sold" (ECF 92-2 at 188), but because Core recognized no revenue from equipment sales in 2019 (*see* ECF 92-2 at F-65), the cost of revenue associated with equipment sales in 2019 must have been $0 and the cost of revenue associated with equipment sales in 2020 must have been approximately $11.0 million. Subtracting this figure from the $47.9 million cost of revenue for the combined hosting and equipment sales segment in 2020 (ECF 92-2 at 191) yields a cost of revenue for hosting in 2020 of $37 million. Subtracting the cost of hosting revenue for the first three quarters of 2020 (ECF 92-2 at F-100) leaves $8.8 million in hosting costs for Q4 2020. Inputting the hosting revenue ($9.5 million) and cost ($8.8 million) figures yields a gross margin of 8.2% for Q4 2020 ([revenue – cost of revenue] / revenue). This figure is confirmed by Core's later-filed Form 10-K for 2022. Ex. DD at 105.

three quarters of 2020 to the first three quarters of 2021 already clearly reflected in the Registration Statement at F-100. *In re Patriot Am. Hospitality Sec. Litig.*, 2001 U.S. Dist. LEXIS 28669, at *19 (N.D. Cal. Aug. 17, 2001) (no Item 303 claim "where needed information may be derived through calculations of data provided by the corporation").[11]

### C.     Plaintiffs Fail To Plead Loss Causation Under Section 14(a)

Plaintiffs' conclusory assertion (Opp. at 15-16) that they were harmed when Core's stock price declined fails to plead loss causation. The alleged omission pertains to a trend in a specific financial ratio. Plaintiffs fail to explain how the purported non-disclosure of that trend *caused* any subsequent underperformance. *Rubenstein ex rel. Jefferies Fin. Grp. v. Adamany*, 2023 WL 6119810, at *4 (2d Cir. Sept. 19, 2023) (must link alleged statements to asserted economic harm).

### III.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(B)

Plaintiffs fail to adequately allege at least three elements of their Section 10(b) claim.

*Falsity.* Even setting aside Plaintiffs' misplaced reliance upon Celsius' unadjudicated allegations,[12] the SAC lacks any well-pleaded allegation that any of the statements Plaintiffs rely upon were false. Plaintiffs argue (Opp. at 17) that Statement 1 (Core's hosting "customers [were] generally billed on a fixed and recurring basis") is identical to one the Court previously deemed false, but that was before the Court clarified on reconsideration that this statement, whenever made,

---

[11] The heightened pleading standard applicable to Plaintiffs' claims provides still more reason to reject them. Plaintiffs' disavowals of fraud (Opp. at 12-13) are "insufficient to exempt a claim from Rule 9(b)'s requirements 'when the wording and imputations of the complaint are classically associated with fraud,'" alleging facts "rooted in concealing." ECF 73 at 8. Here, Plaintiffs put forth a "core theory of fraud" by alleging Defendants "'conceal[ed] key facts from [Core's] public disclosures until after the merger closed,' and 'conceal[ed] the continued serious deterioration in'" Core's business. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161 (3d Cir. 2004); ¶¶ 21, 104 (alleging Defendants "concealed" Core's hosting margins); Opp. at 13 (similar).

[12] Celsius' allegations cannot be used to establish falsity for the same reason they cannot be used to establish loss causation. *In re GDC Technics, LLC*, 643 B.R. 417, 431 (Bankr. W.D. Tex. 2022) (creditor could not rely on unadjudicated allegations from another matter to support fraud claim).

is not actionable under a "future plans" theory. ECF 86 at 10-12. Without the "future plans" theory, what remains is a "literally truthful" statement. ECF 73 at 15. Plaintiffs claim (Opp. at 18) that the Court has "rejected" the argument that the "generally" caveat renders the statement true, but that prior reasoning was bound up in the Court's reliance upon the "future plans" theory. *See* ECF 73 at 15 ("Plaintiffs pled with particularity that Statement 5 is misleading because 'generally' is not sufficient when, behind closed doors, the company had *plans* to divert from fixed rates."). Plaintiffs still have not alleged that Core's customers were not "generally" billed on a fixed basis as of August 2022.

Statement 2 (rising power costs "will" impact Core's ability to attract hosting customers) is, likewise, literally true. While Plaintiffs wrongly assert (Opp. at 19) that the Court previously deemed it actionable, the Court in fact there appears to have been analyzing what the SAC calls Statement 1.[13] And contrary to Plaintiffs' suggestion (Opp. at 18-19) that the timing of Statement 2 renders it actionable, Plaintiffs still have not addressed the "analytical gap" between the risk disclosure (that rising power costs could harm Core's hosting business) and the purported omission (the alleged pass-through charges). ECF 73 at 11-12. As the Court already found, nothing in Statement 2 "refer[s] to fixed rates or to Core's business model for hosting contracts." *Id.* at 12.[14]

Moreover, whether framed as a nonculpable inference (Opp. at 24-25) or as an alternative

---

[13]   *See* ECF 73 at 27 ("For reasons explained above, the Court finds it was not enough to discuss ***the fixed pricing*** without letting investors know of their attempt to foist pass through costs onto their customers."); *id.* at 26 (bolding only the language identical to SAC Statement 1).

[14]   Plaintiffs have never "bridge[d] [this] analytical gap" (*id.*) because rising power costs were always the fundamental underlying risk to Core's hosting business. Plaintiffs focus myopically on the *manner* in which this unavoidable and disclosed risk affected Core's bottom line—*i.e.*, whether Core would subsidize customers' uneconomical mining activity or face reduced revenue from their scaled-back activities should they be forced to bear their own power costs—without addressing its inevitable impact regardless of what action Core took. They identify no statement that would have left investors with the misleading impression Core could defy economic realities to "save its hosting business" (Opp. at 18) should the identified risk materialize.

interpretation of the statements, Statements 2 and 4 are not actionably misleading. Statement 4 is immediately preceded by this sentence: "We will no longer take on hosting business that is not sufficiently profitable from day 1." ¶ 163. Thus contextualized, Statement 4 can only be read to refer to the acquisition of new hosting customers in the future, and cannot be misleading with respect to existing accounts as alleged by Plaintiffs. *See* ¶ 164. The same is true of Statement 2, which is phrased in the future tense ("*will* impact our ability *to attract* customers"). ¶ 159.

Finally, Plaintiffs concede (Opp. at 19) that the actionability of the SOX certifications (Statement 3) rises or falls on the falsity of at least one of Statements 1 or 2, neither of which is materially false. Br. at 20.

In any event, even if the at-issue statements were false, none would have been material to an investor aware that only *2.9%* of Core's gross profits at the relevant time came from hosting. *See* ECF 92-2 at F-100; *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 422-23 (S.D.N.Y. 2013) ("Where misstatements implicate less than 5% of an entity's revenue, the misstatements are not likely to be material."); *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 310 (D.D.C. 2016) ("information regarding a small business segment that is unlikely to affect the future of the entire company is generally not material"). Plaintiffs' claims fail for lack of falsity and materiality.

*Scienter.* The Court previously held that the FAC failed to adequately allege scienter. *See* ECF 73 at 35-36. Plaintiffs attempt (¶¶ 51-52, 201, 203) to remedy this defect by adding allegations sourced from two new confidential witnesses alleged to have been Core employees. But in the Fifth Circuit, "courts must discount allegations from confidential sources." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 535 (5th Cir. 2008). And even if credited, the confidential witness statements do not fill the gaps identified by the Court.

As explained (Br. at 22), the new allegations do not connect *Levitt* or *Sterling* to purported pushback by Core's auditor, Ernst & Young ("EY"). The Opposition concedes that gap in the scienter allegations by continuing to rely (Opp. at 21) on what EY allegedly "told *Core*." Plaintiffs' failure to "allege with specificity [] who in the company was actually aware of EY's alleged recommendations" or "chose to ignore the supposed advice" (ECF 73 at 35) is fatal to their scienter theory because EY's guidance is the only basis upon which they allege Levitt and Sterling should have concluded Core's new invoicing strategy was improper. *Id.* at 38.

Even if credited, all the confidential witness statements create is a vague inference that Levitt and Sterling *may* have been aware of customer pushback related to Core's new invoicing methodology. *See* Br. at 23-24. That would not equate to knowledge "that pass-through costs were improper" (ECF 73 at 38). And, as the Court previously noted (*id.* at 39-40), the suggestion that Defendants sought to conceal the purported customer pushback from investors is undercut by Core's disclosure in its 22Q2 10-Q that Celsius was likely to challenge the new invoicing approach.

Moreover, Plaintiffs' allegations from FE2 (¶ 201) are fatally lacking in specificity as to the who, what, when, where, or why related to the meeting(s) allegedly attended by Levitt *after* the new invoicing approach took effect. *See Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 433 (5th Cir. 2019) (rejecting "amorphous" allegations of meetings at which CEO was informed of unspecified "inventory problems").[15] The allegations derived from FE3 likewise fail as a matter of law. Br. at 24. Plaintiffs attempt (Opp. at 22 n.14) to distinguish authority holding that a confidential witness's "hearsay-within-hearsay" is insufficient to establish scienter at the pleading stage on the basis that FE3's allegations have purportedly been corroborated by

---

[15] FE2's allegations as to Sterling concern meetings alleged to have occurred *before* Core implemented its new invoicing approach, and thus logically cannot support an inference of scienter.

13

others. Plaintiffs cite no authority supporting that distinction, especially where the purportedly "corroborating" evidence consists of other disfavored confidential witness statements.[16]

Having failed to directly connect Defendants to facts establishing scienter, Plaintiffs resort (Opp. at 23-24) to relitigating the applicability of the "core operations" doctrine. The Court previously considered and rejected the application of that doctrine in this case (ECF 73 at 36-39), and Plaintiffs have failed to plead any new allegations relevant to that analysis.

Instead, Plaintiffs cite a single non-binding decision involving materially different allegations. The defendant in *Carlton v. Cannon*, 184 F. Supp. 3d 428 (S.D. Tex. 2016), was a pre-revenue start-up with a single product under development and a single production facility. *Id.* at 446. Core, by contrast, had multiple business lines with data centers scattered across numerous states (¶ 79) that, as of Q1 2022, were generating nearly $200 million in revenue *per quarter*, of which hosting represented less than 15%. ECF 92-5 at 58. Indeed, the evidence from another proceeding that Plaintiffs repeatedly cite (¶¶ 101-03, 176) further confirms that hosting never represented a meaningful profit driver for Core. Far from the "one-trick pony" defendant in *Carlton* (184 F. Supp. 3d at 484), Core's operations were significantly more complex and varied than the companies to which the Fifth Circuit has applied this narrow exception. Plaintiffs have identified no compelling reason why the Court should disturb its prior holding.

***Loss Causation.*** Plaintiffs concede (Opp. at 25-29) that they have not alleged ***any*** new purported corrective disclosures beyond those the Court already rejected, but rather merely seek to relitigate those same disclosures. Their arguments are unavailing. The Court previously declined (ECF 73 at 42) to credit assertions in a motion filed by Celsius against Core in Celsius's

---

[16] As the Court previously found, the absence of stock sales by Defendants further undercuts any inference of scienter. Plaintiffs' argument (Opp. 25) that motive is not strictly ***required*** to sustain a Section 10(b) claim is irrelevant. The Court did not suggest motive must be alleged in all cases.

bankruptcy on the ground that "a corrective disclosure that is entirely based on another party's allegation in a separate suit does not pass muster."[17]  Straining to avoid that ruling, Plaintiffs claim (Opp. at 27) that the FAC somehow relied on "the merits of Celsius' legal claims against Core" whereas the SAC relies on "the underlying facts revealed in the Celsius motion."  That is wrong. The FAC relied extensively upon purported "facts" drawn from the Celsius motion.  In reality, nothing has changed, except that Celsius has now abandoned its motion and acknowledged "Core was contractually entitled to pass through power costs to Celsius."  Br. at 6-7.  Plaintiffs' contention that the Celsius motion's value as a corrective disclosure is somehow different with respect to the SAC defies logic and conflicts with the Court's careful reasoning.[18]

Similarly, Plaintiffs identify no reason the Court should abandon its previous rejection of the "going concern" warning in Core's October 2022 Form 8-K as a corrective disclosure.  Nothing in the SAC cures the "disconnect between the facts allegedly concealed"—that Core had been attempting to pass-through rising power costs to customers—"and the purported corrective disclosures," which merely "reiterate[d] many of the risks disclosed in [Core's] prior public statements," such as rising power costs, declining Bitcoin prices, and the Celsius litigation. ECF 73 at 43.  The Court's reasoning and analysis regarding loss causation remain entirely intact, and it should dismiss Plaintiffs' Section 10(b) claims on this ground.[19]

## CONCLUSION

Plaintiffs' Second Amended Complaint should be dismissed in its entirety with prejudice.

---

[17] While Plaintiffs note that the case the Court cited in support of this proposition involved a lawsuit still at the pleading stage, the Court in fact already rejected that distinction.  ECF 73 at 43.

[18] Plaintiffs argue (Opp. at 27) that the Celsius motion was "corroborated" by later filings, but that same evidence was cited by Plaintiffs in the FAC (at ¶¶ 123, 236) and did not sway the Court.

[19] For the reasons discussed above, Plaintiffs fail to plead a primary violation.  Accordingly, their control person claims necessarily fail.  *See* Br. at 29.

Dated: October 21, 2024

Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: */s/ John Bash*
John F. Bash
Texas Bar I.D. 24067504
Evan Z. Pearson
Texas Bar I.D. 24121403
300 W. Sixth Street, Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100
Facsimile: (737) 667-6110
johnbash@quinnemanuel.com
evanpearson@quinnemanuel.com

John B. Quinn (*pro hac vice)*
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
johnquinn@quinnemanuel.com

Jesse Bernstein (*pro hac vice)*
Brenna Nelinson (*pro hac vice*)
Peter M. Collins (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
petercollins@quinnemanuel.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ John Bash*
John Bash